# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| INTERNATIONAL PROFIT ASSOCIATES, INC. | ) ) ) |
| Defendant. | ) ) |

Case No. 01 C 4427

Judge Joan B. Gottschall

## MEMORANDUM OPINION AND ORDER

Defendant International Profit Associates, Inc. ("IPA") has moved for summary judgment against individual claimants Nos. 6, 65, 89, 93, 99, and 170 in this class action suit brought by the Equal Employment Opportunity Commission (the "EEOC"). For the reasons set forth below, IPA's motions for summary judgment with respect to Claimants Nos. 89, 99, and 170 are granted. IPA's motions for summary judgment with respect to Claimants No. 6, 65, and 93 are denied.

### I. BACKGROUND

Pursuant to the court's memorandum opinion and order of October 23, 2007 (the "October 23rd Order"), this case has been bifurcated into two phases. *See E.E.O.C. v. Int'l Profit Assocs., Inc.*, No. 1 C 4427, 2007 WL 3120069, at *17 (N.D. Ill. Oct. 23, 2007). In Phase I, the EEOC must establish by a preponderance of the evidence that the sexual harassment that occurred at IPA during the relevant time period, taken as a whole, was so severe or pervasive that a reasonable woman would find the work environment at

1

IPA to be hostile or abusive. *Id.* Furthermore, the EEOC must also demonstrate that IPA knew, or should have known, that regular or systematic sexual harassment was occurring in its offices but did not take adequate steps to address the problem. *Id.* A finding in the EEOC's favor at Phase I will allow the court to award prospective relief under *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335-36 (1977), and the court will then proceed to Phase II. *Int'l Profit Assocs.*, *Inc.*, 2007 WL 3120069, at *17.

In Phase II, the EEOC will be required to prove, by a preponderance of the evidence, that each individual claimant who seeks monetary damages experienced sex-based harassment that an objectively reasonable woman would find severe or pervasive enough to constitute a hostile work environment. *Id.* The EEOC must also demonstrate that each claimant subjectively perceived the harassment she experienced to be hostile or abusive. *Id.* The burden of production on the negligence element of the individual class members' claims, however, will be shifted to IPA if the jury returns a verdict in the EEOC's favor at the pattern or practice phase. *Id.* If IPA comes forward with evidence demonstrating that it was not negligent with respect to a particular class member, the burden will shift back to the EEOC to demonstrate that the steps IPA took were inadequate. *Id.* If the harassment any individual claimant experienced was perpetrated by a supervisor, rather than a co-worker, IPA will bear the burden of establishing an affirmative defense to its liability for the supervisor's harassment, if applicable. If IPA cannot do so, it will be held strictly liable for such harassment so long as the EEOC meets its burden with respect to the other elements. *Id.*

The EEOC must also make individual showings with respect to the amount of compensatory and punitive damages to which each claimant is entitled. *Id.* If punitive

damages are awarded, the court will closely examine each award to ensure that the parameters of *BMW v. Gore*, 517 U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), as prescribed in the October 23rd Order, are met. *Id.*

## II. ANALYSIS

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to avoid summary judgment, the nonmoving party (the EEOC in the instant case) is required to set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Furthermore, it must produce more than a scintilla of evidence in support of its position. S*ee Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, summary judgment standards are applied with greater scrutiny in employment discrimination cases, in which intent and credibility are crucial issues. *See Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998).

In the instant case, the court will approach each motion for summary judgment with respect to an individual claimant as though the court has already found in Phase I that the EEOC has proved (by a preponderance of the evidence) that sexual harassment occurred at IPA during the relevant time period and, taken as a whole, it was so severe or pervasive that a reasonable woman would find the work environment at IPA to be hostile or abusive. Furthermore, the court will presume that the EEOC has also demonstrated that IPA knew, or should have known, that regular or systematic sexual harassment was occurring in its offices but did not take adequate steps to address the problem. To succeed in its instant motions for summary judgment with respect to each of the

individual claimants, IPA must demonstrate that there is no genuine issue of material fact concerning: (1) whether each claimant experienced sex-based harassment that an objectively reasonable woman would find severe or pervasive enough to constitute a hostile work environment; and (2) whether each claimant subjectively perceived the harassment she experienced to be hostile or abusive. Since the latter burden is not an onerous one, it is the former upon which the court will focus its analysis.

As an initial matter, the EEOC argues that because (for purposes of these motions for summary judgment) the court presumes that IPA has been found liable for maintaining a pattern or practice of severe and pervasive sexual harassment to which its female workers were collectively subjected, the analysis of the individual claimant's claims is different from that of a woman filing an individual claim. The EEOC suggests, by way of example, that an inference that a certain behavior constitutes a sexual proposition might be reasonable under the court's analysis in the present circumstances whereas it might be unreasonable in an individual suit.

Title VII's prohibition against discrimination in employment on the basis of sex encompasses sexual harassment that is sufficiently severe or pervasive so as to alter the employee's terms or conditions of employment. *See Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 73 (1986); *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7th Cir. 2007); *see also Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("One of the ways in which Title VII's prohibition against sex discrimination in the terms and conditions of employment may be violated is through sexual harassment that is either severe or pervasive enough to create an abusive working environment"). The test for determining whether sexual harassment has reached the point of affecting terms and

conditions of employment inquires whether the complaining person: (1) was subject to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on his or her sex; (3) the harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability. *Benders v. Bellows and Bellows*, 515 F.3d 757, 768 (7th Cir. 2008); *Valentine v. City of Chicago*, 452 F.3d 670, 677 (7th Cir. 2006); *see also Bernier*, 495 F.3d at 373. The court presumes that the claimant, for the purposes of this motion for summary judgment, has prevailed in Phase I, and therefore the claimant's burden of meeting the requirements for establishing employer liability, as described above in element (4) has already been satisfied.[1]

The court's October 23rd order establishes that each claimant bears the burden of individually establishing that she was subject to sexual harassment under both the objective and subjective standards recited above. However, that does not mean that the court, when examining the nature and severity of the harassment claims of each claimant in Phase II, must turn a blind eye to the findings of Phase I concerning the existence of pervasive and severe hostile environment. If a claimant has been exposed to all or most of the incidents proven by the EEOC in Phase I, that claimant will have little or no burden on the objectively severe and pervasive element in Phase II. Furthermore, even if an individual claimant was not the direct object of a sexually harassing act, but was

---

[1] A plaintiff attempting to hold her employer liable for the actions of a co-worker, "bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that the employer did not act reasonably to equalize working conditions once it had knowledge." *Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005)

5

subject to an atmosphere that was objectively and subjectively sufficiently hostile so as to alter the working environment, that may be enough, in the context of the workplace environment established in Phase I, to survive a motion for summary judgment.

Incidents directed at others and not at the claimant have relevance in demonstrating the existence of a hostile work environment. *Gleason v. Mesirow Fin. Corp.*, 118 F.3d 1134, 1144 (7th Cir. 1997); *see also Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995). An individual could be in the "target area" of harassment, i.e., a member of a group being vilified, even if not singled out, and, if the harassment is sufficiently severe and pervasive, still bring an actionable claim of sexual harassment. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007). Target area harassment, as defined by the Seventh Circuit, need not include an intention of causing distress or offense. *Id.* A working environment may be deeply offensive or hurtful to women "even though the men who created it were merely trying to please themselves and were thus guilty of insensitivity rather than aggression." *Id.*; *see also Markham v. White*, 172 F.3d 4486, 492 (7th Cir. 1999). Although the severity and pervasiveness of the alleged hostile work environment must be viewed in the totality of the circumstances, the creation of a hostile work environment is actionable under Title VII when the hostility is to a group (or specific members of a group), such as women, who are protected by the statute. *Yuknis*, 481 F.3d at 554.

**A. Defendant No. 6**

Defendant No. 6 ("No. 6") was employed in the Inside Sales Department at IPA for approximately six weeks from November to mid-December 2000. During her orientation at IPA, No. 6, who was the only woman present, claims that she was

subjected to offensively sexist language concerning the inability of women to make up their minds, and references to another woman (not present) as a "bitch." Subsequently, No. 6 alleges that she frequently overheard male co-workers talking among themselves about the various physical attributes of sundry "hot babes" of their acquaintance. According to No. 6, one man, allegedly a star performer in the Sales Department, was in the habit of yelling "fucker, cock-sucking bitch, cunt, whore" whenever a prospective client turned him down (presumably not at the prospective client); this could happen several times a day. No. 6's complaints about this behavior to her supervisor allegedly went unheeded.

Furthermore, No. 6 claims that one of her supervisors, Richard Gottleib ("Gottleib"), routinely stared at her breasts during their frequent office meetings. Gottleib also allegedly once massaged her shoulders and neck (from which she quickly recoiled), wondered aloud how she would look in a dress, asked her to wear a dress to work, and also asked her to bring him a picture of herself.

Because the IPA company policy against smoking was allegedly not enforced in the Sales Department, No. 6 took to wearing a portable air purifier about her neck. At one point, Gottleib allegedly grabbed the device and inhaled from it; in doing so he allegedly touched No. 6 and placed his head inappropriately close to No. 6's *poitrine*. No. 6 complained of Gottleib's behavior to the Human Resources Dept., which acknowledged that Gottleib's behavior was inappropriate and stated that Gottleib had been talked to before concerning his actions.

In one of the more bizarre episodes related by No. 6, a male co-worker allegedly dropped his pants to his knees for a minute or two in a room full of people. When No. 6

inquired as to what he was doing, he stated that he was tucking in his shirt and that he "didn't know anybody was here." No. 6 complained of this behavior to Human Resources as well.

Finally, No. 6 alleges that Tony Jones ("Jones") (another supervisor) and his fiancée, who was also an employee, engaged in frequent "heavy kissing and necking" in the middle of the office while other employees were making phone calls and working. No 6 contends that Jones' fiancée would spend only 20 or 30 minutes in the office (much of that time in the throes of passion with Jones) and yet ended up with six sales, when others in the Sales Department had to work longer and harder to achieve similar results. According to No. 6, the fiancée was given the best leads as a result of her romantic relationship with Jones.

"There is no bright-line test for determining when a workplace becomes objectively hostile. There are, however, a number of factors courts must consider, 'including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work.'" *Valentine*, 452 F.3d at 681 (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004)). In the case of discriminatory statements, the court must assess the frequency of their use, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).

With respect to No. 6's complaints, the totality of the circumstances, when combined with a Phase I finding of a severe and pervasive hostile work environment, provides a sufficient combination of target area harassment combined with actions

directed against No. 6 to provide a genuine issue of material fact concerning whether she experienced sex-based harassment that an objectively reasonable woman would find severe or pervasive enough to constitute a hostile work environment. Her co-workers' comments about their amorous exploits, and their use of offensive language including vulgarities with sexual content, while obnoxious and contemptible, were not directed at No. 6, but certainly fall within the target area of sexual harassment. *Yuknis*, 481 F.3d at 554. Likewise, the bizarre "dropped trouser" incident was not aimed directly at No. 6 but could be found to be objectively offensive to a reasonable woman, when taken in the context of a severe and pervasive hostile work environment.

The behavior of Gottleib presents an instance of an act directed against No.6. The two touching incidents that No. 6 describes (the air purifier grab-and-sniff and the abortive neck massage) were not directly sexual, nor were they directly threatening or repeated. However, given a pervasive and severely hostile workplace environment, such acts reasonably establish a genuine issue of material fact as to whether a reasonable woman would find these acts, in conjunction with the others listed above, as constituting sexual harassment.

In evaluating the objective offensiveness of a plaintiff's work environment, the court must consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). Taken as a whole, and in the context of what the court must presume the EEOC has proven in Phase I for purposes of this motion, these incidents create a genuine issue of material fact as to whether a reasonable woman would have

found them to be so pervasive or severe so as to create an objectively hostile workplace environment. The court consequently denies IPA's motion for summary judgment with respect to No. 6.

**B. Claimant No. 65**

Claimant No. 65 ("No. 65") worked in the Inside Sales Department of IPA for approximately four weeks from June 8, 2000 through July 6, 2000. As was the case with No. 6, No. 65 claims she was subjected daily to hearing her male co-workers talk amongst themselves about their various sexual exploits. Furthermore, some of her co-workers commented on the perfume she was wearing, and one said "That's a hot suit you have," in an allegedly suggestive manner.

No 65 also related that a supervisor put an arm around her shoulder and told her that he would "show her the ropes." No. 65 alleges that this occurred immediately after the same supervisor had been discussing his sex life with another co-worker, and that she felt that he was insinuating that she would have to have sex with someone to "learn the ropes." No. 65 thus claims that the offer was tantamount to a sexual proposition.

No. 65 cites *Quantock v. Shared Marketing Services, Inc.* in support of her contention that the alleged proposition constitutes conduct sufficiently severe and pervasive as to alter the conditions of employment. 312 F.3d 899, 904 (7th Cir. 2002). No. 65's case, however, is distinguishable from *Quantock*. In that case, a supervisor made multiple explicit demands directly to the plaintiff for various specific sex acts. *Id.* at 904. Moreover, the same supervisor had some time previously "also grabbed her breasts and forcibly kissed her." *Id.* at 902. The Seventh Circuit found that this behavior was considerably more "severe" than the type of "occasional vulgar banter, tinged with

sexual innuendo" that had been deemed to fall short of the hostile workplace standard. *Id.* (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)) (finding that three sexually suggestive comments by a co-worker did not unreasonably interfere with the plaintiff's working environment).

The court finds that, standing by itself, the remark made by No. 65's supervisor falls more into the category of "sexually suggestive" comments and fails to rise to the level of pervasive and severe conduct that substantially alters the conditions of employment. However, given the totality of the circumstances, i.e., a finding in Phase I that the level of hostility in the work environment at IPA was pervasive and severe, and her co-workers' continuous bragging about their sexual experiences, there is a genuine issue of material fact as to whether No. 65 was objectively subjected to a hostile work environment. IPA's motion for summary judgment with respect to No. 65 is consequently denied.

**C. Claimant No. 89**

Claimant No. 89 ("No. 89") was employed at IPA for approximately two weeks in January, 2001. No. 89 claims that she saw an unidentified male and female employee flirt with each other and overheard the male employee address the female employee as "honey" and "sweetie." No. 89 also claims that she saw 3-4 pictures in the cubicles of other employees depicting females seductively posed in bikinis. She claims that she overheard male employees referring to women by using the word "bitch" when speaking to each other, although she states that she was never addressed as "bitch."[2] No. 89 further claims that she observed unidentified female employees being patted on the

---

[2] For example, No. 89 allegedly heard male managers use expressions such as "I fucked that bitch last night," "That bitch made me mad," That bitch gets on my nerves, man," and "Man, fuck that bitch."

buttocks by unidentified male employees. Finally, No. 89 claims that she saw graffiti on the walls of two cubicles with the words "bitch" and "fuck."

The presence of pornography in a work place can be one factor courts may consider as part of a hostile work environment claim. *See, e.g., Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (actionable sexual harassment may include exposure to pornographic pictures); *Greene v. A. Duie Pyle, Inc.*, 371 F. Supp. 2d 759, 762 (D. Md. 2005). However, it is unlikely that a calendar or poster featuring women in bikinis, which can be purchased in almost any major chain bookstore, achieves the level of prurience required to constitute "pornography." No. 89 claimed that although she could see the women's breasts, they were all wearing "garments" and that their nipples were not visible. Moreover, her male coworkers' comments about "bitches," not addressed to No. 89, appear to be less "uninvited sexual solicitations; intimidating words or acts; obscene language or gestures," than "vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville*, 50 F.3d at 430. As such, a reasonable jury could not find that there is sufficient evidence to find that No. 89 was subjected to sexual harassment through a hostile work environment. IPA's motion for summary judgment with respect to No. 89 is consequently granted.

**D. Claimant No. 93**

Claimant No. 93 ("No. 93") makes a number of allegations similar to the other claimants above, but alleges sufficient additional facts to establish a hostile workplace environment. No. 93 alleges that her managers, Fedel St. James ("St. James") and John Bear ("Bear") made numerous comments about how sexy they found her legs, including the comment that No. 93 should "come up and wrap them around me." Even more

seriously, No. 93 alleges that on one occasion a male co-worker approached her from behind and grabbed her buttocks in front of other employees while she was retrieving a soda from a machine. No. 93 also claims that another male rubbed his arm against her buttocks on another occasion. Another male also once asked No. 93 if she would be interested in working for his brother's stripping business. As a result of these incidents, No. 93 averred that she "felt like red meat to a pack of wolves."

IPA cites *Adusumilli* in support of its argument that even the intentional grabbing of No. 93's buttocks was not sufficiently serious to create a hostile work environment. 164 F.3d at 362. However, the touching incident in *Adusumilli* took the form of "relatively mild form of a poke and occurred only once." *Id.* In the instant case, the act was repeated and was designed to sexually humiliate No. 93 in front of her coworkers. Although acts that are "too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex" fall within the "safe harbor" established by the Seventh Circuit, the court finds that these egregious acts, combined with the crude sexual invitations addressed directly to No. 93, cause IPA's argument to founder short of the harbor entrance. *See Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996). Harassment need not be severe *and* pervasive to impose liability; one or the other will do. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). Even a single act of harassment will suffice if it is egregious. *See Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999) (single egregious act sufficient to establish hostile work environment); *DiCenso v. Cisneros*, 96 F.3d 1004, 1009 (7th Cir. 1996); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273-74 & n. 4 (7th Cir. 1991); *King v. Board of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir.

1990); *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180, 1186-87 (7th Cir. 1986); s*ee also Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 464 (7th Cir. 1990) (implicitly assuming that a single act is sufficient to establish a hostile work environment).

The behavior described by No. 93 was repeated and egregious. A reasonable jury could therefore find that these acts constituted a hostile work environment and IPA's motion to for summary judgment with respect to No. 93 is consequently denied.

**E.  Claimant No. 99**

Claimant No. 99 ("No. 99") was 62 year old grandmother when she worked at IPA for two or three months as a Business Coordinator. No. 99 claims that she heard unnamed female employees at IPA set up dates with unnamed male "bosses" to meet in the IPA parking lot and have sex in their vehicles. No. 99 believes that the women who made such dates were "favored" by the bosses, "got away with murder," and had "certain privileges," including coming and going from work when they pleased and receiving credit for more sales than they had actually made. No. 99 avers that she did not receive credit for two client appointments that she made while at IPA.[3] No. 99 further claims that there were frequent, explicit, sexually-oriented conversations between male managers and female employees, innuendo-laden inquiries by male employees asking if female employees were going to "work late", and frequent touching of female employees by the males, some of which she believes was unwelcome. No 99 states that she was uncomfortable, disgusted, and offended by the sexually inappropriate behavior that she witnessed.

---

[3] No. 99 does not adduce any facts indicating how serious were the consequences of IPA's failure to credit her for the two client appointments, nor whether it otherwise affected her earnings or her position in the workplace.

However, No. 99 denied experiencing, witnessing, or being aware of any sexual harassment at IPA directed against her. Moreover, No. 99 does not state that she complained to IPA managers concerning the behavior. Basically, No. 99 contends that the young female workers who were sexually compliant received favored treatment by IPA, whereas she did not.

No. 99's claim fails because she cannot demonstrate that the alleged severe and pervasive hostile work environment resulted from any actions that were directed against her because of her sex. To succeed in her claim, No. 99 must establish that: "she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006). No. 99 adduces no facts to suggest that she was "subjected to unwelcome sexual conduct, advances or requests" because of her sex, as she does not claim that she was the subject of any of the behavior she witnessed or that any of the behaviors were based upon her sex. *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008).

Furthermore, No. 99 cannot legitimately claim that she was in the target area of the offensive conduct because of her gender: a 62-year old man might well have been equally offended by the sexual shenanigans of the younger workers in the IPA workplace and, more importantly, would certainly have been equally disadvantaged if the male IPA managers were favoring their young female paramours. "The fact that one's coworkers do or say things that offend one, however deeply, does not amount to harassment if one is not within the target area of the offending conduct." *Yuknis*, 481 F.3d at 554.

Furthermore, words having sexual content or connotation do not automatically constitute discrimination that is actionable under Title VII. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 24 (1993)).

Defining the target area is always context-dependent, but although the alleged flirtations and assignations between co-workers may have contributed to establishing a hostile work environment, they do not achieve the threshold of being so pervasive and severe so as to alter the conditions of employment. *Yuknis*, 481 F.3d at 555. The more remote or indirect the act claimed to create a hostile working environment, the more remote the inference that the worker's working environment was actually made unbearable. *Id.* No. 99's allegations are too attenuated from that standard to withstand a motion for summary judgment. With the perhaps the exception of her single allegation that she failed to receive credit for two client appointments, No. 99 cannot demonstrate that she was the result of sexual discrimination directed at her because of her gender or that pervasive and severe harassment substantially altered the conditions of her employment. No. 99 does not claim that any sexually offensive behavior was directed at her and, although she is a woman, her relation to the alleged harassing behavior is too remote to withstand a motion for summary judgment.

Because she does not allege any facts to support her argument that she was subjected to a hostile work environment because of her sex, IPA's motion for summary judgment is granted with respect to No. 99.

16

### F. Claimant No. 170

Claimant No. 170 ("No. 170") worked at IPA for four to six months in 2003. While employed at IPA, according to No. 170, she was subjected to inappropriate comments from her zone manager, Lucas Newhouse ("Newhouse"), on a daily basis. Many of these comments were along the lines of "Act like a whore and you'll get appointments" and "Sell what you have to sell to get appointments." At a zone meeting on July 7, 2003, Newhouse made derogatory comments, including "You fucking act like whores and – and sell, sell, sell." Newhouse also addressed the workers as "fucking stupid" and "fucking losers" No 170 did not understand these comments to be directed at the men in her zone, although men were present when Newhouse spoke. That same day, No. 170 complained of Newhouse's behavior to the Human Resources Department and both she and Newhouse were shortly thereafter transferred to other zones and Newhouse was possibly demoted. No. 170 stated that she was satisfied with IPA's response in this regard.

No. 170 also iterates the same factual allegations as No. 99 concerning sexual interactions among co-workers at IPA (i.e., hugging, touching, going out to cars at lunchtime). The only incident that she reports was directed at her (other than the comments made by Newhouse) was when a male co-worker put his arm around her and said "Hey, baby, how you doing?" However, after No. 170 promptly removed his arm from around her, the individual did not bother her again.

No. 170's complaint about Newhouse was addressed by IPA and the problem solved: No. 170 expressed satisfaction with the way IPA responded and she had no further interactions with Newhouse after the July 7, 2003 incident. Title VII requires

only that the employer take steps reasonably likely to stop reported harassment, and this IPA apparently did, to No. 170's satisfaction. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). In *Saxton*, the Seventh Circuit upheld the district court's finding that uncontested evidence, submitted by the defendant, of corrective action that was "reasonably likely to prevent the misconduct from recurring" was sufficient to support a motion for summary judgment. 10 F.3d at 532; *Saxton v. American Tel. & Tel. Co.*, 785 F. Supp. 760, 767 (N.D. Ill. 1992) (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990)). As outlined above, the other incidents described by No. 170 do not rise to a level of harassment, even when combined with a Phase I finding against IPA, that is sufficiently pervasive and severe "to alter the conditions of [No. 170's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67. IPA's motion for summary judgment with respect to No. 170 is consequently granted.

### III. CONCLUSION

For the reasons set forth above, IPA's motions for summary judgment with respect to Claimants Nos. 89, 99, and 170 are granted. IPA's motions for summary judgment with respect to Claimant No. 6, 65, and 93 are denied.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 14, 2008