# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION et | ) | |
| al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 01 C 4427 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| INTERNATIONAL PROFIT | ) | |
| ASSOCIATES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the schedule adopted in this case for streamlining summary proceedings, International Profit Associates, Inc. ("IPA") has moved for summary judgment against individual claimants Nos. 2, 7, 15, 17, 21, 37, 39, 43, 46, 55, 56, 57, 58, 61, 69, 72, 78, 88, 104, 107, 108, 113, 134, 137, 139, 147, 149, 157, 164, 166, 167, 169, 172, 175, 178, 180, 186, 187, 188, and 189 in this class action suit brought by the Equal Employment Opportunity Commission (the "EEOC"). For the reasons set forth below, these motions are resolved as follows.

### I. BACKGROUND

The somewhat unusual procedural posture in which the present motions will be examined is by now familiar to both the parties and the court. In resolving the handful of summary judgment motions that IPA presented prior to the court's adoption of the streamlined summary judgment schedule, the court summarized its disposition of previous issues presented in the case, and explained how the earlier rulings affected the

parties' respective burdens at summary judgment. *See E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *1 (N.D. Ill. 2008). That discussion also guides the court's analysis of the present motions (as well as those to be filed and resolved separately, pursuant to the streamlined schedule) and, for reference, is reproduced in whole:

Pursuant to the court's memorandum opinion and order of October 23, 2007 (the "October 23rd Order"), this case has been bifurcated into two phases. *See E.E.O.C. v. Int'l Profit Assocs., Inc.*, No. 1 C 4427, 2007 WL 3120069 at *17 (N.D. Ill. Oct. 23, 2007). In Phase I, the EEOC must establish by a preponderance of the evidence that the sexual harassment that occurred at IPA during the relevant time period, taken as a whole, was so severe or pervasive that a reasonable woman would find the work environment at IPA to be hostile or abusive. *Id.* Furthermore, the EEOC must also demonstrate that IPA knew, or should have known, that regular or systematic sexual harassment was occurring in its offices but did not take adequate steps to address the problem. *Id.* A finding in the EEOC's favor at Phase I will allow the court to award prospective relief under *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335-36 (1977), and the court will then proceed to Phase II. *Int'l Profit Assocs., Inc.*, 2007 WL 3120069 at *17.

In Phase II, the EEOC will be required to prove, by a preponderance of the evidence, that each individual claimant who seeks monetary damages experienced sex-based harassment that an objectively reasonable woman would find severe or pervasive enough to constitute a hostile work environment. *Id.* The EEOC must also demonstrate that each claimant subjectively perceived the harassment she experienced to be hostile or abusive. *Id.* The burden of production on the negligence element of the individual class members' claims, however, will be shifted to IPA if the jury returns a verdict in the EEOC's favor at the pattern or practice phase. *Id.* If IPA comes forward with evidence demonstrating that it was not negligent with respect to a particular class member, the burden will shift back to the EEOC to demonstrate that the steps IPA took were inadequate. *Id.* If the harassment any individual claimant experienced was perpetrated by a supervisor, rather than a co-worker, IPA will bear the burden of establishing an affirmative defense to its liability for the supervisor's harassment, if applicable. If IPA cannot do so, it will be held strictly liable for such harassment so long as the EEOC meets its burden with respect to the other elements. *Id.*

The EEOC must also make individual showings with respect to the amount of compensatory and punitive damages to which each claimant is entitled. *Id.* If punitive damages are awarded, the court will closely

> examine each award to ensure that the parameters of *BMW v. Gore*, 517
> U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.
> 408 (2003), as prescribed in the October 23rd Order, are met. *Id.*

2008 WL 4876860 at *1. Bearing in mind these considerations, the court

proceeds to analyze the instant motions.

## II. ANALYSIS

The Seventh Circuit has often described summary judgment as the "put up or shut

up" moment in a lawsuit, when each party must show what evidence it has to convince a

fact finder to rule in its favor. *AA Sales & Associates, Inc., v. Coni-Seal, Inc*., 550

F.3d.605, 612 (7th Cir. 2008) (*citing Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892,

901 (7th Cir. 2003). As the movant, IPA bears the initial burden of demonstrating that

undisputed facts properly in the record entitle it to judgment as a matter of law. Fed. R.

Civ. P. 56(c); *Celotex Corp., v. Catrett*, 477 U.S. 317, 322 (1986). If IPA meets this

burden, EEOC, as the non-movant, must then point to specific record evidence that

sufficiently controverts IPA's version of events to enable a jury to find in EEOC's favor.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If reasonable minds

could differ as to the import of the evidence," the case must proceed to trial. *Id*. at 250-

51.

The court must view any disputed facts in the light most favorable to EEOC, and

it must draw all reasonable inferences from the undisputed facts in EEOC's favor.

*Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Because

intent and credibility are typically crucial issues in employment discrimination cases,

summary judgment must be approached with caution, and heightened scrutiny of the

record is appropriate.  *See Talanda v. KFC Nat. Management Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998).

A worker suffers sex-based discrimination under Title VII if she is subjected to sexual harassment that is sufficiently severe or pervasive that it alters the terms or conditions of her employment.  *See Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 73 (1986); *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007).   Whether this standard is met turns on a "constellation of factors," *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000), including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 806-07 (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Conduct that is "too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex" is insufficient to show a hostile work environment.  *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) (quotation omitted).  There is no "magic number" of incidents required to establish a hostile environment, however, and even one act of egregious harassment will suffice. *Hostetler*, 218 F.3d at 808 (*citing cases*).

In *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995), the Seventh Circuit addressed the types of conduct that may amount to actionable sexual harassment and observed that it is not always easy to draw the line between actionable and non-actionable conduct.  The court nevertheless distinguished between general categories of behavior that fall on one side or the other of that line:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual

> solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1009-10 (7th Cir.1994). On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. *Meritor Savings Bank v. Vinson, supra*, 477 U.S. at 61, 106 S.Ct. at 2402-03; *Rabidue v. Osceola Refining Co*., 805 F.2d 611, 620-21 (6th Cir.1986); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983).

50 F.3d at 430-31.   When it is uncertain on which side of the line the offending conduct lies, the question must be left to the jury. *Id*. at 431.

   *Baskerville*'s taxonomy of harassment is instructive, but it is not exhaustive of actionable conduct under Title VII.  Indeed, even conduct that has *no* sexual content may be regarded as sexual harassment—and actionable as sex discrimination—if it is directed at a worker *because of* her sex and is sufficiently serious to alter the terms or conditions of her employment.  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 80 (1998) (citing *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). The Seventh's Circuit illustrated this principle in *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007 (7th Cir. 1994), with the observation that "[i]f because [the claimant] was a woman [the employer] turned down the heat at her work station in order to make her uncomfortable, that would be actionable sex discrimination," *id*. at 1011, and again in *Smith v. Sheahan*, 189 F.3d 529,  533 (7th Cir. 1999) ("It makes no difference that the assaults and the epithets sounded more like expressions of sex-based animus rather than misdirected sexual desire although power plays may lie just below the surface of much of the latter behavior as well. Either is actionable under Title VII as long as there is

evidence suggesting that the objectionable workplace behavior is based on the sex of the target") (citing *Oncale*, 523 U.S. at 80). *See also* Nussbaum, *Carr, Before and After: Power and Sex in* Carr v. Allison Gas Turbine Division, General Motors Corp., 74 U.CHI.L.REV 1831, 1833 (2007) (explaining three distinct ways that workplace harassment can be "based on" sex: 1) where sex is the ground or basis for the worker's harassment (as reflected in the preceding quotation); 2) where the harassment is sexual in content (e.g., the use of "denigrating stereotypes of women and insulting epithets about women"); and 3) where the content of the harassment concerns sexual relations ("in which the woman is being treated as a sexual object, a person available for sexual overtures and likely sexual favors, in a way that is either extortionate (quid pro quo) or intimidating ('hostile environment'), or both")).

District courts in this circuit have acknowledged this principle as well. *Avdyli v. Barnhart*, 05 C 2132, 2007 WL 57601 (N.D. Ill. Jan. 3, 2007 (Manning, J.) (citing *Curde v. Xytel Corp.*, 912 F.Supp.335, 340 (N.D. Ill. 1995) ("We believe the most recent statements by the Seventh Circuit dispel the notion that hostile work environment claims are limited solely to situations of a sexual nature; rather, actionable harassment 'encompasses *all forms of conduct* that unreasonably interfere with an individual's work performance or create [ ] an intimidating, hostile, or offensive work environment.'") (citing *Doe v. R.R. Donnelley & Sons*, 42 F.3d 439, 443 (7th Cir.1994) (citing *Meritor*, 477 U.S. at 64) (emphasis added in *Curde*))); *See also* C. Geoffrey Weirich, *Employment Discrimination Law*, Ch. 20 at 593 (3d ed. 2002 Cumulative Supplement) ("Although harassment must be because of gender, it need not be sexual in nature to be actionable."); Alba Conte, *Sexual Harassment in the Workplace*, § 3.05[B] at 192 (3d. ed. 2000)

("Offensive verbal or physical conduct need not be overtly sexual to be deemed sexual harassment.").

Finally, a worker may be subject to sexual harassment either as the individual target of hostile or abusive conduct of a sexual nature, or because she is in the "target area" of such conduct. *Yuknis v. First Student, Inc.,* 481 F.3d 552, 554 (7th Cir. 2007). As the Seventh Circuit explained in *Yuknis*, "target area" harassment is no less actionable, nor categorically less serious, than individualized harassment. *Id.* Nevertheless, the offending behavior must affect the aggrieved worker directly, as it does, for example, if she sees or hears it. *Id.* An "[o]ffense based purely on hearsay or rumor" is generally insufficient to support an individual claim. *Id.*

The court assumes for the purpose of resolving IPA's summary judgment motions that EEOC has already proven in Phase I that sexual harassment occurred at IPA during the relevant time period; that taken as a whole, it was sufficiently severe or pervasive that a reasonable woman would have found the work environment to be hostile or abusive; and that IPA knew or should have known that sexual harassment was rampant in its offices but failed to take adequate remedial steps. *E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *2 (N.D. Ill. 2008). Nevertheless, each claimant seeking monetary damages in Phase II must individually prove the elements of her hostile environment claim, namely, that: "(1) she was subject to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability" *Benders v. Bellows and Bellows*, 515 F.3d

757, 768 (7th Cir. 2008).  Based on the presumed findings of Phase I, the individual claimants are deemed to have demonstrated a basis for employer liability.  This means that the EEOC is not required, at this juncture, to point to specific evidence to support employer liability unless IPA claims, with respect to any particular claimant, that it took appropriate steps to correct the harassment she alleges.  While EEOC must, pursuant to this court's prior rulings, demonstrate the existence of a genuine dispute as to whether each claimant's individual experience rises to the level of actionable harassment, the court is mindful that the totality of the circumstances it must consider in each case includes a presumed finding of severe or pervasive sexual harassment at IPA.

The court is also mindful of each party's objections to the propriety of its adversary's evidence.  Both sides have moved to strike portions of the factual record, and while the court has denied these motions (or denies them as moot concurrently with the present order), it has carefully considered each side's objections.  The factual accounts below are based on evidence the court deems properly before it.[1]

## Claimant No. 2

Claimant No. 2 was a business coordinator at IPA for approximately four years, from late 1996 to mid-2000.  She claims that Keith Link, a colleague who later became a manager, asked her out, then continued to pursue her romantically despite her repeated statements to him that she was not interested.  No. 2 claims that Link made comments to her such as, "You want to get laid tonight?" (to which No. 2 responded, "You know that's never going to happen") and "why don't you come on over.  I can, you know, give you a good time," and that Link asked No. 2's supervisor to find out whether she would go out with him.

---

[1] In some, but not all, instances, the court discusses the parties' evidentiary objections.

On one occasion, No. 2's car broke down in IPA's parking lot, and she asked Link (by then a manager, though not No. 2's supervisor, whose car was parked next to No. 2's) whether he would give her a jump. He said he would, but that she would owe him a blow-job. No. 2 assumed Link was joking, and laughed the comment off. As No. 2 was seated in the driver's seat of her car, preparing to leave after the two had successfully started her car, Link positioned himself between No. 2 and the open car door, which evidently prevented her from closing the door. With his crotch in her face, Link began to unzip his pants and thrust himself forward, repeating, "you owe me a blow job." No. 2 responded by moving her head back and physically pushing Link away.

The next day, as No. 2 passed Link's desk on her way into work, Link said to the people in the area, "Oh, there's [No. 2]. Well don't do anything for her because she never keeps her promises." After Link's comment, No. 2 discussed the parking lot incident with her supervisor, Dmitri Kotsakis, then met with Kotsakis and Tony Jones, then-Director of the Business Coordination Department. No. 2 claims Kotsakis and Jones suggested No. 2 "keep it in the IPA family," as opposed to taking her complaint about Link to human resources. No. 2 claims she agreed not to go to human resources because Kotsakis and Jones agreed to talk to Link, and because she was fearful that people would talk or laugh behind her back if she took a complaint about a blow job to human resources. Kotsakis and Jones did, in fact, talk to Link, whose sexually offensive conduct and language ceased.

No. 2 also claims that she saw John Burgess, IPA's Managing Director, comment on a particular female employee's cleavage and figure. She further claims that another female employee reported to her that Burgess made sexually explicit comments to her.

No. 2 also heard other managers make comments about women's intimate body parts as they walked by, and claims that some managers touched women inappropriately at work.

No. 2 further complains that Shawn Fishman, an acting zone manager, used the word "cunt" repeatedly in front of her, despite her request that he not use that word, and even after Kotsakis (to whom No. 2 had complained about Fishman's use of the word) told him to stop. She also states that she complained to several managers about the sexually explicit "motivational speeches" these and other managers made to the workforce. The speeches contained phrases such as "go out there and grab your balls. Whack your peepee." No. 2 claims that during a work dispute, she was once called a "prima donna bitch" by a male manager. Occasionally, when women in her "zone" expressed excitement or concerned about something, remarks would be made that they were "code red," which she understood to mean that they were menstruating. On one occasion, her manager used the speaker phone and announced, "[No. 2], code red. Code red."

Finally, No. 2 claims that she complained to her manager, David Soskin, that she felt excluded from the "inner circle" at IPA, despite her hard work and good performance. She claims that Soskin responded by suggest that she could get further if she were "a little nicer to some of the top management." Suspecting this was a sexual innuendo, No. 2 asked, "you mean like a blow job or something?" to which Soskin allegedly responded, "well, I'm not saying for myself or anything," while shaking his head affirmatively.

IPA asserts that these episodes are neither severe nor pervasive enough to be actionable, nor are they based on sex. The first of these arguments is patently without

merit.  The parking lot incident alone is sufficiently egregious to raise a genuine dispute as to whether a reasonable woman would find the environment to which No. 2 was subjected hostile.  Viewing the evidence in the light most favorable to EEOC, Link not only verbally solicited No. 2 for sex, he physically cornered her and placed his genitals in her face, while telling her that she owed him a "blow job."  That Link did not touch No. 2 before she physically pushed him away is immaterial.  Having a co-worker force his genitals at one's face is not conduct that would be anticipated in the workplace, and a reasonable person in No. 2's position "might well experience that type of behavior as humiliating, and quite possibly threatening."  *Hostetler*, 218 F.3d 798, 808 (forcibly kissing co-worker and unsnapping her brassiere is actionable conduct).  IPA's argument that No. 2 herself interpreted the incident as nothing more than a "crude joke" is disingenuous, as it ignores substantial portions of No. 2's testimony.

Although IPA does not explicitly argue that it should escape liability for Link's conduct based on Kotsakis's and Jones's response to No. 2's complaint, it suggests as much by asserting that Link stopped harassing No. 2 after they spoke to him.  While it may be true that Link's sexually offensive conduct ceased, in light of the egregiousness of his behavior, No. 2's claim that her managers urged her not to escalate her complaint, and the presumption that IPA did not, as a general matter, take appropriate measures to curtail pervasive workplace harassment, IPA has not demonstrated that its response to this episode was adequate.

IPA's argument that No. 2's claims are not based on sex addresses only a portion of her claims, notably ignoring the parking lot episode.  As to that incident, IPA does not suggest, nor does the evidence support, that it was based on anything other than sex.

Because the court finds summary judgment inappropriate as to No. 2 based on the parking lot incident alone, it need not linger on the extent to which her additional allegations support her claim of a hostile work environment, and merely notes in passing that conduct "designed to sexually humiliate [No. 2] in front of her coworkers," as, for example, the "[No. 2], code red. Code red." announcement seems to have been, likely falls on the side of actionable harassment, particularly in the context of pervasive sex-based discrimination. *See E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *7 (N.D. Ill. 2008).

For the foregoing reasons, IPA's motion as to Claimant No. 2 is denied.

## Claimant No. 7

The parties disagree about how long Claimant No. 7 worked at IPA, and whether she worked only as a business coordinator (as IPA states), or also in inside sales in the coaching department (as EEOC claims). The parties agree, however, that No. 7 worked for IPA for some period of time between August 2000 and January 2001, and the disputed details of her tenure are not material to IPA's motion.

No. 7 claims that in the short time she was employed by IPA, she was grabbed, touched, and slapped on the buttocks several times by male co-workers when she stood up from her cubicle in the Business Coordination Department. She claims that she saw the same thing happen to at least one other female colleague, and she believes that at least that colleague saw it happen to her.

No. 7 also claims that during her training, IPA trainer Steven Rochenburg told her dirty jokes on a daily basis and ostentatiously scratched his genitals in front of her. Her supervisor, Phil Olsen, told No. 7 that he thought she would look good with her clothes

off, thought she had nice breasts, and thought she would be good in bed. No. 7 claims that she reported Rochenburg's and Olsen's behavior to Shelle Bareck, Director of Human Resources, and that Bareck said she would look into it, but also told No. 7 that "men will be men" and that she should "just let it go and let bygones be bygones." No. 7 is not aware of (nor does IPA assert) any action taken in response to her complaints.

No. 7 claims that at the office Christmas party, IPA's Managing Director, John Burgess, told her that she could go far with the company if she was "very good to him," which No. 7 understood to mean that she would advance professionally if she performed sexual favors for Burgess. At the same party, a male colleague told her she had a "great mouth that would be good for oral sex." No. 7 reported the latter incident to her manager, John Greco, who said he would "look into it" and advised No. 7 to "just stay away" from the offending colleague. No. 7 is not aware of (nor does IPA assert) any action taken in response to her complaint to Greco.

IPA argues that No. 7's claims are not severe or pervasive enough to be actionable, that her allegations are too vague and unspecific to support her claim, and that No. 7 was never bothered again after reporting the offending conduct to IPA management.

While it is true that No. 7's claims relate to conduct that may be considered comparatively less severe than that described by certain other claimants, harassment need not be both severe *and* pervasive to be actionable. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). No. 7's catalog of complaints is appreciable, given the short period of time she was employed by IPA. The court is convinced that in this light, a reasonable individual could find that the conduct No. 7 describes was pervasive. IPA seeks to defeat

No. 7's claims based on *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705 (7th Cir. 1995), which upheld summary judgment in the defendant's favor despite the claimant's allegations that: the president of the company had grabbed her buttocks and rubbed his foot against her leg without her consent; the president had told the claimant that he found her attractive and could not control himself in her presence; a group of employees asked her to donate a pubic hair for a collection they were taking up as a gift for the company president; and she heard rumors about a sexually explicit photograph the company president purportedly carried in his wallet. *Id*. at 706-707. While some of this conduct is similar to that alleged by No. 7, the conduct in *Koelsch* occurred over a period five years, rather than (at most) five months, as alleged here. Moreover, the unwelcome touching No. 7 alleges was witnessed by at least one co-worker (the buttocks-grabbing in *Koelsch* occurred while the claimant and alleged harasser were alone). Although the physical contact No. 7 alleges is similar to that in *Koelsch*, the fact that it occurred in front of at least one coworker is a reasonable basis for considering it more serious, since conduct designed to degrade or sexually humiliate the victim in front of coworkers is particularly egregious. *See E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *7 (N.D. Ill. 2008).

Although none of the comments No. 7 claims were directed to her were explicit sexual invitations, they nevertheless amount to more than mere "occasional vulgar banter, tinged with sexual innuendo," *Baskerville*, 50 F.3d at 421, and a reasonable woman could find that her coworkers' and superiors' repeated comments about her intimate body parts, and their suggestions about sexual acts she could perform, were deeply offensive.

Indeed, No. 7's complaints to human resources about this conduct demonstrate that she was, in fact, offended.

While certain of the conduct No. 7 alleges, such as the reference to "dirty jokes" may be too unspecific, standing alone, to persuade a jury that her work environment was intolerably hostile, the cumulative effect of crude jokes, unwelcome physical conduct by male coworkers (even if they cannot be identified by name), and overtly sexual comments directed at her by both colleagues and superiors is not so "tepid, intermittent or equivocal," in the context of an environment pervaded with sexual harassment, that no jury could find in No. 7's favor.

The court agrees that allegations based on rumor or hearsay are insufficient to support No. 7's claim. But the conduct No. 7 directly experienced is sufficiently serious to survive summary judgment. That No. 7 was "never bothered again" by certain individuals whose behavior she reported appears from the record to have been more a fortuitous circumstance than a testament to the effectiveness of any remedial action taken by IPA (again, IPA has not identified any) and does not entitle IPA to judgment.

For these reasons, IPA's motion as to No. 7 is denied.

### Claimant No. 15

Claimant No. 15 worked in administration and as a business coordinator at IPA for approximately six months in 1999 and 2000. During the first few months of that time, a zone manager, Blake Hamilton, called No. 15 "penis head" multiple times a week over the course of several months and also pointed and referred to her breasts as "M&M's." No. 15 also claims that an assistant zone manager, John Narcisse, looked at her as though he were "checking her out" and walked up behind her on at two occasions and massaged

her back and shoulders. After the second time, No. 15 gave Narcisse a nasty look to let him know she didn't appreciate the contact, and he never did it again. On another occasion, No. 15 heard a male employee say about a female employee, "I'd fuck her."

No. 15 claims that while she was working as a receptionist, someone called her on at least two occasions with a sex line on the phone. No. 15 claims she heard women referred to as "bitches" on a daily basis, and she recalls several instances in which managers used the word in expressions like, "I'm getting tired of that bitch." On one occasion, No. 15 heard one or more male colleagues whistle and say "look at the booty" as she was leaving the room. She also heard male employees say, on at least five occasions "Oh, look at that ass," in reference to women wearing skirts. No. 15 saw Tyler Burgess, a male manager, slap Claimant No. 134, a female colleague, on the buttocks on two occasions. Williams screamed at Burgess and hit him after one of these incidents.

One day, No. 15 saw five photocopies, taped up in various publicly-viewed locations of the Business Coordination area, of a woman's buttocks in stockings with the words "big booty [No. 134]" written on them. The photocopies were hanging up for a few minutes before someone took them down.

While No. 15 was working as the evening receptionist after hours one day, she saw a female business coordinator enter the office of senior executive Scott Kollins. Kollins himself arrived sometime thereafter, and the two closed the door and played loud music, remaining in the office until No. 15 left for the evening. The following day, upon hearing No. 15 and another claimant discussing the incident, Rich Lubicz, Director of Business Coordination Department, said, "maybe she was in there sucking his dick," before laughing and walking away.

After No. 15 was fired, she complained to Shelle Bareck, Director of Human Resources, asking "Do you have to be fucking or sucking someone around here to keep your job?" Bareck replied, "Well, what did you expect. This is a company run by men. I'm the only woman, and that's just how things are."[2]

IPA argues that these allegations do not rise to the level of seriousness necessary to support an actionable claim. The court disagrees. While the impact on a reasonable woman of the "penis head" and "M&M's" comments might be negligible if they were stray or isolated, No. 15 claims that these comments—which can reasonably be construed as based on sex, since the former sexualized No. 15's hairstyle, while the latter likened her breasts to candy—were directed at her several times a week for several months. Although these comments did not expressly reference or solicit sexual relations, it is difficult to imagine a male worker being subjected to this type of offensive comments. The same can be said of the various "booty" comments. No. 15's testimony supports a finding that she was "exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed," *Oncale*, 523 U.S. at 80.

Likewise, a jury could find that the frequency and the manner in which No. 15 heard the word "bitch" used by male employees was sufficient to render her workplace objectively hostile. In addition, No. 15 heard multiple comments sexualizing or

---

[2] IPA objects that this testimony was elicited by a suggestive deposition question by the EEOC, and that the testimony is contradicted by No. 15's prior testimony. The court disagrees that the questions were improperly leading, and IPA does not identify what prior testimony is supposedly in conflict with No. 15's answer. Nevertheless, the relevance of the testimony must be understood in its proper scope. EEOC does not argue that No. 15 was fired because she declined to engage in sexual acts with IPA managers (i.e., that No. 15 was the victim of the *quid pro quo* type of harassment). Rather, EEOC argues that No. 15's work environment was sexually hostile or abusive. The relevance, then, of Bareck's alleged comment is limited to the issue of whether IPA was aware of the alleged harassment, and whether IPA responded (or failed to respond) appropriately. Because IPA is presumed, for present purposes, to have been aware of pervasive harassment and failed to respond appropriately, this portion of No. 15's testimony adds little to the strength of her claim.

attributing sex acts to female workers ("I'd fuck her," and "maybe she was in there sucking his dick" are two choice examples), and she saw other women being treated in the workplace as available sex objects. A jury could reasonably find that the cumulative effect of these comments and conduct was sufficiently serious to alter the terms or conditions of No. 15's employment.

Finally, No. 15's allegations about Shelle Barack's response to her complaint about being terminated emphasize what the court already presumes for the purpose of IPA's summary judgment motions: that IPA was aware of severe and pervasive sexual harassment among its employees but failed to take reasonable corrective action.

For the foregoing reasons, IPA's motion as to Claimant No. 15 is denied.

## Claimant No. 17

Claimant No. 17 responded to an advertisement for a management position at IPA. After her interview, she received a call offering her a job as a "telemarketer" (in fact she was hired as a business coordinator) and was told that she had to start there before moving to a job in management. After a week as a business coordinator, she asked her supervisor when she would be promoted. He put his arm around her, smirked, and said "well, there are certain things that you have to do in order to advance." No. 17 interpreted her supervisor's words and body language to mean that she had to have sexual relations with someone at IPA in order to be promoted. No. 17 claims that she had a nearly identical exchange with her supervisor on two other occasions. No. 17 also states that her supervisor made unwelcome physical contact with her (by putting his arm around her each time she approached him, and by leaning his chest into her shoulder on two or three occasions), and that she witnessed similar contact between other supervisors and

female employees. No. 17 also claims she saw female employees give male supervisors their phone numbers, and she believed doing so was required to advance at IPA. As a result of these circumstances, No 17 felt stressed, cheap, inadequate, upset, angry, and humiliated. She began to miss days of work, and finally she quit her job. All of this occurred over the course of three weeks.

IPA argues that the conduct No. 17 describes is not severe or pervasive enough to support a claim for a hostile work environment and asserts that her "unreasonable and far-fetched conclusion" that her supervisor was asking for sexual favors does not support her claim of harassment. IPA also argues that No. 17's allegations are generally too vague and conclusory to support her claim.

EEOC responds that No. 17's three exchanges with her supervisor represent a "textbook case" of the *quid pro quo* theory of sexual harassment. EEOC also argues that No. 17 was the victim of a hostile work environment based on her encounters with her supervisor and the workplace scenes she witnessed.

Because most of the court's and parties' attention in this case has been focused on the hostile work environment theory of sexual harassment, a brief discussion of the so-called *quid pro quo* theory is in order. Allegations that an employer demanded sexual favors from an employee in return for a job benefit is actionable under Title VII because such conduct explicitly (as opposed to constructively, as in hostile environment claims) alters the terms or conditions of the victim's work. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 751 (1998). Such allegations were formerly considered to state a *quid pro quo* claim of sexual harassment. More recently, however, "the concept of *quid pro quo* harassment has largely been abandoned; courts distinguish instead between cases in

which the plaintiff suffered a tangible employment action and those in which no such action was taken." *Godin v. Whirlpool Corp.*, 132 Fed. Appx. 661, 664 (7th Cir. 2005) (citing cases).

It is clear from No. 17's claim that she rebuffed, rather than submitted to, her supervisor's advances. The question, then, is whether a reasonable jury could find that her refusal to indulge him resulted in a tangible employment action against her. If so, then her claim may proceed regardless of whether the alleged conduct was severe and pervasive. If she suffered no tangible employment action, however, then any alteration in the terms or conditions of her employment was constructive, i.e., due to a hostile environment, and she must prove that it was severe or pervasive. *See Ellerth*, 524 U.S. 751.

Despite its assertion that No. 17 experienced "a textbook case" of *quid pro quo* sexual harassment, EEOC does not assert that No. 17 was denied any tangible job benefit. Nevertheless, the court is mindful that it must draw all reasonable inferences in EEOC's favor and thus construes No. 17's claims as an assertion, however oblique, that she was refused a promotion based on her unwillingness to submit to her supervisor's advances. Failure to promote may qualify as a tangible employment action. *Ellerth*, 524 U.S. 742, 761 (1998). To prevail on such a claim, however, No. 17 must prove that she was denied a promotion for which she was qualified. *Godin*, 132 Fed.Appx. 661, at 664. No reasonable jury could draw this conclusion based on the evidence EEOC presents. To begin with, No. 17's entire tenure at IPA lasted only three weeks (which period encompassed the Christmas holiday), and by the time she quit her job, she had already missed several days of work. Moreover, No. 17 admits she was told she would have to

gain experience in her position before being promoted, and her employment agreement with IPA explicitly stated that her first thirty days were considered a "probationary period." These are not circumstances in which one can reasonably conclude that No. 17 was "denied" a promotion at all, much less that she was denied a promotion for failing to engage in sex with her supervisor. Notably, EEOC has not offered any evidence to suggest that IPA in fact promoted other workers under such circumstances. That No. 17 had experience as a sales manager at another company does not, by itself, demonstrate that she was qualified for the promotion she sought. For these reasons, No. 17's "*quid quo pro*" claim fails.

No. 17 may, nevertheless, succeed in convincing a jury that she was subjected to a hostile environment based on the conduct she alleges. Although the physical contact she asserts (her supervisor's putting his arm around her and his chest on her shoulder) does not appear to have been particularly threatening, a reasonable woman could interpret the combination of the gestures and his alleged comment that No. 17 would have to do "certain things" to advance at the company as unwanted pressure to engage in sex, or even as a threat that she would suffer negative professional consequences if she did not engage in sexual behavior with him. Though the fact that No. 17 saw female coworkers giving their phone numbers to male supervisors, and saw the supervisors put their arms around these women, may not, standing alone, support her hostile environment claim, but a jury could conclude that these workplace scenes reinforced the message No. 17 claims she received from her supervisor three times in as many weeks: women who engage in sexual activity with their supervisors are successful at the company, while those who do not are not.

For the foregoing reasons, IPA's motion as to Claimant No. 17 is denied.

**Claimant No. 21**

Claimant No. 21 was employed by IPA as an administrative assistant and a business coordinator from April of 1998 to July of 1999. She claims that during that time, IPA's managing director, John Burgess, regularly asked her when she was going to "take care of" a male coworker, Jason Zolnowski, who Burgess said was a virgin. No. 21 understood this question as a suggestion that No. 21 should have sex with Zolnowski. These comments, which were sometimes made in front of other IPA employees, made No. 21 extremely uncomfortable, and she asked Zolnowski and Tyler Burgess (John Burgess's son and a manager at the company) to ask John Burgess to stop. The comments continued on a weekly basis throughout No. 21's employment at IPA. John Burgess also told No. 21 that her blouse would be nicer if it were see-through, and suggested that she wear low-cut blouses and shorter skirts.

No. 21 also alleges that she heard male coworkers make comments about female coworkers' breasts; about their short skirts; and about how they "wouldn't mind doing that one" (not, apparently, a reference to No. 21).

On one occasion, No. 21 heard that a male stripper was in the office of a female executive at the company, and she saw a crowd going in and out of the executive's office. Curious, No. 21 went to have a look, and saw (from the back), a man dressed in only a g-string, with his bare buttocks exposed. No. 21 thought it was "repulsive and offensive" that a stripper had been hired to perform in the office during the workday.

No. 21 also heard a series of rumors about untoward office behavior: that a female coworker had exposed her bare breasts at the office; that John Burgess gave a female

employee a Jeep Cherokee in exchange for oral sex; and that Burgess had hired a stripper whom he had met in Las Vegas to work in the Inside Sales department. No. 21 learned the final tidbit from Rich Lubicz, the Director of Business Coordination, who commented to No. 21 about the stripper's appearance and on the "services" she could provide. No. 21 stated she was "uncomfortable" that Lubicz would make such comments.

IPA argues that No. 21's claims should be dismissed because the conduct she describes is neither severe nor pervasive enough to support her claim. IPA further argues that her allegations are too vague and unspecific to be actionable.

The court agrees that No. 21's allegations about rumors do little to advance her claims. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007) ("Offense based purely on hearsay or rumor" is "less wounding than offense based on hearing or seeing"). But No. 21's claims are not based "purely" on rumor. She also alleges conduct that directly affected her, either because she was the individual target or because she saw and heard male employees talking about other women in the workplace in objectifying, sexualized terms. These allegations do support her claim.

First, No. 21 complains about John Burgess's incessant suggestion that she "take care of" her coworker. These comments—which a jury could reasonably construe as sexual, based on No. 21's description of them and the atmosphere at IPA as a whole— could conceivably be relegated to the category of non-actionable sexual "humor" if they were isolated remarks. But No. 21 alleges that she heard these comments week in and week out, and that she was "mortified" by the comments. In addition, Burgess allegedly told No. 21 that she should wear see-through blouses and shorter skirts. These comments—like those No. 21 alleges she often heard male colleagues make about female

coworkers' body parts or their desirableness as sex partners—demean women workers by reducing them to sexual objects. *See* Nussbaum, *Carr, Before and After: Power and Sex in* Carr v. Allison Gas Turbine Division, General Motors Corp., 74 U.CHI.L.REV 1831, 1833 (2007). There is no evidence, and indeed it is somewhat difficult to imagine, that male employees were the objects of similar sexual attentions. Regardless of whether Burgess's suggestion that No. 21 "take care of" her coworker was intended as humor, a reasonable woman could find that the repetition of that particular joke, coupled with the sexually demeaning or humiliating comments No. 21 alleges she heard, so pervaded No. 21's workplace as to alter the terms or conditions of her employment.

As to the allegations regarding the male stripper, neither party has advanced any authority that speaks to whether an employer who condones (or, at least, does not forbid) sexually explicit entertainment at the workplace creates a hostile environment under Title VII. It seems to the court that while myriad considerations undoubtedly counsel against fostering a sexually charged atmosphere at the office, it is not clear that the scene No. 21 described—a male stripper in a g-string performing for a female colleague—would be any more offensive to female workers than it would be to male workers. Nevertheless, IPA does not argue that No. 21 fails to show that the harassment she alleges was based on sex. Mindful that it must draw all reasonable inferences in favor of the non-movant, the court assumes that No. 21's allegations about the stripper support her claim of sex-based harassment.

For the above reasons, IPA's motion as to Claimant No. 21 is denied.

## Claimant No. 37

Claimant No. 37 worked at IPA as an administrative assistant for approximately ten months from July 1999 to May 2000. She claims that during that period, she regularly heard comments "of a sexual nature" directed to her and to other female employees by male coworkers and superiors. For the most part, No. 37 does not specify what these comments were. Here are a few exceptions: No. 37 heard John Burgess say to his secretary, "You're looking mighty fine today" and "It's a good thing you left your husband. Now you're open for a real man." IPA's Chief Financial Officer, Gregg Steinberg, said to No. 37 on one occasion, "You know…if you dressed like that more often you'd get that raise and promotion you were looking for. Otherwise, you're going to end up staying here forever." Steinberg also told her, "You need to show what God gave you." When No. 37 complained about the latter comment to a female supervisor, the supervisor said, "Get over it. You have a chest. Show it." No. 37 also claims that she heard Steinberg say to other women, "Nice ass. Nice skirt. Glad you're showing a little more today."[3] No. 37 also claims she heard Rich Lubicz say to other female employees, "nice ass," and "you've got a nice rack," and that Lubicz asked other female employees out on dates. No. 37 claims that she heard Lubicz make comments of this nature about ten times a day, three days a week, for about three or four months.

No. 37 also claims that she heard, from various sources, about additional untoward office behavior: that a female stripper had been hired by John Burgess for Rich Lubicz's birthday and was performing in the lunchroom; that Lubicz and other male managers made sexually inappropriate remarks.

---

[3] IPA contests these allegations with an affidavit from one of the women No. 37 claims was the object of such comments. At summary judgment, of course, the court resolves this factual dispute in No. 37's favor.

No. 37 repeatedly voiced her objection to the conduct she described. She complained to her (female) supervisors in the accounting department about Steinberg's comments and about the stripper, and also complained (though about what is not clear) to another manager, Doug McClain. On the day of the stripper incident, Shelle Bareck, Director of Human Resources, called No. 37 into her office and told No. 37 that she (Shelle) had heard No. 37 had been "whining about what happened in the lunchroom" and needed to "get over [her]self."

A few weeks later, No. 37 arrived at work one morning to discover she had been "demoted" to the position of business coordinator from her position in accounting. Gregg Steinberg told her that her "comments were becoming ludicrous" and that nobody wanted her in their department. At her deposition, No. 37 testified that the "comments" to which Steinberg referred had to do with her complaints about the treatment of employees at IPA, and specifically about the working hours and lunch breaks. No. 37 testified that Steinberg was not referring to her comments about the "Rich Lubicz incident."

IPA argues that No. 37's claims do not describe conduct that is severe or pervasive enough to be actionable, and that her allegations are too vague and conclusory to withstand summary judgment.

Although EEOC seems to suggest that No. 37's "demotion" was the result of her complaints, it does not clearly assert that she suffered a tangible employment action as a result of sex discrimination (i.e., a "*quid pro q*uo" claim). Indeed, it appears from the record that to the extent No. 37 was "demoted" at all (IPA contests this), her change in status was related to complaints she made that had nothing to do with the harassment she

alleges. Accordingly, the court examines whether No. 37's claim can withstand summary judgment based on her allegations of hostile environment.

First, as discussed with respect to other claimants, claims based on rumors—including No. 37's allegations involving third-party reports of unsavory goings-on in the corporate lunchroom—are too remote, as far as No. 37 is concerned, to support her claim. *See Yuknis*, 481 F.3d at 555-56. And while the comments No. 37 attributes to Shelle Bareck may well support employer liability, they do not substitute for specific evidence of sex-based harassment. These allegations thus do not support No. 37's claim.

As the case law in this area (including in this particular case) makes clear, whether or not a hostile environment claim is actionable depends on a highly nuanced assessment of the likely impact of the challenged words or conduct on a reasonable individual. Claims generically alleging comments "of a sexual nature" are insufficiently precise to allow the court—or the fact finder—to "provide a basis to determine whether that conduct was severe, pervasive, and objectively offensive harassment." *Gabrielle M. v. Park Forest-Chicago Heights, Ill. School Dist.* 163, 315 F.3d 817, 823 (7th Cir. 2003) (five year old plaintiff's allegations that classmate did "nasty stuff," and father's testimony that classmate touched plaintiff's "[p]rivate parts, chest" insufficiently precise to withstand summary judgment).[4] While it is true that a plaintiff need not remember every detail of every offensive comment, *see Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994), she must nevertheless present sufficient evidence to

---

[4] The court is mindful that *Gabrielle M* was brought under Title IX of the Education Amendments of 1972, not under Title VII of the Civil Rights Act. A claim under Title IX requires a showing of conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to educational opportunity or benefit." *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 633 (1999). Although the applicable standards are not entirely coextensive, each requires the finder of fact to judge the severity and/or pervasiveness of the challenged conduct, underscoring the need for a reasonable degree of specificity in the evidence.

enable a fact finder to determine whether the conduct alleged falls on one side or the other of the *Baskerville* line.

It is true that No. 37 alleges comments "of a sexual nature," which, standing alone, are too vague to support her claim, since this description encompasses both activity that is generally actionable (solicitations for sex, for example), and activity that is not (telling vulgar jokes).   It is also true that some of the comments that No. 37 does recall with specificity are the kind of "tepid" remarks that fall on the non-actionable side of the *Baskerville* line (e.g., "you're looking mighty fine today.")   On the other hand, however, certain of the comments No. 37 heard referred to female employees' body parts in a manner that can certainly be construed as demeaning to women in a professional environment ("nice ass," and "you've got a nice rack" are two choice examples). Although No. 37 does not allege that these comments were directed at her, she does assert that the IPA's CFO urged her to dress in a fashion that would "show what God gave" her, and that he even went so far as to suggest that her professional success was contingent on whether she did so ("You know…if you dressed like that more often you'd get that raise and promotion you were looking for.  Otherwise, you're going to end up staying here forever.")  As the court noted with reference to the claim of No. 17 (who alleges that her supervisor told her, in a sexually suggestive manner, that she would have to do "certain things" in order to advance at IPA), pressure by an employee's supervisor to engage in sex, or comments that can be construed as a threat of negative professional consequences unless the employee agrees to sex, can support a hostile environment claim where the employee also witnesses workplace scenes that reinforce the message that women who engage in sexual activity with their supervisors are successful at the

company, while those who do not are not. No. 37 does not claim to have been pressured for sex, but she does allege that she was pressured to dress more provocatively. Meanwhile, No. 37 heard Steinberg comment to a female coworker, "glad you're showing a little more today," and she heard Rich Lubicz make comments about her coworkers' bodies up to ten times a day over the course of months. In this context, a jury could find that No. 37 reasonably believed that her professional success was indeed dependent upon how much of her own body she exposed to her male colleagues, and that the resulting pressure on her constructively changed the terms and conditions of her employment.

For the foregoing reasons, IPA's motion as to Claimant No. 37 is denied.

**Claimant No. 39**

Claimant No. 39 worked as an outside sales consultant for IPA from January 2001 to February 2001. No. 39 spent the first three-and-a-half days of her employment at an off-site training class, which was held at a hotel where trainees apparently spent the night in between the daytime training sessions. No. 39 bases her hostile environment claim on the conduct of IPA employees during the training. Specifically, No. 39 alleges that: Richard Gottlieb, the IPA training instructor, routinely called her "princess" and asked her to make and hand out photocopies. Gottlieb did not ask any of the other trainees (which group included five women and thirty men), to make photocopies. Gottlieb told No. 39 that she had made the copies well, to which No. 39 responded, "[y]ou'd be surprised what I can do well." At this, Gottlieb allegedly looked No. 39 up and down and said, "I bet you can." No. 39 also alleges that Gottlieb made sexual jokes and lewd comments, that he referred to another female trainee as "Boom boom," and that he

"talked down" to the women in the training, rather than treat them in a businesslike fashion. Gottlieb also eyed the women in the training up and down, touched their arms, and rubbed their backs as they left the room. No. 39 does not allege, however, that she herself was subjected to any unwelcome physical contact by Gottlieb. At the end of the training class, Gottlieb announced that there would be a graduation party, and that the women in the class would "get some" because there would be more men that women.

One night during the training session, a male trainee called No. 39 on her hotel phone, asked her for a drink, and told her he was going to leave his wife for her. No. 39 declined the invitation, but at the graduation party, the same trainee rubbed No. 39's back and shoulders and told her he was a good kisser. Also at the graduation party, another male trainee offered No. 39 a drink. No. 39 turned down the offer, but he ordered the drink anyway and appeared angry when she declined to drink it. No. 39 claims she was "very scared" that the trainee who had bought the drink would accost her or "do something" when she left the bar, so No. 39 did not want to leave alone. Finally, a third male trainee tried to give No. 39 his room key at the graduation party and told her his room number in case she got "lonely."

Taken together, and in the most favorable light to EEOC, these allegations are insufficient to allow a reasonable jury to conclude that No. 39 was subjected to conduct so severe or pervasive during her tenure at IPA that her environment could be considered objectively hostile. Cognizant that No. 39 alleges no offensive conduct in any but the first three-and-a-half days of her month-long employment, EEOC argues that the objectionable conduct was pervasive during that initial period. Of course, even one instance of misconduct can be considered "pervasive" if the control period is short

enough. As noted above, the reason sex-based harassment must be "severe or pervasive" to sustain a hostile environment claim under Title VII is that a violation of the statute occurs only when the challenged conduct constructively alters the terms or conditions of the victim's employment. *See Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 752 (1998). In this light, it is clear that an aggrieved worker cannot manufacture pervasiveness simply by parsing her employment into byte sized periods and alleging that one of those periods was "pervaded" with misconduct. Even assuming such allegations were true, the aggrieved worker in most cases simply would not have demonstrated that the terms or conditions of her employment were effectively altered as a consequence.

This is not to say, of course, that any claim must fail unless it alleges a constant barrage of misconduct throughout a worker's employment. As the court noted above, even a single instance of sex-based harassment can be actionable, provided it is sufficiently severe. The trouble with No. 39's claim is that it alleges conduct that is *neither* severe *nor* pervasive enough (when considered against the full term of her employment) to have constructively altered the terms or conditions of her employment. Gottlieb's calling her "princess" did not have that effect, *see Woodford v. Federal Express Corp.*, No. Civ. 02-1116, 2004 WL 234396 at *7 (D. Minn., Jan. 21, 2004) (Tunheim, J.) (coworker's use of nickname "princess" was "annoying and inappropriate" but not sexual, and amounted to "simple teasing"); *see also Figueroa v. New York City Health and Hospitals Corp.*, No. 03 Civ. 9589, 2007 WL 2274253 at *10 (S.D.N.Y., Aug. 7, 2007) (Buchwald, MJ.) (calling plaintiff "Miss Princess" not actionable harassment), nor did his ambiguous reply to her equally ambiguous remark, "[y]ou'd be surprised what else I'm good at." Even assuming that the nickname "Boom boom" was

tinged with sexual innuendo, No. 39 was neither the direct nor the indirect target of this name, and any effect it may have had on her is remote. *See Yuknis v. First Student*, 481 F.3d 552, 555 (7th Cir. 2007). And to the extent No. 39 was singled out during the training to perform the administrative task of photocopying on the basis of her gender, and that Gottlieb "talked down" to the women in the class (whatever that may mean), there is simply no indication that this conduct materially affected No. 39's work conditions or environment as a whole.

No. 39's remaining allegations are equally insufficient. As discussed elsewhere, unwelcome physical contact that is neither threatening, nor ongoing, nor sexually humiliating is generally too mild to support a claim. *See Adusumilli v. City of Chicago*, 164 F.3d, 353, 362 (7th Cir. 1998). No. 39's various invitations for drinks and late-night visits, while perhaps unwelcome, were only marginally related to her working environment, having occurred after hours during the training period, and do not appear to have had any ongoing effect on her working conditions.

For these reasons, IPA's motion as to Claimant No. 39 is granted.

## Claimant No. 43

Claimant No. 43 worked as a business coordinator at IPA for approximately three weeks from May to June 1998. It is unnecessary to recite her appreciable list of grievances in full, since it is evident from just a few examples that her claim survives summary judgment. To wit:

During the training period, No. 43 walked by several male employees who were standing together outside the bathroom. One of the men touched No. 43 on the buttocks and said to another male employee, "that's going to be mine." No. 43 alleges that she

was touched every day, and that the unwelcome physical contact to which she was subject included repeated incidents in which a colleague brushed her breast and put his penis on her shoulder. The parties dispute whether No. 43 reported these and other incidents of unwelcome physical contact.

No. 43 also claims that she did not receive commissions to which she was entitled. When No. 43 complained to a male employee, Victor Baltimore, who No. 43 believed was a supervisor (though IPA disputes this), Baltimore told No. 43 that if she had a "threesome" with him and his wife, he would ensure that her commissions were paid.

The court finds that based on these incidents alone, all of which occurred in the space of less than a month, a jury could find the workplace conduct described by No. 43 to be objectively hostile. The incidents of unwelcome physical contact appear, based on No. 43's testimony, either to have been designed to sexually humiliate No. 43 (as in the first instance), or to have been persistent and involving intimate body parts (as in the remaining instances). Furthermore, a fact finder could construe Baltimore's "threesome" comment as an overt solicitation for sex. Because this conduct falls within the categories of actionable harassment under *Baskerville*, the court will not enumerate or discuss No. 43's myriad additional allegations at any length. The court does note in passing, however, that the remaining allegations include a host of sexually explicit and degrading remarks, all of which could be found by a trier of fact to contribute to an environment that was hostile to No. 43 based on her sex.

For these reasons, IPA's motion as to Claimant No. 43 is denied.

**Claimant No. 46**

Claimant No. 46 worked as a business coordinator for approximately nine or eleven months (the parties disagree) beginning in August 2000. She alleges that Nick Jones, who was the assistant zone manager, and later the zone manager for her zone, told her on multiple occasions (five to ten times) that if she wanted better sales leads, she would have to wear a tighter sweater and/or a shorter skirt. Although she cannot remember additional details, No. 46 states that Jones also made sexual "digs" and innuendos throughout the day. On one occasion, when No. 46 went to ask Jones a question, she found him surrounded by female assistants who were massaging various parts of his body. On that occasion as well, Jones told No. 46 that she would not have problems with sales if she wore a shorter skirt and a tighter sweater. No. 46 complained about these incidents to Shelle Bareck, who said she would look into them. No. 46 is not aware of (nor does IPA assert) any action taken in response to her complaints.

No. 46 also claims that on two occasions, she witnessed a verbal and physical altercation between a male and a female coworker. On the first occasion, a coworker named Blake (who may or may not have been acting as an assistant zone manager) called a female colleague a slut. The woman retorted, calling Blake a skinhead. At this, Blake picked up a heavy book and struck the woman in the face. The woman then fell to the floor bleeding. No. 46 asserts that she learned at a meeting held for the Business Consultants on the floor that as a result of the altercation, the woman had been fired, and the man had been suspended.

IPA disputes various elements of No. 46's account of the incident. Based on the affidavit of Tyler Burgess, who states he was then IPA's Director of Business

Coordination, IPA admits that Blake Hamilton (who it appears from the statement was indeed an assistant zone manager at the time) struck a female colleague in the face. IPA asserts that no disciplinary action was taken against the woman, and confirms that Hamilton was suspended. IPA also asserts that the woman did not report the episode as sexual harassment or discrimination.

On the second occasion, No. 46 saw and heard Nick Jones tell a "very pregnant" employee, "you're too fat and you're too pregnant. You need to get out of here" and "you slut, get out of my fucking zone." The pregnant employee then sat or was pushed on a desk (No. 46 did not see which), and the desk broke in half, causing the pregnant woman to fall to the floor. No. 46 testified that she interpreted Jones's comments to mean that the pregnant employee was fired, but she does not know (nor does IPA clarify) if the woman was actually fired.

It is obvious from the above that the parties disagree about significant factual issues relating to several critical episodes underlying No. 46's claim. Summary judgment is therefore inappropriate. Assuming that the events occurred exactly as No. 46 claims, *see Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 977 (7th Cir. 2000), a jury could conclude that the altercations No. 46 witnessed (and which thus had a direct impact on her, *see Yuknis*, 481 F.3d at 556), which, in addition to causing physical harm to the women involved, included use of the sexually pejorative insult "slut," were severe enough to render No. 46's working environment objectively hostile to No. 46 based on her sex. Moreover, a jury could find that the effect of these incidents on No. 46 was compounded by Jones's repeated "suggestions" to No. 46 about her wardrobe, as well as by the Phase I finding of a pattern of sexual harassment at IPA.

For the foregoing reasons, IPA's motion as to No. 46 is denied.

## Claimant No. 55

Claimant No. 55 worked as a business coordinator at IPA for approximately two and a half months from May to July of 2001. She claims that male employees made "inappropriate comments" about her breasts and buttocks, about the way she walked, and about "their interest in sexual relations" with her. She further claims that Shawn Fishman, her assistant zone manager, made "sexual comments" multiple times throughout the period of employment, and that Fishman made comments about her body and "insinuated that he wanted to have sexual relations" with her.

No. 55 also claims that on one occasion, Rich Lubicz, Director of Inside Sales,[5] told her, in response to No. 55's complaint about her income from IPA, "you're better off being a stripper." She claims that she was once paid a commission she had not earned simply by smiling and waving at a senior manager who, she had heard, had a sexual interest in her.

Finally, No. 55 claims that she witnessed "certain acts of inappropriate touching" at the workplace, and in particular that she "witnessed women being touched (for example on their buttocks)" once or twice a week. No. 55 also "overheard some inappropriate comments being made to female employees" and "was told about other inappropriate comments." The remainder of No. 55's allegations assert conduct No. 55 had "heard about" or "was told" by others.

---

[5] In its response to IPA's motion as to No. 55, EEOC refers to Lubicz as "Director of Inside Sales." In its L.R. 56.1 Statement of Material Facts, IPA does not dispute the title EEOC imputes to Lubicz, although IPA states that No. 55 was a business coordinator and refers to Lubicz as No. 55's "manager." In addition, Lubicz is elsewhere referred to as the Director of Business Coordination. The court need not concern itself with these inconsistencies, however. as they are immaterial to the resolution of IPA's motion.

No. 55's claims cannot survive summary judgment.  Her allegations, like many of No. 37's, discussed above, are simply too vague to enable a fact finder to conclude that the conduct she asserts was actionable.  Her conclusory allegations of "inappropriate" comments and physical conduct do not suffice.  No. 55's subjective view of what is "appropriate" may or may not correspond to the criteria used by the courts to distinguish actionable from non-actionable conduct under the statute, and her allegations are insufficiently specific to enable a fact finder to evaluate her claims under the applicable standard.  For example, a rational jury could not determine, based on No. 55's allegations about "comments of a sexual nature," whether she heard sexually explicit jokes (generally not actionable), or solicitations for sex (potentially actionable).  Although repeated comments about a female employee's "tits" and "ass" may contribute to a hostile environment, *see Valentine v. City of Chicago*, 452 F.3d 670, 681-82 (7th Cir. 2006), the context and frequency of such comments are critical to an evaluation of their impact.  Compare *Valentine* with *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902-03 (7th Cir. 2005) (comments by male employee about female employee's "tits" and about female job applicants' physical appearance, and innuendos about his own penis size, among other comments, insufficiently serious to support hostile environment claim).  No. 55's general assertion that such comments were directed to her is therefore insufficient.

Perhaps the closest No. 55 comes to asserting actionable conduct in these allegations is with her assertion that Fishman "insinuated" that he wanted to have sex with her.  But No. 55 testified that Fishman never asked her on a date and never asked her to go to bed with him.  (She also testified that he never touched her).  In light of No.

55's affirmative denial that Fishman *explicitly* solicited her for sex, no rational fact finder could conclude, based on No. 55's vague allegations, that he *implicitly* did so. To be sure, solicitations for sex are not the only category of actionable comments. Threatening, abusive, or humiliating comments of an explicitly sexual nature may also support a claim (provided, of course, that they are sufficiently severe or pervasive). But No. 55 provides no evidence that Fishman's comments fell into any of these categories. Moreover, "[a]mbiguous comments that could possibly carry a sexual connotation are not sufficient to create an objectively hostile work environment." *Enriquez v. U.S. Cellular Corp.*, No 06 C 3135, 2008 WL 4925012 (N.D. Ill., Nov. 14, 2008) (Kendall, J.) (*citing Adusumilli*, 164 F.3d at 361-62).

Although by contrast, No. 55 recalls Lubicz's stripper comment in reasonable detail, that comment, standing alone, does not save No. 55's claim from summary judgment. It is true that the comment appears to have been made in front of other IPA employees, and was surely humiliating to No. 55 for that reason. Nevertheless, the insufficiency of No. 55's remaining allegations requires that the court view Lubicz's comment in isolation (or, more accurately, as an isolated instance of conduct directly affecting No. 55. The court remains mindful of the presumption that sexual harassment was pervasive and unchecked at IPA generally). Even offensive conduct that causes an employee "significant discomfort and distress" is not generally sufficient to demonstrate a hostile environment if the conduct is infrequent or of limited duration. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993). That is the case with Lubicz's remark. While insulting and understandably upsetting to No. 55, the comment was not so extreme as to alter the terms and conditions of her employment.

Finally, while No. 55's claim that she received a commission to which she was not entitled, simply by smiling and waving at a senior manager, is perhaps consistent with allegations by this claimant and others that IPA had a practice of paying commissions to female employees on a discretionary basis, based on whether the employee engaged in sexual acts with managers, her allegations do not support a finding that No. 55 was affected by this practice. Smiling and waving are simply too far removed from any kind of sexual activity to conclude from No. 55's allegations that was affected by the discriminatory policy alleged.

For the foregoing reasons, IPA's motion as to No. 55 is granted.

## Claimant No. 56

Claimant No. 56 worked for IPA for approximately two and a half months from September to December of 2001, first in Inside Sales and later as a business coordinator. During her time as a business coordinator (which appears to have spanned roughly the last three weeks of her employment), two of her colleagues repeatedly asked her out on dates. She consistently declined their requests. One of the unwelcome suitors, Terrence Burke, asked her out approximately six to ten times after she refused him. Burke repeatedly made comments to No. 56 about her breasts, the shape of her buttocks, and her "abilities to perform in bed," and he asked No. 56 to sit in his lap. No. 56 also overheard Burke loudly discussing female employees at IPA and whether they had sexually transmitted diseases. At some point, No. 56 discussed with an assistant zone manager

and/or Nick Jones the possibility of moving No. 56 to a different zone to get away from Burke, but no such move materialized.[6]

Another male business coordinator, whose name No. 56 does not recall, also made repeated unwelcome advances, which included telephone calls to her house. This individual asked No. 56 out ten to fifteen times, and despite her refusals, told No. 56 that he wanted to touch and caress her breasts and buttocks and that he wanted to "experience" her sexually. No. 56 believes that it was this individual who called her at home over the weekend, identifying himself as an IPA business coordinator, and said that he had heard she had gotten into an argument with another IPA employee, but that she should not leave IPA. After No. 56 told the caller not to call her again, her "caller ID" showed that he called another three or four times.

Frank Atkinson, a manager who led a training session in which No. 56 had participated, approached No. 56 at her cubicle after the training and said she was "not like all the other hoochie mamas at IPA. Once you do the nasty with them, you have … nothing to talk about."

No. 56 also claims that a female employee named Jenny (whose last name began with D, and who No. 56 states in passing was under 18 and still in high school at the time) was referred to by male employees as "Jenny Double D" in reference to her bra size. No. 56 claims that she saw male employees brush up against Jenny and touch her breast. No. 56 herself was subjected to unwelcome physical contact on one occasion, when Jason Zolnowski, her assistant zone manager, massaged her shoulders.

---

[6] It appears that No. 56 discussed moving zones on two separate occasions, once with an assistant zone manager whose name No. 56 does not recall, and once to Nick Jones. No. 56's testimony on this point is not entirely clear, however.

No. 56 reported some of these incidents to Nick Jones shortly before she left IPA. In particular, she told Jones that she was not comfortable in her zone because of her proximity to Burke, and that she was also uncomfortable about the phone call she had received at home.

IPA argues that these allegations fail because they are insufficiently severe or pervasive. It is true that No. 56 does not allege repeated or aggressive physical contact or explicit sexual solicitations, nor does she describe being subjected to obscene language or gestures. Nevertheless, a jury could find that the sheer number of advances several male coworkers made (sixteen to twenty-five over the three week period she was employed as a business coordinator), as well as their sexually suggestive content and the fact that one of her would-be suitors may have called her at home, amounts to conduct that is severe or pervasive enough to create a hostile environment. Obviously, No. 56's claims would be stronger if she could remember more details about the events she describes. Her chances of convincing a jury to find in her favor may be slim, but they are not zero, and she is entitled to the benefit of the doubt on summary judgment.

For the foregoing reasons, IPA's motion as to Claimant No. 56 is denied.

## Claimant No. 57

The parties dispute when and for how long Claimant No. 57 worked at IPA. EEOC claims she worked there for a little over a month in 1997. No. 57 stated in her deposition that although, she cannot recall the exact dates of her employment, she worked there for a month or a little more, sometime in 1996, 1997 or 1998. IPA asserts that No. 57 worked as a business coordinator for one week in November and December of 1997.

No. 57 alleges that three times a week during her employment, her zone manager asked her out for a drink. She consistently declined his requests, saying that she was married. She also alleges that two or three times per shift, male coworkers and supervisors leaned over her shoulder and rubbed against her back in a manner she says she cannot explain, but which she found to be sexual and inappropriate. She states that when she told the men to back off, they did, although some of them came back and leaned against her again. No. 57 also claims she saw male employees hug and kiss female employees, and that in some instances the female employees would push the men away. She also saw and heard male employees asking female employees out on dates. No. 57 generally cannot remember any details of conversations she overheard. She explains of her experience working at IPA, "I more or less put the things that I don't want to remember out of my mind, and so therefore I don't remember."

IPA argues that No. 57's claims are insufficiently severe or pervasive to give rise to a hostile environment. In particular, IPA emphasizes that No. 57 stated in her deposition that she did not find the environment hostile. IPA also argues that No. 57 provided insufficient detail to prove her claims, and that the details she did provide demonstrate that the conduct she alleges is not actionable.

At the outset, the court is not at all persuaded by IPA's argument that No. 57's claim must fail based on her purported testimony that her work environment was not "hostile." To begin with, this testimony was elicited by IPA's leading question: "It wasn't hostile?" after No. 57 stated that she found her work environment "unprofessional."[7] More importantly, however, there is no magic to a claimant's use of

---

[7] IPA is of course entitled to use leading questions to examine EEOC's witnesses, but the exchange on which it bases its argument that No. 57 did not subjectively find her environment hostile does not

the word "hostile" in pursuing a claim based on the "hostile environment" theory of liability. A claimant who describes sexual harassment that is so severe or pervasive as to alter the terms or conditions of her employment may prevail on a hostile environment claim, regardless of whether she uses the word "hostile" to describe her workplace.

No. 57's claim has other problems, however. Most fundamental is her general inability to recall the details necessary for a jury to determine that the conduct she alleges is actionable. While it is certainly possible to imagine that No. 57's supervisor asked her out in a way that was sexually explicit or offensive (indeed, other claimants describe such invitations: No. 43, for example, alleges her supervisor invited her for a threesome with his wife), No. 57's allegations provide so little detail that it is impossible to conclude that the impact of the invitations on a reasonable woman would have been so serious that it altered the terms or conditions of her employment. Like No. 55 (who claims her assistant zone manager "insinuated that he wanted to have sexual relations" with her but could not remember any particular invitation), No. 57 simply does not provide enough factual detail to enable a reasonable jury to conclude that her supervisor's invitations for "drinks" were such as would render No. 57's working environment objectively hostile. This is also true of the conduct she alleges she saw and heard, but that was not directed towards her specifically.

Similarly, the unwelcome physical contact No. 57 describes is too mild, and the description itself too vague, to support her claim. First, No. 57 does not claim that the

---

necessarily support the conclusion it seeks to draw. It is not at all clear from No. 57's testimony that she appreciated the legal significance of IPA's counsel's use of the word "hostile." The relevant exchange reads: "Q: …Was [your work environment] anything besides unprofessional? A: Well, it was kind of – I felt kind of that shouldn't have – shouldn't be in the workplace." Q: Because it was unprofessional? A: Right. Q: Okay. It wasn't hostile? A. It wasn't hostile but it was conduct that didn't belong in the workplace."

contact involved any particularly sensitive or sexual body parts, and she states that she "can't explain" what made the gesture sexual, other than that "what they were doing did not require them leaning over me in that – in that type of way." Second, No. 57 states that in each instance, the contact lasted only a "few seconds," and that when she asked the men to stop, they generally did (although some of them returned later). These allegations do not depict conduct that a reasonable jury could find so severe or pervasive as to alter the terms or conditions of No. 57's employment.

For these reasons, IPA's motion for summary judgment as to No. 57 is granted.

**<u>Claimant No. 58</u>**

Claimant No. 58 worked as a Business Consultant for IPA for two weeks in 2000. It appears from her allegations that No. 58's backside caused quite a stir at IPA. Beginning with her first day at work, when she had gotten no further than the parking lot before ten to fifteen men commented on her buttocks (in such terms as "Damn, you've got a big ass, baby"), No. 58 endured daily comments about—and on two occasions, unwanted contact with—her buttocks. These included such graphic appeals as "You can come to my house and I'll, you know, wack (sic) that ass for you" and "nail you to the nearest wall." The employee who uttered these last comments explained his meaning: "I'll fuck the shit out of you." No. 58 claims that these are the kinds of comments she heard day in and day out, even though she "cussed out" the men who made them. Finally, No. 58 quit her job because she was "tired of hearing it."

The court's disposition of IPA's motion as to Claimant No. 58 requires little explanation. An employee claiming she was subjected to daily comments about her buttocks, including graphic, arguably violent solicitations for sex, easily survives

summary judgment. IPA's motion for summary judgment as to Claimant No. 58 is denied.

## Claimant No. 61

Claimant No. 61 worked at IPA from May to December of 1997, when she was twenty-two years old. For the first three weeks, she trained and then worked in the Business Coordination Department. No. 61 states that she was a mediocre performer as a telemarketer, and after two weeks on the job, John Burgess, the CEO of IPA, personally offered her a position as an assistant in the quality assurance department. Shortly thereafter, Burgess offered No. 61 a salaried position as quality assurance manager, which she felt was a promotion. Initially, No. 61 believed that Burgess offered her the position because he thought she showed potential as a professional. Soon after she became quality assurance manager, however, Burgess placed his hand on No. 61's shoulder, and, while standing close enough her to make her uncomfortable, asked her out for dinner and drinks. No. 61 declined the invitation, telling Burgess, "you're married," to which Burgess allegedly replied, "we won't invite her." Although she consistently declined his invitations, Burgess consistently asked No. 61, approximately once every two weeks, whether she had changed her mind about going out with him.

Approximately three weeks after No. 61 declined Burgess's his last request, Shelle Bareck, IPA's Human Resources Manager, called No. 61 to her office and told her that because of No. 61's complaints about people smoking and using foul language in her office, the quality assurance manager position was "not the best match" for No. 61, and that "the environment was probably a little too hostile" for her. Bareck offered No. 61 a position as a business coordinator, but by that point, No. 61 was not interested in any

position at IPA. She quit the same day she was removed from the quality assurance manager position.

In addition the above, No. 61 alleges a variety of harassing conduct by numerous male employees at IPA. For example, she alleges that a male employee twice pressed his erect penis against her from behind. The second time was after No. 61 had complained about the first incident to her supervisor (and CEO of the company), John Burgess. No. 61 also alleges that on one occasion, a male coworker insulted her using the epithets "fucking whore," "fucking slut," and "fucking bitch." Another coworker called her a "fucking bitch" and responded to her work related requests with "fuck you" after she refused to go out with him.

IPA argues, unconvincingly, that these and other incidents not cataloged here are insufficient to demonstrate a hostile environment as a matter of law. The court disagrees. IPA also argues that No. 61's claim is time barred because only the last week of her employment falls within the limitations period, and, according to IPA, No. 61 does not allege any harassment during that period. But No. 61 claims that she was demoted from her position as quality assurance manager and asked to return to her position as a business coordinator because she refused to accede to John Burgess's advances. EEOC argues that No. 61's experience provides "a perfect example of how women's careers can rise and fall at IPA based on their receptiveness to managers' sexual advances," and that her demotion was part of the sexually hostile environment at IPA.

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). As the Court has explained, "[Title VII] does not

separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability." *Id.* at 118. Of course, the parties factually dispute whether No. 61 was, in fact, "demoted." But summary judgment is not the place to resolve this dispute. EEOC has provided sufficient evidence from which a jury could conclude that No. 61 was removed from her position as quality manager as part of a sexually hostile environment at IPA, and that environment persisted throughout the time of No. 61's employment, including the period that falls within the limitations period.

For the foregoing reasons, IPA's motion for summary judgment as to Claimant No. 61 is denied.

## Claimant No. 69

Claimant No. 69 was a business coordinator at IPA for about a month and a half in November and December of 1997. On at least four occasions, she saw men huddle together and whisper after women walked down the hall, and although she couldn't hear exactly what was said, she heard comments of a "sexual nature," such as the words "ass" and "boobs." No. 69 did not hear any comments about her personally. On about four occasions, she also heard male coworkers refer to female employees as "bitch" or "dyke," and she heard the word "lesbian" used once or twice. No. 69 also alleges that she heard her supervisor, Jim, complain about an employee on two different occasions, using language such as, "the bitch is trying to get me fired," and referring to her as a "cunt." She also alleges that two coworkers—a husband and wife team—frequently complained about the husband's ex-wife and her requests for child support. The husband and wife referred to the ex-wife as a "fucking bitch" and a "whore."

No. 69 states that a male colleague with whom she had a good rapport, and who she believed had an understanding of how things worked at the company because he worked with managers, told her on one occasion that if she wanted to get anywhere in the company, she would have to sleep with somebody. She also states that her supervisor, Jim, kept a calendar of semi-naked women (whose bare nipples were exposed) in an area of his workspace that was generally visible to other employees.

IPA argues that summary is appropriate because the harassment No. 69 alleges is not severe or pervasive and is not based on sex. The court agrees that No. 69's claim cannot withstand summary judgment. She does not claim to have been the individual target of any harassing language or behavior. In fact, she does not claim that the offensive language was directed to the women apparently being talked about, but rather that it was used during semi-secretive conversations among men. Although No. 69 claims to have overheard snippets of these conversations, this type of exposure to sexually inappropriate or offensive language in the workplace is not generally sufficient to create a hostile environment. *Yuknis*, 481 F.3d at 556 (remarks and behaviors unrelated to complainant except for her having overheard them not generally actionable). Moreover, although No. 69 claims that she heard comments about coworkers "frequently," she also quantifies the total number of comments as fewer than ten. The objectionable comments by No. 69's colleague about his ex-wife indeed included gender-based epithets; but the alleged comments were clearly a reflection of personal hostilities, not of sex discrimination at IPA.

Even taking into consideration the bare-nipples calendar and her colleague's suggestion that No. 69 would have to sleep with someone to get ahead at the company,

the potential impact on No. 69 of the totality of the conduct she alleges falls short of that required to cause a reasonable woman to feel she had been discriminated against based on her sex. She does not claim to have been subjected to any unwelcome contact; she was not herself verbally harassed, nor did she hear other women being verbally harassed; and although she was offended by the calendar with semi-naked pictures of women, the pictures she describes were not so shocking or egregious as to render No. 69's workplace objectively hostile. Even the addition of one off-handed remark by a colleague that she would have to "sleep with someone" to get ahead, does not bring No. 69's claims to an actionable level of severity or pervasiveness.

Because the court determines that the potential impact on No. 69 of the conduct she alleges was too attenuated to render her workplace objectively hostile, it need not address IPA's argument that the alleged harassment was not based on sex. IPA's motion as to No. 69 is granted.

**Claimant No. 72**

Claimant No. 72 worked as a business coordinator and then a Recruiting Coordinator (and, according to IPA, also as an administrative assistant) at IPA from December 1999 to September 2000. She claims that after performing well as a business coordinator, she was promoted to Recruiting Coordinator. Like No. 69, No. 72 often heard male business coordinators and zone managers making sexual comments and jokes about the bodies of female business coordinators. As a result of these comments, No. 72 did not want to walk to the front of the room (as she had to do for her job), because she did not want the attention focused on her. Moreover, unlike No. 69, No. 72 did not

merely overhear comments and jokes about other women's bodies—she claims that some of the comments were directed at her.

No. 72 states that Richard Gottlieb, who was her manager when she was in recruiting coordination, once made a comment about how nice her legs looked in the skirt she was wearing. On another occasion, after No. 72 asked Gottlieb whether there was anything else he needed as she was leaving his office, he replied, "[u]nless you'd like to stay for – unless you'd like to do something else." Gottlieb also massaged No. 72's shoulders on one occasion. No. 72 claims that the manner in which Gottlieb made this comment implied a sexual invitation. No. 72 claims that in addition to Gottlieb, other male employees commented about her legs or how she looked in her clothing on several occasions.

No. 72 also makes a number of allegations relating to the amorous relationship between another female Recruiting Coordinator and Jim Slywka, a supervisor in the Recruiting Coordination department. First, No. 72 complains that she was unwillingly privy to several conversations about the couple's sex life. Next, she states that because her female colleague was spending time in their supervisor's office, rather than doing her job, No. 72's job was more difficult because she had to handle a disproportionate number of incoming calls to the department. No. 72 complained about this situation, first to Rich Lubicz, then to Shelle Bareck. Lubicz responded by giving No. 72 a salary raise, but apparently no further action was taken. No. 72 claims that the only solution Bareck offered was to move No. 72 back to a position in Business Consulting, which No. 72 did not want. Bareck said that No. 72's female colleague would not be removed from her position in recruiting coordination.

IPA argues that No. 72's claim cannot proceed to a jury because she "never heard anything that could not be repeated on primetime television" (quoting *Baskerville,* 50 F.3d at 431) and because No. 72's allegations regarding the relationship between her colleague and her supervisor is a non-actionable "reverse quid pro quo" claim.

While it is true that No. 72 was not subjected to the kinds of graphic sexual epithets certain other claimants describe, she nevertheless was subjected to comments that she interpreted as a sexual solicitation by a supervisor. Here, the court is mindful of its presumed findings in Phase I and concludes that in an environment pervaded with sexual harassment, a reasonable woman could indeed construe Gottlieb's comment as an invitation for sex. No. 72 was also subjected to repeated comments about her body and appearance that caused her to believe she was being judged at IPA not simply on the basis of her professional ability, but also on the basis of how she looked in a skirt. This belief was reinforced by her environment, in which sexual harassment was pervasive, and in which a colleague whose performance was demonstrably "not up to par," but who was in a sexual relationship with a supervisor, was allowed to remain on the job, making No. 72's job more difficult. To be clear, the point is not that No. 72 was subjected to "reverse *quid pro quo*" harassment as a result of her coworkers' sexual relationship. The court need not and does not express any opinion on whether such claims may, standing alone, be actionable. Although No. 72 does contend that her colleague was treated more favorably than she, regardless of whether that claim is actionable, No. 72 also alleges that the palpable effects of her coworkers' relationship contributed to an overall working environment in which women were valued as sex objects rather than as professionals.

The totality of these circumstances could lead a reasonable woman to believe that she had been discriminated against based on her sex. Accordingly, IPA's motion for summary judgment as to No. 72 is denied.

## Claimant No. 78

Claimant No. 78 was a business coordinator at IPA for approximately two months from December 1999 to February 2000. Over the course of her employment, a male employee named Fidel St. James made comments to No. 78 such as, "your booty sure look good in that skirt," "your titties sure do look good in that shirt," "your ass is plump," "ooh, look at your legs." He made these comments "Every day all day." Because there is no question that these types of comments are actionable and that they pervaded No. 78's environment, a jury could find that environment objectively hostile. The court rejects IPA's argument that No. 78 does not allege severe or pervasive harassment and need not linger on this point.

Nevertheless, IPA's second argument—that summary judgment is proper because No. 78 concedes that she did not *subjectively* perceive her environment as hostile—requires further examination. Indeed, the impact of alleged harassment upon a complainant is viewed both objectively and subjectively. "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798 (7th Cir. 2000). EEOC does not dispute IPA's factual assertion that the incidents No. 78 experienced at IPA "didn't bother." Indeed, No. 78 testified at her deposition that she did not find the sexual harassment she experienced to be "overwhelmingly hostile," and that she does not believe she suffered any kind of damage

or harm from the alleged incidents.  In its opposition to IPA's summary judgment motion, EEOC argues that a genuine issue of material fact nevertheless exists as to whether No. 78 perceived her work environment as hostile based on her testimony that she was "offended" by the conduct she experienced.  But mere offense is not enough.  *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007) (contrasting "mere offense" with "serious harassment").   As noted above in relation to No. 57's claim, an aggrieved employee is not required to invoke the word "hostile" to prevail on her claim, and even an express disavowal of that term need not, in all circumstances, be fatal.  No. 78, however, goes further than merely denying that her environment was overwhelmingly hostile:  she states that she was not even bothered by the harassment.  For example, No. 78 testified that she never did anything about the harassment she alleges because "[i]t didn't personally affect me.  It was just offensive.  People said things offensive every day.  Are you gonna go and run and report that?"  To further illustrate, No. 78 claims that her response to St. James's pervasive, inappropriate remarks was, "[y]ou can talk to me however you choose to talk to me, but it's not gonna bother me with you and you shitty-ass comments.  So if you have nothing nice to say to me as a female then don't say nothing at all."  No. 78 also testified that although she found the conduct at IPA offensive, it did not make her angry, it did not make her stressed, and it did not affect her work.  Based on this and similar testimony, the court finds that no reasonable jury could conclude that No. 78 subjectively perceived her work environment as so hostile or abusive that it constructively altered the terms or conditions of her employment.  Accordingly, IPA's motion for summary judgment as to No. 78 is granted.

**Claimant No. 88**

Claimant No. 88 worked as a business coordinator from January 25, 2001 to April 13, 2001. According to her testimony, during this time, two managers approached her from behind while she was seated at her desk and rubbed her shoulders. On each occasion, she jumped and gasped, and the unwelcome contact stopped. After the first incident, No. 88 asked her supervisor, Jim Jordan, to ask the offending manager on that occasion not to touch her. No. 88 saw Jordan call the manager immediately after she made her complaint, and that manager never rubbed her shoulders again. No. 88 did not make any reports or complaints about the second incident (which occurred after she had reported the first), but she told the second manager who touched her—Shawn Fishman— that she "didn't like being touched that way at work." Fishman never rubbed No. 88's shoulders again, but he "often" put his hands on her shoulders or waist as he was walking past.

On another occasion, which the EEOC characterizes as "the most disturbing incident," a male coworker with whom No. 88 was not friendly was walking past No. 88 in an aisle. He slowed down, said "hey, smile," and ran his fingers along No. 88's jawbone and neck. When No. 88 said "don't, don't," the coworker "looked surprised and said, sorry." This episode was clearly upsetting to No. 88, who cried and needed several moments to collect herself at her desk. She then reported to Jim Jordan that someone had touched her face and that she thought it was inappropriate, but she refused Jordan's requests to tell her who the offender had been, saying, "I don't know if I'm overreacting. I don't want to get anyone in trouble." That same day, another manager with whom No. 88 was friendly, Garrett Bresette, approached her about the incident and told her that if

she wanted him to do anything about it, she would have to tell him who the offending employee was. She declined. Instead, No. 88 resigned the following day. The next day, while no longer employed by IPA, she called Bresette and told him the name of the individual who had touched her face.

In addition to the above, No. 88 heard managers, including Keith Link, use vulgar language, such as the words "shit" and "fuck." She also heard one male manager use the word "penis" (referring to his own, apparently) when speaking to another male manager. On another occasion, she heard Link laugh loudly and say, "this guy is trying to sell me porn." No. 88 saw Link with a video cassette, but she did not actually see what was on the video. Finally, the same coworker who later touched No. 88's face once came over to her work area, picked up a picture of No. 88's boyfriend from her desk, and said, "[h]ey, what are you doing with a picture of my gay lover on your desk? Is he cheating on me?" Of this incident, No. 88 states that she was "floored," but also that she "could tell that he was being theatrical. And he thought he was being very funny."

No. 88 reports that other than the incidents above, she did not personally see or hear anything at IPA that she considered sexual harassment.

IPA argues first that these allegations do not reach the level of severity or pervasiveness necessary to withstand summary judgment. IPA also argues that it took appropriate steps in response to the alleged harassment. Because the court agrees with IPA's first argument, it need not reach the second.

The two two-or-three-second shoulder rubs No. 88 alleges, while clearly unwelcome, are simply too innocuous, even in the context of No. 88's other allegations, to support her claim. Even the face-touching incident, which EEOC deems the "most

disturbing," and which unquestionably provoked a strong reaction by No. 88, nevertheless is not the type of physical conduct that is so egregious that even one instance would make a reasonable woman experience her workplace as hostile. The gesture was not intimidating or threatening (indeed, No. 88 testifies that the offender was surprised by her response and apologized), nor was it particularly sexually suggestive in nature. In *Hostetler* v. *Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir. 2000) the court contrasted the forceful kiss it found sufficient to survive summary judgment in that case with certain types of less serious physical contact: "There are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. Cumulatively or in conjunction with other harassment, such acts might become sufficiently pervasive to support a hostile environment claim, but if few and far between typically will not be severe enough to be actionable in and of themselves." The physical contact No. 88 describes, even considered cumulatively and together with her claims of verbal harassment, falls into this category.

No. 88 does not claim to have seen pornography at IPA, only that she heard a manager discussing it. This is not actionable harassment. *See Yuknis*, 481 F.3d at 555 (manager's allegedly watching pornography on his office computer had insufficient impact on plaintiff's workplace to render environment hostile). Likewise, No. 88's coworker's joke about her boyfriend's photograph is off-color, but it not the stuff of sexual harassment.

Despite the sexual harassment the court assumes was rampant at IPA, No. 88 describes being personally exposed to only a handful of annoyances. IPA's motion for summary judgment as to No. 88 is granted.

**Claimant No. 104**

Claimant No. 104 was a business coordinator at IPA for roughly six months from January to June of 2000. She states that she wore sweaters to work nearly every day, and that each day she did, her assistant zone manager, Shawn Fishman asked her to take her sweater off so he could see her chest. He also rubbed her shoulder frequently, despite her requests that he stop. In addition, Keith Link, a manger in the "hybrids" department, told No. 104 that he wanted her to do a cheer to "pep up" the employees in the hybrids department. Link wrote the text of a cheer on paper and asked No. 104 to do it. No. 104 thought the cheer was "dirty" and told Link she would never do a cheer of that nature and would not do a cheer while at work and wearing a skirt. Link's handwritten cheer, which is included the record, reads, in part, "Do you want to see me shake it, do you want to see me bake it, do you want to see me naked, hybrids are the way." Despite her refusal, Link asked her to do the cheer every day.

A male coworker repeatedly asked No. 104 to go out, and he brought her flowers at her desk. No. 104 declined, saying that she had a boyfriend, whereupon the male colleague told her he should kill her boyfriend so that No. 104 should be with him. He also followed her to her car every day for approximately two weeks. No. 104 reported these incidents to her zone manager and assistant zone manager. She is not aware of any action taken as a result of her complaint, nor does IPA allege that any action was taken.

Although EEOC does not rely on this testimony in opposing IPA's motion, No. 104 stated at her deposition that a childhood friend who was also an IPA employee told No. 104 that John Burgess had offered her $5,000 in exchange for oral sex, but that she turned him down. IPA has consistently argued that claims based on hearsay such as this

are not actionable, and indeed the court has noted that claims based on conduct that claimant merely heard about are insufficient to withstand summary judgment. Nevertheless, IPA goes to the trouble in this instance of rebutting No. 104's testimony with an excerpt from the deposition of a woman who appears to be the referenced friend, whose name is either Diane or Toula Megalis.[8] Megalis testified that she was never harassed at IPA, and specifically, that John Burgess never offered her money for oral sex. Megalis further testified that No. 104 told her that No. 104 planned to make up a false story about harassment at IPA in order to collect money in this lawsuit.

IPA argues first that the conduct No. 104 alleges is too innocuous as a matter of law to withstand summary judgment. The court cannot agree. A jury could find that a reasonable woman asked day in and day out to remove her sweater for better viewing of her breasts, and repeatedly asked to do a cheer in which she queries, "do you want to see me naked?" would find her environment hostile. No. 104's additional allegations reinforce the image of a sexually charged workplace, in which unwelcome, even threatening amorous advances by colleagues were unexceptional. Moreover, it is not the role of this court to weigh the evidence IPA introduces to controvert No. 104's testimony or to assess her credibility.

For the foregoing reasons, IPA's motion for summary judgment as to No. 104 is denied.

## Claimant No. 107

Claimant No. 107 was employed by IPA in various capacities, including as a senior manager, from 1993 to 2000. Although she often worked in the field or from her

---

[8] No. 104 refers to the individual by a different first name than the one identifying the testifying witness in the deposition transcript, although the last name is the same. The transcript also refers to No. 104 by a different first name than her own. The parties do not comment on these discrepancies.

home, No. 107 typically went to IPA headquarters every day, at least during the afternoon. Most, though not all, of her allegations relate to John Burgess. No. 107 recounted several incidents in detail during her deposition, and testified that incidents she considered to be sexual harassment involving Burgess are "too many to totally recall." A few examples follow.

During a management meeting one evening at Burgess's house, where No. 107 was the only woman present, Burgess singled her out to ask, "[No. 107], you know why Tony [one of the male managers present] is marrying Nikki?" Burgess then answered his own question: "Well, Nikki used to be a dancer in a club and that's where Tony met her, and Tony thinks this is real love because she's the first girl that has been able to make him come in her mouth. Tony's real embarrassed."

In a similar vein, during a meeting in Burgess's office between No. 107, Burgess, and a manager named Dan Drugan, Burgess ended the meeting with a handshake and the statement to No. 107, "You know Danny [Drugan] just got a divorce….Danny needs a blowjob." No. 107's states she became "uptight" at this remark, and Burgess explained, "[w]ell you'll have to excuse me…I'm a sexual man. I'm different from other people."

In 1997, after No. 107 had been performing extremely well at IPA, she asked Burgess why he didn't put her in a management position. No. 107 states that Burgess "looked at [her] and he said, [No. 107], don't you know, women cannot manage men."

These examples, which No. 107 recounts in detail, suffice to defeat IPA's motion. On multiple occasions, IPA's most senior officer, with whom No. 107 was in regular contact, singled her out as the only woman in a group of men and directed graphic, sexually explicit comments to her, which No. 107 found "humiliating." He also told her,

essentially, that women were not fit to hold management positions, a comment No. 107 found demeaning.[9] No. 107 testified that although these particular episodes (and others not mentioned here) stood out in her mind, they are merely examples of the kinds of comments Burgess made on a regular basis. No. 107 need not recall each instance of harassment in similar detail to bring her claim to a jury. *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1456 (7th Cir. 1994) (rejecting argument that because plaintiff could recall only five incidents in detail, her claim was insufficient as a matter of law, explaining that there was "sufficient evidence in the record to corroborate [the plaintiff]'s charge of ongoing conduct."). The court has no trouble concluding that a jury considering the totality of the circumstances could find that a reasonable woman would find No. 107's working environment hostile based on her sex.

For the foregoing reasons, IPA's motion for summary judgment as to No. 107 is denied.

## Claimant No. 108

Claimant No. 108 worked as a business coordinator and Recruiter for IPA from November 11, 1998 to March 12, 1999. During that period, a male colleague asked her several times (approximately three) to perform oral sex on him in the parking lot. On each occasion, No. 108 turned her back to him and ignored his request. A different male coworker made comments such as, "Girl, you've got fine legs" when she walked past while wearing a skirt. No. 108 also heard male colleagues make comments on a daily basis about female coworker's bodies. In addition, No. 108's manager, Dmitri Kotsakis, would hug her to encourage her when she made sales, and on one occasion, Rich Lubicz, who was her manager at the time, gave her a neck massage that lasted about thirty

---

[9] That No. 107 did, ultimately, become a manager is not fatal to her hostile environment claim.

seconds while she was on the phone. No. 108 did not tell either manager that the contact was unwelcome, nor did she report it (or the comments she found offensive) to anyone. No. 108 testified at her deposition that the reason she did not complain about the incidents was that she thought her complaints would be fruitless. Specifically regarding the physical contact, she thought that because her supervisors knew "the boss," nothing would be done if she complained. As to the offensive comments, she testified that they were so frequent, she assumed nothing would be done about them.

IPA asserts that these allegations are insufficiently severe or pervasive as a matter of law. While the unwelcome physical contact—which No. 108 testified was not sexual, although it made her uncomfortable—may, standing alone, fall below the threshold for actionable conduct, the cumulative effect of repeated, explicit sexual solicitations (oral sex in the parking lot), daily comments about female coworkers' body parts (including her own on at least one occasion), and unwelcome, if relatively inoffensive physical contact from her supervisors is sufficient to withstand summary judgment. Sexual harassment need not be both severe *and* pervasive to be actionable—one or the other suffices. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). A reasonable jury could find that a handful of overt sexual solicitations, in a work environment in which ongoing commentary about female workers' bodies was the norm, rendered No. 108's work environment objectively hostile to her as a woman. Accordingly, IPA's motion for summary judgment as to No. 108 is denied.

**Claimant No. 113**

Claimant No. 113 was a business coordinator at IPA for approximately three weeks in October and November of 2000. Her claim rests on the following events: On

one occasion, as she sat with No. 58 at a lunchroom table, a male coworker who was sitting across from them bent under the table. No. 113 assumed he was tying his shoe; but when he remained under the table for an unusually long time, No. 113 herself bent down to discover her colleague looking under her and No. 58's skirts. No. 113 complained about this event to Linda, her IPA trainer, but could not identify the offender by name. No. 113 returned to speak to Linda the following day, but when Linda was unavailable, No. 113 let the matter drop.

On another occasion, as No. 113 and No. 58 walked passed a group of male colleagues, she heard someone say, "ya'll got a big booty." She did not know whether this comment was directed at her or at No. 58. At her deposition, No. 113 testified that she was touched on her buttocks several times (although her testimony on this point is hopelessly muddled, and it is unclear whether her claim is that she felt several hands on her on one occasion, or that she was touched on several occasions), for a "quick second." No. 113 also testified that she saw No. 58 and No. 113's sister (also an IPA employee) have their buttocks grabbed, to which each responded "Don't touch me" or, "don't put your hand on me like that." No. 113 recalls that the man who touched No. 58 responded, "I'm sorry, I'm sorry." The man who touched her sister simply "walked off."

Finally, No. 113 claims that on one occasion, as she and No. 58 walked by a group of three male coworkers on their way for a cigarette break, the men grabbed them by the hands or arms and asked for their phone numbers. The women refused, and the men left them alone. At one point in her deposition, No. 58 described feeling "tortured" by getting hit on her behind and hearing comments about her body. She does not,

however, claim that she was subjected to any comments about her body other than the "big booty" comment noted above.

No. 113's claims cannot survive summary judgment. The episode involving the lunchroom voyeur, although creepy, is not so severe, as an isolated occurrence, or even in conjunction with the remainder of her allegations, as to render her workplace objectively hostile. Next are the incidents involving No. 113's buttocks, and those of two of her colleagues. Unlike No. 58, who, as the court noted above, faced a daily barrage of highly graphic and offensive commentary about her *derrière,* in addition to several incidents of unwanted touching, No. 113 claims to have been subjected to only one comment about, and one (or possibly three) "taps" on, her behind. On another two occasions, she saw her colleagues subjected to unwelcome "grabs" on their behinds as well. It is difficult to conclude, however, based on No. 113's description of these occurrences, that their cumulative effect on No. 113 was disturbing enough to render her working environment objectively hostile. Nor can this handful of incidents reasonably be considered pervasive, even in view of her short tenure at IPA. In sum, the untoward conduct of which No. 113 complaints falls within the "safe harbor" of conduct that is "too tepid, intermittent, or equivocal to make a reasonable woman believe she has been discriminated against based on her sex." *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) (quoting *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996)). Accordingly, IPA's motion as to No. 113 is granted.

## Claimant No. 134

Claimant No. 134 worked at IPA from March of 1998 until April 1, 2001. On or around July 17, 2001, she filed a sexual harassment claim against IPA with the EEOC.

Since that time, she has testified that her manager, Rich Lubicz, nicknamed her "bubble butt" and that he and other employees—both colleagues and supervisors—hit, slapped or smacked her on the buttocks regularly. She testified that she felt as though every man at IPA thought she was a slut because "[e]verybody hit me on my butt whenever they felt like it." No. 134 claims that this bothered her, and that she told the men to stop and sometimes pushed them away or hit them back. She asserts that on one occasion, Tyler Burgess took a photograph of her backside, photocopied the photograph, and displayed the photocopies, with No. 134's name on it, in various locations throughout the office. No. 134 calls the day on which the photocopies were displayed the "most embarrassing day of [her] life."

In addition, No. 134 asserts that she saw male employees at IPA grab the chests or buttocks of female employees, including Elyse Neyfeldt, Lauren Neyfeldt, Evelyn Smason, Trinda Heinrich, and others. She saw some of these women tell the men to stop or hit them back. No. 134 believes that these women have not complained about this behavior because they fear for their jobs.

The foregoing recital is not exhaustive of No. 134's claims, but it suffices to give a flavor of the environment in which she claims she worked.

IPA attacks No. 134's complaints about the persistent bottom-smacking she and other female employees endured with the argument that No. 134 was "an active participant in—if not the instigator of—this horseplay." The argument itself reveals the inappropriateness of summary judgment, where all reasonable inferences must be drawn in favor of the non-movant. To grant IPA's motion based on a conclusion that the conduct No. 134 describes was not "harassment" at all because it was welcome, *see Reed*

*v. Shepard*, 939 F.2d 484, 486-87 (7th Cir. 1991), would require the court to make inappropriate credibility findings.

Moreover, having reviewed No. 134's deposition transcript in its entirety, the court looks askance at IPA's characterization of the unwelcome contact she recounts as "mutual butt smacking." Nowhere in No. 134's testimony (or in any other evidence IPA cites), is any statement or suggestion that No. 134 smacked any male employee on the buttocks. Rather, she claims to have "hit back" one or more of the men who touched her. The court is similarly unimpressed with IPA's rhetorical question, "How could anyone photocopy Claimant No. 134's behind without her active participation and cooperation?" No. 134's testimony is clearly that Tyler Burgess *photographed* her backside, then photocopied the picture for public display. These and other interpretive liberties IPA takes with the record do not incline the court in its favor.

IPA also takes great pains to refute No. 134's claim that other women were sexually harassed by submitting affidavits signed by the women No. 134 identified in her testimony. These affidavits deny the incidents No. 134 recounts, either generally ("I have never been subjected to any unwelcome comments, inappropriate or unwelcome touching or any other sexual harassment by any other employee"), or specifically ("Rich Lubicz never 'grabbed' my butt or chest"). Some go further, asserting, for example, that No. 134 encouraged the affiant to file frivolous a claim against IPA and admitted that her own claim was frivolous. To the extent these affidavits are inconsistent with No. 134's testimony the inconsistencies only underscore the need for a jury to determine the merit of No. 134's claim. IPA's motion as to Claimant No. 134 is denied.

**Claimant No. 137**

Claimant No. 137 worked as a business coordinator at IPA for a few weeks in August of 2000, and again from August 25, 2001 to September 21, 2001. No. 137 testified that the reason she first left the company the first time was that it was too far away, and she had to take a bus and train to get to work. No. 137 testified that she left the second time because a colleague, Percy Houston, told her, in front of her colleagues, about a rumor going around that she was "sucking somebody's dick" at IPA. This rumor was so upsetting to No. 137 that she cried for the rest of the day. She told her zone manager, Jim Jordan, who told her, "don't worry about it. We'll get to the bottom. Just get back to work. We need some leads." No. 137 states that she followed up with Jordan, who told her he had talked to Percy, but that she continued to get "funny looks like nasty" that she believed were a result of the rumor.

No. 137 also testified that men were "constantly in [her] face" while she was on the phone working. "Constantly every day – every day it's a different guy actually." She claims that they made comments such as, "you thick as hell," which she interpreted as meaning she has big breasts or buttocks, and asked her out. No. 137 states that she would tell them no, and that she was trying to work. They would leave, but then come back later for more of the same. On one occasion, a male employee said to No. 137 and a male colleague, "she thick as hell but she ugly" about a female business coordinator. No. 137 also complains that she saw male and female employees hugging, kissing, and touching each other's "booty" in a way that she felt was inappropriate for the workplace.

No. 137 is entitled to have a jury decide whether she was discriminated against based on her sex. To begin with, although the phrase, "you thick as hell" is a novelty to

this court, No. 137 expressed no doubt about its meaning, and it is possible that a jury would interpret it in the same manner No. 137 did: "you got big titties, big booty." Certainly, a female worker claiming she was accosted on a daily basis with remarks about her breasts and backside in a way that interfered with her work describes conduct that is both sex-based and pervasive. Moreover, regardless of whether rumors about sexual activity are generally sufficient to support a hostile environment claim, *Yuknis v. First Student, Inc.,* 481 F.3d 552, 554 (7th Cir. 2007) (offense based purely on hearsay or rumor generally insufficient to support a claim), in this case, a colleague announced a sexually explicit and, evidently, humiliating rumor about No. 137 to her, in front of her colleagues. Taken together, and bearing in mind the pervasive and unchecked harassment the court assumes was rampant at IPA, a jury could find that No. 137's workplace was both subjectively and objectively hostile to her based on her sex. IPA's motion as to Claimant No. 137 is denied.

**Claimant No. 139**

Claimant No. 139 was a business coordinator at IPA from July 5, 2001 to July 13, 2001. The week got off with a bang: No. 139 testified that her first day on the job, her assistant zone manager, Jason, told her that women workers were "good for nothing but being on the phone" and that "the only way that [they] could get into a nice position is if [they] sleep with him or Nick [No. 139's zone manager]." Jason also called No. 139 "dumb" or "stupid" nine or ten times, and although she heard him call her female colleagues dumb or stupid, she never heard him speak that way to a man. No. 139 also claims that while female employees were "screamed and hollered at" if they were not on the phone, she never saw men being similarly rebuked.

Jason also sexualized criticisms of No. 139's work, telling her that she wasn't performing her job well because her "boyfriend must not be doing a good job at home." On several occasions, he said: "Your boyfriend must not be satisfying you. If you do me instead, I'll make you happy and you'll do better here." After the first time he made the comment, No. 139 asked him to stop. His response was, "you know you want it." No. 139 states that she complained to Nick, her zone manager, who responded that people were always complaining about Jason, but that Nick didn't believe the complaints. No. 139 recounts several other incidents of verbal harassment that need not be addressed individually.

In addition, No. 139 states that she saw Jason slap a female colleague on her buttocks twice during the week that she was there. The woman told Jason to leave her alone, to which Jason replied, "you know you like it." No 139 also heard Nick say to the same colleague, "Hey, I can see your pussy. Want me to show you what I've got?"

No. 139 also saw pictures of naked and partially naked women hanging in a cubicle used by a male employee. No. 139 complained to her zone manager about the pictures, but he told her that the pictures didn't matter, as long as the men got their work done. No. 139's tenure at IPA culminated in an argument with her zone manager, which escalated until he ultimately threw a chair at her.

IPA argues both that the foregoing incidents do not reflect sex-based harassment and that they are insufficiently severe and pervasive as a matter of law. The court rejects both arguments. First, even assuming that some of the incidents—such as the chair-throwing episode—were motivated by workplace frustration and not sexual animus, a reasonable jury could conclude, based on No. 139's testimony, that women

disproportionately bore the brunt of such frustration at IPA. In other words, her testimony supports the conclusion that women at IPA were "exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed," *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80. That is sex-based harassment, even if one ignores the conduct whose content was explicitly sex-based. Moreover, a jury could conclude that the episodes No. 139 relates pervaded her brief employment at IPA.

For the foregoing reasons, IPA's motion for summary judgment as to Claimant No. 139 is denied.

## Claimant No. 147

Claimant No. 147 was a business coordinator at IPA from September of 2000 to July of 2002. Shortly after she began working at IPA, No. 147 was approached in the lunchroom by Richard Gottlieb (whom she did not know at the time), who told her that she had nice breasts and asked her if they were real. A few weeks later, Gottlieb again commented to No. 147 that her breasts were nice, and he asked whether she ever participated in "touch and feel." After No. 147 made clear to Gottlieb that she was not interested, he stopped making these comments.

Approximately two months after she began working at IPA, her manager, Keith Link, called her on the phone with a proposition: "I understand that you are divorced. And you – in your fifties and well, not very – well, you're older, not – not – you're cute, but, you know, you're not real attractive…. I want you to understand that I'm very good at what I do and I'm also cheap, and that anytime that you would need to have your sexual desires taken care of, your sexual needs, I'm discreet, and you can always contact

me, and, you know, we can work it out." No. 147 rejected the offer and said she hoped not to have any similar conversations with Link. Link did not make any further propositions.

On one occasion, as No. 147 approached the desk of her zone manager, Nick Jones, she saw that Jones, a colleague named Bob Palese, and a floor monitor named Rick Metzger were viewing, on a computer that was facing the open floor in which business coordinators worked, graphic images of men and women engaging in oral and anal sex. No. 147 asked Bob to turn the computer off. He told her to "mind [her] own fucking business." She then addressed Rick, as the manager of the business coordinator floor and asked him to turn the computer off. Rick laughed, then had Bob turn off the computer. No. 147 complained to the business coordination manager, Liza Vitello, about male workers viewing pornography in a publicly visible area. Vitello replied, "Rick is a young guy. He doesn't understand what it all means to be a manager yet." Nevertheless, Vitello agreed to talk to Bob Palese about the incident. Later that day, Palese approached No. 147 in the IPA parking lot, called her a fucking bitch, and told her, "what was on the screen, we're going to have it happen to you. You know, but maybe even worse. How would you like that? … You just wait…it's going to happen." No. 147 replied, "Why wait? … Go ahead and do it to me, Bob. I may not come out of this breathing…but you're to come out of it with your fucking balls shoved down your throat." No. 147 testified that she felt physically threatened by Palese's comments, and that although she felt she had defended herself, "that didn't mean to say that at any time that he would not be violent." No. 147 reported her exchange with Palese to Vitello the following day. Vitello told her, "Bob is Bob."

On another occasion, No. 147 saw a teenaged female business coordinator, whom she knew as "Jenny D," crying in her cubicle. No. 147 asked her why she was crying, and Jenny D told her that Keith Link had made "crude comments" about the size of her chest. No. 147 testified that men at IPA "always" called Jenny D "Jenny Double D." No. 147 reported what Jenny D had told her to a manager named Mark Patenaude and asked him to speak to Link. She does not know whether he did.

In late June or early July of 2002, No. 147 sought to meet with John Burgess and Tyler Burgess to address "inappropriate behavior" towards women at IPA. She set up an appointment with the Burgesses through David Soskin. No. 147 waited for the Burgesses to call her, as planned, on the designated day. By the end of the day, when the meeting still had not been convened, No. 147 approached Soskin, who told her of the meeting, "it's just not going to happen. They're going on vacation and they just left in a limousine." This was the last straw for No. 147, who quit her job at IPA and decided to join the present lawsuit. She testified that she decided to join the lawsuit because she felt "there was no other way that I could make them understand that this behavior is harmful. It's inappropriate."

No. 147 also recounts a handful of other incidents she heard about from colleagues; two episodes involving nude or sexually explicit images at IPA and an IPA-sponsored event; and several ambiguous exchanges with managers on the topic of No. 147's participation in the present lawsuit. During one such conversation, No. 147's assistant zone manager told her that if she joined the lawsuit, she should quit IPA.

IPA contends that the objectionable incidents No. 147 recounts are too few and far between, and insufficiently serious, to be actionable. It is true that many claimants in

this case allege a greater number of incidents in shorter time frames. Nevertheless, it is clear from her testimony that No. 147 subjectively found these incidents—which, it bears noting, included an explicit sexual proposition from her manager, as well as a sexually suggestive, threatening rant by an angry colleague apparently trying to intimidate her, both of which fall on the actionable side of the *Baskerville* line—troubling enough to report them to various managers at the company. Indeed, at different times, No. 147 complained to Liza Vitello, Dan Drugan, and Shelle Bareck, and she tried, unsuccessfully, to complain to John and Tyler Burgess. The court simply cannot conclude that the incidents No. 147 found serious enough to warrant repeated complaints to management were nevertheless so objectively benign as to fall below the threshold of actionable conduct, particularly when viewed in light of the presumed harassment that pervaded the IPA workplace. IPA's motion for summary judgment as to Claimant No. 147 is denied.

### Claimant No. 149

Claimant No. 149 worked at IPA for approximately six weeks from March to May of 2002, first in inside sales, then as a business coordinator. During the time she worked as a business coordinator, she was asked to participate in a training session led by Joe Paxton.[10] On the first day of the training, Paxton stared and grunted at No. 149, rubbed her shoulders and arm, peeked over her shoulder to see her breasts, told her "what a nice chest [she] had and what he could do with it." Paxton then suggested she leave her boyfriend and told her that he drives a Jaguar and "could do a lot for [her]." Paxton also looked at No. 149's buttocks and said, "Look at that. Look at that. Look. Look at that."

---

[10] No. 149 refers to this individual as Joe "Paxman" but there seems to be no dispute about the identity of the person in question, whose name is "Paxton."

No. 149 told Paxton to leave her alone, to which he responded by threatening to have her fired. No. 149 complained to her assistant zone manager, then her zone manager, Nick Jones. Jones asked No. 149 to identify the man who had bothered her. After No. 149 pointed out Paxton (whose last name she did not know), Jones said, "No, no no. That's my friend. That's my buddy and he's a good guy. I'm trying to get him a permanent position as trainer back here." When No. 149 refused to return the next morning to the training area where Paxton was, Jones agreed to let her work at her usual desk for the day. Later that day, No. 149 was fired. No. 149 made notes of some of the incidents she alleges here, although those notes do not appear to be in the record. She then contacted an attorney, who advised her to contact the EEOC to report the harassment. No. 149 did, in fact, call the EEOC, although it is not clear from her testimony whether there is any relationship between that call and her participation in this lawsuit.

On at least five or six occasions, No. 149 saw and heard Paxton tell a female colleague "I want to fuck you." No. 149 also saw and heard Paxton make grunting and cat-purring noises to this colleague.

IPA contends that these incidents are insufficiently severe or pervasive as a matter of law, emphasizing the fact that Paxton's offensive conduct toward No. 149 occurred on only one day. True enough. But when she reported the conduct to her manager, he summarily dismissed her complaint (and, adding insult to injury, told her he was trying to get the offender promoted), then abruptly fired her. These circumstances—along with No. 149's claim that she witnessed Paxton treating a female colleague as a sex object on multiple occasions—could lead a reasonable woman to believe she had been

discriminated against based on her sex, and No. 149 is entitled to have a jury decide her claim. IPA's motion for summary judgment as to No. 149 is denied.

**Claimant No. 157**

Claimant No. 157 worked in the inside sales department at IPA for approximately two months, from June to August of 2000. After her first day of work at IPA, No. 157 went out to dinner with two friends and gave them her impression of the general environment at the company: "It's only a matter of time before they're hit with a huge sexual harassment lawsuit." No. 157 testified that as of that very first day, "when I left work, I was just disgusted." Although she cannot recall the specific comments she heard on that day, throughout her employment at IPA, she heard: John Burgess make "crude" and "embarrassing" comments while No. 157 stood in his office, then turn to No. 149 and say, "it's not sexual harassment unless they touch you" (another male colleague made the same remark another day, after telling No. 157 that she was a "pretty girl"); a male coworker ask her, "do you want to give me a blow job?"; another male coworker observe aloud, in front of other colleagues, that No. 157 had "nice legs"; and male employees, including one of her supervisors, Tony Jones or Scott Hanson, refer to women as "cunts," "hos," "bitches," and "sluts."

In addition, No. 157 was once slapped on the buttocks after she got a sale. A male colleague made her uncomfortable by repeatedly asking her out, making sexual innuendos, rubbing her shoulders, and putting his arm around her shoulder or waist and trying to pull her into him, even after she told him to "cut it out." This conduct continued throughout No. 157's employment at IPA.

IPA characterizes the offensive comments No. 157 testified to as "relatively harmless," with the exception of the blow-job invitation, which it dismisses, along with the unwelcome physical contact No. 157 alleges, as "isolated." The court is not convinced. Although the comment about No. 157's legs did not relate to a particularly sensitive body part, a reasonable woman may construe a comment designed to draw No. 149's coworkers' attention to her body in the workplace (which was pervaded with sexually inappropriate conduct, as No. 149 perceived on her very first day) as demeaning to her as a worker. Treating women workers as available sexual objects rather than as professional is not harmless—it is harassment. *See* Nussbaum, *Carr, Before and After: Power and Sex in* Carr v. Allison Gas Turbine Division, General Motors Corp., 74 U.CHI.L.REV 1831, 1833 (2007). That women were perceived and treated this way at IPA was reinforced to No. 157 by her coworkers' and supervisors' use of sexually denigrating epithets such as "slut," "cunt," and "ho." Evidence that No. 157 did not find her colleagues' conduct harmless is that she began to pretend that she was engaged or married in order to stave off their advances. Moreover, IPA's assertion that No. 157 was subjected to unwelcome physical contact on only one occasion misrepresents her testimony: No. 157 stated that the male coworker who repeatedly asked her out and touched her did so "pretty much the whole time [she] was there."

It is true that some of the offensive comments No. 157 alleges (such as the references to "crude" and "embarrassing" comments and "sexual innuendos") and are too nonspecific, standing alone, to be actionable. Nevertheless, No. 157 recalls with specificity a handful of harassing incidents, and she also recalls her general impression of a sexually hostile environment. In this connection, the court is mindful of its earlier

observation that "proof that the employer had a policy of tolerating unlawful sexual harassment does not necessarily make it more likely that any particular claimant was subject to actionable harassment." *EEOC v. Int'l Profit Assoc., Inc.,* 2007 WL 3120069 at *15. Here, however, No. 157 testified that she herself perceived the workplace as generally harassing, and she also recounted specific incidents that illustrated the basis for that impression. Her claim withstands summary judgment. IPA's motion as to Claimant No. 157 is denied.

**Claimant No. 164**

The court grants IPA's unopposed motion for summary judgment as to Claimant No. 164.

**Claimant No. 166**

Claimant No. 166 was an outside sales representative for IPA from August of 2000 to August of 2002. She lived in Florida throughout her employment at IPA, and she worked out of her home. No. 166 spoke to David Soskin, who was responsible for sending her sales leads, several times a day. On one occasion, Soskin offered to have sex with No. 166, saying that if she wanted him to come to Florida to have sex with her, he would. No. 166 ignored the comment and continued the conversation. No. 166 also claims that Keith Link told her "many times" that he was going to visit her in Florida and stay with her so they could have a "good time." Link suggested she "get rid of [her] son for a week" so that Link could stay at her house and have a "good time." No. 166 did not think Link was joking, but she ignored his "stupid, ridiculous comments" and "continued with whatever [she] had to say."

On one occasion, after No. 166 achieved three sales in one day, Soskin told her that he was sending her something as a gift for her performance. Soskin sent a vibrator that looked like a pink plastic penis to her house. No. 166 believes he purchased the vibrator with IPA funds. No. 166 "freaked" when she received the package and "wanted to kill" Soskin for sending the vibrator to her house, where it might have been opened by her young son. No. 166 told Soskin that it wasn't a joke; that she didn't take it lightly, and that if he kept "playing" with her, she would report him to John Burgess.

No. 166 states that although she performed her job well both before and after she received the vibrator, her sales dropped after the incident. No. 166 explained that she stopped working as hard because she had "less respect" for the company. No. 166 describes the consequence of the harassment she alleges as an "inability to do my job as I should have, my inability to want to deal with anybody at IPA, just being kept very out of the loop, staying out of the loop purposely because I didn't want to be bothered."

No. 166 visited IPA headquarters on two occasions. The first occasion was for the company Christmas party in 2001. At the party, she saw Tyler Burgess and a senior executive named John (not Burgess) grabbing female IPA employees' buttocks. She also heard Tyler Burgess ask one of the women if she wanted to do drugs and "get laid." Several female employees told No. 166 they wanted to remain near No. 166 and her fiancé because it was a "safety zone" at the Christmas party. The woman No. 166 saw Tyler Burgess invite to "get laid" told No. 166 that she "couldn't stand" being hit on anymore by Tyler.

IPA argues that the conduct No. 166 alleges was insufficiently severe or pervasive as a matter of law. The court disagrees. Although it is true that No. 166 did not have

daily, face-to-face contact with her alleged harassers, she testified that the repeated telephonic sexual solicitations of two male colleagues, coupled with the surprise "gift" that one of them sent to her house, affected her ability to perform her job "at a high level." The court cannot say, as a matter of law, that no reasonable woman would have been similarly affected by the alleged conduct. Moreover, a jury could find the vibrator incident particularly egregious, since a reasonably foreseeable consequence of sending a sex toy by mail to No. 166's home is that other family members (such as No. 166's young son) could open the package, potentially exposing No. 166 to extreme embarrassment. Indeed, No. 166's testimony indicates that her upset at receiving the vibrator stemmed primarily from the concern that the package would be opened by her son. Finally, on one of the infrequent occasions on which No. 166 visited IPA's headquarters, she saw female employees of the company being grabbed on the buttocks by a male colleague.

   As the court has observed, conduct that demeans women workers by treating them as available sexual objects in a professional environment can, in certain circumstances, give rise to a hostile environment. *See* Nussbaum, *Carr, Before and After: Power and Sex in* Carr v. Allison Gas Turbine Division, General Motors Corp., 74 U.CHI.L.REV 1831, 1833 (2007). Here, a jury could find that the cumulative effect on a reasonable woman of multiple sexual solicitations by two colleagues with whom No. 166 had regular contact; the receipt, at her home, of an explicitly sexual object; and the observation of female coworkers being grabbed on their behinds at a company party, is sufficiently demeaning, humiliating, or offensive to render her environment hostile. Accordingly, IPA's motion as to Claimant No. 166 is denied.

**Claimant No. 167**

Claimant No. 167 worked at IPA in the inside sales department and as a business coordinator from mid-December of 2001 through mid-March of 2002. She claims that she was subjected to comments "of a sexual nature" on a "regular, daily basis." No. 167 recounts, for example, that shortly after she started at IPA, male business coordinators made comments such as "ooh, there's a pretty one," and "who are you? When did you start here? I would have known if I've seen you here before. Somebody as pretty as you….What's your name, are you going out with anybody?" When No. 176's work required that she enter an inside sales area where male employees were working, these employees would comment, "oh, it's so good to see a sexy person in here again," "damn, you're looking good, you're looking fine," and, "you got sexier from the last time I seen you." Male employees made theses comments every time No. 167 went into the inside sales area, which was at least once a week. One of the inside sales managers asked No. 167 to enter the area through the back entrance, rather than the front entrance because she was "too much of a distraction" to the male workers, who would stop and look at her and try to talk to her, rather than do their jobs. No. 167 states that although she was told two or three times to use the back entrance, she did not always comply because entering through the back required her to spend more time outside in the cold, snowy and wet weather.

No. 167 also states that every time she saw a recruiting manager named Nick, which was about every other day, he "over and over again made comments of 'I have money, I can take care of you, I can treat you like a proper woman. I can give you things that you deserve.'" No. 167 interpreted some of his comments, such as "I want to take

you home" and "I'd love to tap that" as sexual propositions. No. 167 also claims that Nick asked No. 167 to sit on his desk to talk to him, then would try to look up her skirt.

On one occasion, a male colleague named Kendrick Hughes approached No. 167 while she was seated at her desk, slapped his hand on her inner thigh and ran it down her leg, where he left his phone number written on a piece of paper. Previously, Hughes and another male employee had made unwelcome comments to No. 167. No. 167 complained about the behavior of Hughes and the other man to Garrett, her assistant zone manager, to "Rick," the floor manager, and finally to Shelle Bareck, in human resources. She claims that after she complained, the situation became worse, as the men then made comments such as "you had to go tell, are you that much of a baby, and you can't handle things." Garrett also blamed No. 167 for prompting the incident, telling her that if she hadn't been late for work on the day in question (which resulted in her sitting in the area where Hughes and the other man were, rather than at her usual desk), "it wouldn't have happened." A few days after the thigh-slapping episode, No. 167 returned to Bareck to get a copy of the formal report she thought had been filed, but Bareck told her that she "didn't feel a need to file a report" because Bareck had spoken to Hughes, who had completely denied the episode, and "it's basically [No. 167's] word against his." IPA's version of Bareck's response is somewhat different. The parties agree, however, that Bareck did ultimately create a formal report and that Bareck told Hughes that if his name ever came up again in relation to a sexual harassment complaint, he would be fired.

IPA argues that the totality of these episodes is insufficiently severe or pervasive as a matter of law to amount to an objectively hostile environment, and that IPA took prompt remedial action in any event. The court disagrees on both counts. Daily

comments about No. 167's attractiveness and sex appeal, even if they fall short of explicit propositions, certainly may cause a reasonable woman to feel as though her colleagues view her as a sex object rather than as a professional equal. Moreover, some of the objectionable comments were made by individuals in managerial positions, while others were made by colleagues in front of No. 167's superiors. Under the circumstances, a reasonable woman could find such repeated comments degrading and humiliating based on her sex. *Alexander v. CIT Technology Financing Services*, 217 F.Supp.2d 867 (N.D. Ill. 2002), to which IPA looks for support, does not compel a different result. First of all, the *Alexander* plaintiff based her claims on allegations that her coworkers called her "lesbian" and "dyke" because she didn't go out for drinks and parties after work (which comments eventually stopped) and a handful of sexually offensive comments by her male director and male supervisor. The Seventh Circuit found that over the more-than-a-year period of plaintiff's employment, these comments were too isolated and sporadic to be actionable. *Id.* at 866. In this case, by contrast, No. 167 was subjected to objectionable comments on a daily basis, which continued until she left IPA. Moreover, the *Alexander* plaintiff did not allege unwelcome physical contact, which No. 167 asserts as a central part of her claim.

IPA also falls short of carrying its burden (recall that the burden has shifted to IPA due to the presumed pattern of sexual harassment at the company, *see E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *1 (N.D. Ill. 2008)), of proving that it responded appropriately to No. 167's complaints. Although there is evidence that IPA took some action in response to her complaints, No. 167 testified that her work environment became "worse" after she complained. Also, although IPA makes

much of the fact that No. 167 states she was not bothered by Hughes after she complained about him, No. 167 also testified that she deliberately stayed away from Hughes. Thus, IPA's assertion that "the warning and reprimand to Mr. Hughes was effective as it deterred him from ever bothering [No. 167] again" is a bit disingenuous. Indeed, Shelle Bareck, who testified on behalf of IPA, stated that although Hughes was not terminated, she "didn't know if he stayed employed for any length of time" after No. 167 complained. Under these circumstances, the fact that Hughes's harassment stopped after No. 167 complained is not necessarily a testament to the effectiveness of IPA's response. Moreover, No. 167 testified that some of the other incidents of harassment she suffered involved individuals in management positions, which led No. 167 to believe that any complaints she might have made about them would have been futile.

Based on the foregoing, IPA's motion for summary judgment as to Claimant No. 167 is denied.

**Claimant No. 169**

Claimant No. 169 worked as a business coordinator from April 26, 2001 to May 18, 2001. The parties agree that her claim rests primarily on three comments, all of which were made by a zone manager (but not No. 169's zone manager). On the first occasion, a few days after No. 169 began working at IPA, the zone manager told No. 169 in front of ten or twelve of her colleagues that he could sit a coffee cup on her behind. The colleagues laughed at the comment, and the zone manager laughed when No. 169 asked him not to comment on her behind anymore. Indeed, the zone manager paid little mind to No. 169's request: a few days later, he said to No. 169, while passing her in the hall, that she should wear tighter pants to "so [her] curves can show." Several days after

the second comment, the same zone manager asked her if she "wanted to party," explaining that he meant, "you know, for money, sex," and told her that her buttocks were "shaped firmly." No. 169 quit her job shortly after the third incident.

On three occasions, she attempted to meet with John Burgess to complain about these incidents, but she was told he was not available. No. 169 did not attempt to complain to her own zone manager because she saw that he was friendly with the offending zone manager. She also did not complaint to the human resources department.

No. 169 states that she did not see any other women at IPA being sexually harassed. In fact, the reason she says she did not make a complaint while at IPA was that she believed she was "the only person…that it was happening to."

In addition to the foregoing incidents, No. 169 complains that she was treated less favorably than her female colleagues who were "close and cuddly" with their managers. She claims that on several days, she was told there was no phone for her to use, and that she would have to bring her own phone to IPA to work.

IPA alleges that No. 169's allegations are insufficiently severe and pervasive to support her claim, characterizing the first two episodes as "mild" and the third as "isolated." The court simply cannot conclude that all reasonable women would agree that a comment apparently designed to draw the attention of ten to twelve of one's colleagues to one's backside during the first few days of one's employment (or at any time, for that matter) can only be characterized as "mild." Indeed, it is not far-fetched to believe that many women would blush at having a group of colleagues laugh at an apparent joke about the size and shape of their bottoms at the workplace. The second comment added

insult to injury. And the third, when all reasonable inferences are drawn, as they must be, in No. 169's favor, may be considered a sexual solicitation.

Arguably, the totality of these circumstances amounts to a work environment that is less pervasively hostile than that experienced by other claimants, particularly since No. 169's disclaims seeing or hearing sexual harassment that was directed at other female employees. Nevertheless, three episodes in three weeks begins to look more like a pattern than like a series of "isolated" events, and the court rejects IPA's attempt to parse the incidents in such a way as to allow each to be considered isolated.

*McKenzie v. Illinois Dept. of Transportation*, 92 F.3d 473 (7th Cir. 1996), which IPA cites for the proposition that three comments are insufficient to give rise to an actionable claim, is distinguishable. First, the offensive comments in *McKenzie* were not made to the plaintiff in front of a group of her colleagues. Second, the three comments in that case were made over the course of three *months*, not three weeks. In short, neither *McKenzie* nor any other of IPA's cited authorities compels the conclusion that no reasonable woman would find No. 169's workplace to have been hostile based on her sex. Accordingly, IPA's motion for summary judgment of her claims is denied.[11]

**Claimant No. 172**

Claimant No. 172 was an executive secretary for Valerie Ramsdell, a senior executive at IPA, from January 6, 2003 to February 14, 2003. She bases her claim on the following incidents:

---

[11] Because the court finds that No. 169 is entitled to have a jury decide her claims based on the three alleged comments by the zone manager, the court need not address, at this stage, what, if anything, No. 169's perception that she was treated less favorably than colleagues who were "close and cuddly" with supervisors, adds to her claim.

- No. 172 witnessed Tyler Burgess lean over No. 172's colleague Cecilia while Cecilia was eating vanilla pudding and say, "I'll lick your pudding up and down" while flicking his tongue in a provocative manner;

- No. 172 saw and heard Bryan, an executive officer, ask Cecilia, about a new pair of boots that were sitting on her desk, "are those fuck me boots?"

- No. 172 heard Tyler, Bryan, and another executive officer tell Cecilia she was beautiful and tell her she was showing "too much leg."

- During an argument with a male colleague named Jasper, which No. 172 understood to have been prompted by the fact that No. 172 replaced Jasper as Valerie Ramsdell's secretary, Jasper called her a "cunt."

- No. 172 overheard parts of a conversation among three women talking in the ladies' room about having been solicited for oral sex by Tyler Burgess, during which one woman said "that was just Tyler."

- Someone at IPA placed a stapler on No. 172's desk with the word "fluffer" written on it;[12]

IPA argues that none of these allegations describes sex-based harassment, and that in any event, the allegations taken in their totality are insufficiently severe or pervasive to give rise to a hostile work environment.

It appears from No. 172's testimony that she was indeed offended by the "inappropriate" manner in which certain male employees spoke to her colleague, Cecilia.

---

[12] Although substantial time was devoted to the "fluffer" stapler issue during No. 172's deposition, no testimony revealing her understanding of that word was developed. In its brief, EEOC includes a "Wikipedia" definition of the word – the court assumes this is a reference to the website www.wikipedia.org. – that defines a "fluffer" as "a hired member of the crew of a pornographic movie whose role on the set is to sexually arouse the male participants prior to the filming of scenes requiring erections."

In fact, after the pudding incident, No. 172 encouraged Cecilia to file a complaint, but Cecilia declined to do so. Cecilia further asked that No. 172 also refrain from filing a complaint. No. 172 claims, however, that she was sufficiently offended by the conduct to report it to Valerie Ramsdell, despite Cecilia's request. According to No. 172, Valerie Ramsdell took no action and told No. 172 that she was "blowing it out of proportion."

At front and center of IPA's argument that No. 172's allegations are not actionable is an affidavit by No. 172's colleague Cecilia, in which Cecilia states that she has never been subjected to harassment at IPA. IPA has submitted a number of similar affidavits purporting to controvert those claims in which the claimant describes as harassment conduct that she witnessed, but of which she was not the specific target. As the court has previously noted, female employees in the "target area" of sex-based harassment are not barred from bringing claims simply because they were not the individual target of the offensive conduct. *See Yuknis v. First Student, Inc.,* 481 F.3d 552, 554 (7th Cir. 2007). The salient issue is the impact the conduct can reasonably be considered to have *on the complainant.* Thus, in each case, the question for the court is whether the alleged sex-based conduct—regardless of whether it was directed at the complainant individually, at another female employee, or at female employees generally—is sufficiently severe or pervasive, with reference to the *complainant's* work environment, that a reasonable woman in the complainant's shoes would believe that *she* (not the individual target, if other than the complainant) had suffered from discrimination based on her sex. In some cases—such as the violent episode described by No. 46, in which she witnessed a male colleague shout a sexually demeaning epithet to a female colleague then strike her in the face with a book—the impact on a reasonable female

observer may be significant. Likewise, a reasonable woman who, like No. 15, heard male coworkers refer to women as "bitches" on a daily basis, and who repeatedly saw and heard men touching female colleagues on the buttocks and otherwise treating them as sex objects may find that the cumulative effect of these observations rendered her own workplace hostile, regardless of whether she herself was called a bitch, or whether the women she heard being vilified, or saw being ogled, manhandled, or otherwise objectified, themselves found the conduct offensive.

IPA suggests through argument and affidavits such as Cecilia's that allegations of conduct directly targeting individuals who were not themselves offended by the conduct cannot support the claims of individuals who witnessed it. IPA cites no authority for this proposition, however. Indeed, it is arguably inconsistent with *Yuknis*, which makes plain that the focus is the impact of the alleged conduct on the complainant. Affidavits such as Cecilia's are therefore of little value at this stage of the proceedings.[13]

Notwithstanding the foregoing, the court concludes that no reasonable woman could find that she was discriminated against in the terms or conditions of her employment based on the conduct No. 172 alleges. Although she heard three comments containing sexual innuendos directed at her colleague, it is difficult to construe those comments in a way that is so degrading or humiliating *to No. 172* that they made her own workplace hostile. No. 172's altercation with Jasper was, by her own description, a work-related argument, and his use of one sexually offensive epithet in the course of that

---

[13] Further compromising the value of the asserted affidavits at this stage of the proceedings is the fact that the affiants are generally, if not uniformly, still employed by IPA. Several claimants have alleged that the women directly targeted in the incidents described are hesitant to come forward out of fear for their jobs. To the extent IPA seeks to refute the allegations of harassment with the testimony of the employees alleged to have been targeted, the credibility of the witnesses in light of their competing interests obviously must be decided by a jury.

argument simply does not amount to sexual harassment. The remaining allegations—regarding conversations overheard in the ladies' room and the placement of a "fluffer" stapler on her desk—are simply too vague and incomplete to enable a reasonable fact finder to conclude that No. 172's workplace environment was severely and pervasively hostile. Accordingly, IPA's motion as to No. 172 is granted.

## Claimant No. 175

No. 175 worked for IPA in various capacities between July of 2001 and June of 2003, while she was in high school. She states that her school viewed her employment at IPA as an internship, and in addition to earning money, she earned credits that she needed to graduate. No. 175 is the employee who, according to other claimants, was referred to as "Jenny Double D." No. 175 testified that sixty-percent of the male employees at IPA would call her "Jenny Double D" or "jail bait," and would ask her when she was turning 18 so that they could ask her out. In particular, Keith Link "frequently" called her Jenny Double D, which she quantified as every day for the first six months she worked at IPA, and so often that she "can't count." No. 175 testified that she sometimes snapped at the people who called her these names, saying "that's not my name," and that on at least one occasion, the name-calling made her cry. During her first two weeks on the job, a male employee named Brian Rubenstein repeatedly commented on her breasts, asking her twice a day—and, on at least one occasion, in front of coworkers (who, according to No. 175, found the comments "hilarious")—how big they were.

While No. 175 was still employed at IPA, Mike Rudd (whose position at IPA is unclear from the testimony, but who apparently had been made aware of comments about No. 175's breasts) asked No. 175 if male employees in fact referred to her as Jenny

Double D. No. 175 denied hearing these comments. She explains that she felt "influenced to give them information stating that – that that didn't happen, because the people kind of went with it there. They all were very comfortable with joking around about sexual harassment, and I kind of felt that I had to say that it didn't happen because of the way people acted."

No. 175 also claims that an employee named Nate Crawford began calling her multiple times at home late at night, asking her to come to his house for drinks and to hang out in his hot tub. No. 175 does not know how Crawford got her phone number, and it scared her that he kept calling and calling. A female colleague who was with No. 175 when Crawford called her reported the calls to John Greco—Crawford's boss—and the calls stopped. The next day, Shelle Bareck approached No. 175 about the incident and asked if No. 175 wanted to pursue action against Crawford. No. 175 explains that she declined to pursue action because she was fearful of what might happen if she did, and because she didn't trust Shelle Bareck, who, on another occasion, had ridiculed No. 175 in front of colleagues by saying she "looked like a streetwalker" in her blue slacks and white turtleneck sweater. In addition, No. 175 stated that she had seen people being physically abused at IPA, and that as a result, she was scared to report the harassment she suffered.

No. 175 reports one incident of unwanted touching at IPA, when a male employee named Sam Bruce put his hands near her collarbone and moved them towards her breasts after she told him that her back was hurting from a car accident. Another male employee saw Bruce touching No. 175 and told him to stop, allowing No. 175 to walk away. No. 175 also saw Bruce on several occasions hug a female colleague in a manner that she

believed was inappropriate, as Bruce would "wrap his arms around her and squeeze her and then…shake her, as if…he was like rubbing her all over himself."

No. 175 also recounts seeing pictures of men with naked women on display throughout the company. John Greco asked No. 175 to take down the pictures that were out in the open. Greco wanted No. 175 to take the pictures down while no one was working so that the employees could not argue. In fact, some people did argue with No. 175 and refused to take down the pictures she asked them to remove.

IPA claims that the harassment suffered by No. 175 was not severe or pervasive, and that IPA took prompt remedial action. The first argument is patently without merit. No. 175 states that she was subjected to explicit, repeated comments about the size of her breasts on a daily basis, sometimes in front of her colleagues. IPA's citation to *Weiss v. Coca-Cola Bottling Company of Chicago*, 990 F.2d 333 (7th Cir. 1993), in which there were no allegations of the kind of daily barrage of comments No. 175 asserts, is unavailing.

As to the second argument, although there is evidence that certain individuals at IPA took, or sought to take, action to remedy some of the objectionable conduct No. 175 describes, there is also evidence from which a jury could conclude that No. 175 reasonably believed that any complaint she made would be futile. For IPA to prevail at summary judgment there must be no dispute that (a) IPA exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that No. 175 unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Industries, Inc. v.*

*Ellerth*, 524 U.S. 742, 765 (1998). No. 175 is entitled to have a jury evaluate whether her response to IPA's efforts to investigate certain of the conduct she claims was reasonable.

For the foregoing reasons, IPA's motion for summary judgment as to Claimant No. 175 is denied.

### Claimant No. 178

Claimant No. 178 was a senior area manager for IPA from July 22, 2002 until approximately the second or third week in August of 2002. In this capacity, No. 178 worked as a sales representative for the Norfolk/Virginia Beach area of Virginia. She sent a letter of resignation to her regional manager, Howard Siegel, on August 8, 2002, in which she stated that her personal financial situation made it impossible for her to continue working at IPA. No. 178 reconsidered her decision to resign, however, and agreed to accompany Siegel on visits to potential clients in her area on August 13, 2002. At that time, No. 178 had never met Siegel personally, although she had spoken with him on the telephone. She understood her outing with Siegel to be in the nature of further training.

No. 178 claims that Siegel sexually harassed her throughout the "training" day. In particular, she alleges that when she arrived to pick up Siegel at his hotel, she extended her hand to shake his, but he hugged her instead. On two or three occasions while No. 178 was driving, Siegel touched, grabbed, or fondled her hand, even though No. 178 pulled her hand away on each occasion. Siegel also played with No. 178's hair and touched her neck while she was driving, while commenting repeatedly about how "cute" she was. Once, Siegel pushed or nudged her upper thigh with his hand.

While the two were in the car together, Siegel made several phone calls. During one call to a male business coordinator, Siegel commented on No. 178's stature and on how cute she was. On another call, Siegel described No. 178 to another male IPA employee as an "attractive African-American" woman, and told the employee that No. 178 "liked Jewish men," so the other employee should not try to "steal" her away from Siegel. No. 178 also claims that Siegel tried on several occasions to put his arm around her shoulder or waist, but she managed to dodge his contact. During lunch, No. 178 told Siegel that having grown up in the Norfolk, Virginia area, she could spot a naval man a mile away. Although she intended this to be a reference to the military haircut and style, Siegel replied, "because they're so horny." When No. 178 dropped Siegel off at his hotel at the end of the day, he asked whether she was coming in. He then told her he would love to have dinner with her. No. 178 declined both invitations.

No. 178 also claims that prior to their August 13 outing, although she generally had a decent working relationship with Siegel, he had made several comments during phone conversations that she found harassing. On one occasion, after receiving No. 178's letter of resignation, Siegel asked what it would take to make No. 178 stay at IPA. No. 178 responded, "a sugar daddy," to which Siegel replied, "Howie Baby is coming to the rescue." (No. 178 claims that on their August 13 outing, Siegel revisited this topic, asking No. 178 what her family would say about his becoming her sugar daddy.) On another occasion, No. 178 called Siegel after making her first sale and told him that she thought she had "a touch of testosterone" in her that day. Siegel replied, "as long as you're not growing anything between your legs."

Shortly after her outing with Siegel, No. 178 sent a fax to Shelle Bareck and John Burgess complaining about Siegel's conduct and resigning from her position.

In addition to her complaints about Siegel, No. 178 also claims that during her training at the beginning of her tenure at IPA, No. 178 was "hit on" by a fellow trainee, who sidled up to her suggestively and said something in Spanish, which she could not understand. She asked another (male) trainee, who she believed spoke Spanish, what the first man had said. The male trainee, who had laughed while the comments were made, said, "oh, he just said you're hot." No. 178 believes that the Spanish-speaking would-be suitor knocked on her hotel door several times that evening, but she did not answer the door, and she avoided him the following day. No. 178 was also offended that during the training, one of the male trainees made a loud reference to "Debbie Does Dallas" because the IPA trainer was named Deborah.

IPA asserts that the conduct No. 178 alleges is insufficiently severe or pervasive to amount to actionable sexual harassment. It is true that much of the conduct No. 178 found objectionable, such as Siegel's comments that No. 178 was "cute" and that he would love to have dinner with her, his attempt to hug her while she sought to shake his hand (who indeed has not experienced this common social misfire?), and even his offer to be No. 178's "sugar daddy" (which was first made in response to No. 178's own use of the term, in a conversation No. 178 herself described as "light"), is simply too tepid or ambiguous to support her claim. Nevertheless, his persistent attempts to make physical contact with No. 178 while the two were alone in the car, despite her repeated efforts to evade his conduct, are not so mild, nor are his comments to other IPA employees about her "stature." Moreover, it is clear from the transcript of No. 178's deposition that No.

178 had difficulty conveying in words what she found objectionable about the manner in which Siegel touched her. In more than one instance, she resorted to a physical reenactment of the contact to demonstrate why she found it harassing. Accordingly, although it is of course uncertain whether No. 178 will ultimately be able to persuade a jury that Siegel's conduct (even combined with the other instances of harassment she alleges) rendered her workplace objectively hostile, No. 178 is entitled to all reasonable inferences in her favor at summary judgment. No. 178 is entitled to have a fact finder evaluate whether the difficult-to-describe manner in which Siegel touched her, coupled with the comments he made to other employees, in her presence, about her physical attributes, would have made a reasonable woman believe she had been subjected to sex-based discrimination.

The court also rejects IPA's argument that No. 178's claim fails because she was no longer an IPA employee at the time of her "training" outing with Siegel. While it is true that No. 178 sent an initial letter of resignation prior to that date, her claim that her resignation was not "processed" and did not become effective is supported by her continued contact with Siegel and by what appears to have been their mutual efforts toward her professional development.

For these reasons, IPA's motion for summary judgment as to Claimant No. 178 is denied.

## Claimant No. 180

Claimant No. 180 worked as a business coordinator for IBA (a company related to IPA) from September 8, 2003 to April 20, 2004. Her claims relate to conduct by four male employees: Aaron (a business coordinator), Chris Carstens (a colleague with whom

No. 180 had an on-again-off-again, consensual romantic relationship), Rich Jablonski (marketing director and No. 180's direct supervisor), and Scott Kollins (director of inside sales).

No. 180 alleges that Aaron asked her out on dates "many, many times" and responded poorly to her consistent rejection. No. 180 claims that Aaron made "fart" and other "weird" noises when he walked by her work area, and that he was "mean" to her, generally behaving in a juvenile manner. While it is true that Aaron's conduct may have been prompted by No. 180's rejection of his request for dates, it is impossible to conclude, based on No. 180's description of Aaron's adolescent antics, that his conduct was so threatening, demeaning, humiliating, or offensive that a reasonable woman in No. 180's shoes would believe she had been discriminated against based on her sex. Moreover, No. 180's own testimony is that the IPA managers to whom she complained about Aaron spoke to him on several occasions, after which Aaron apologized to her and essentially—if not entirely—stopped the objectionable conduct.

No. 180 also complains that after her consensual relationship with Chris Carstens soured, he wrote her sexually explicit letters, called her repeatedly at home and at work, and humiliated her at work by putting up an "I miss Buzzy" sign in his work area and telling No. 180's coworkers that the sign was a reference to No. 180's vibrator. IPA argues that Carstens's conduct is not actionable under Title VII because it was not the result of sex discrimination, but rather "personal animosity arising from the failure of [a] relationship." *Kaminski v. Freight-A-Ranger, Inc.*, No. 01 C 4937, 2002 WL 31174461 at *3-4 (Sept. 30, N.D. Ill. 2002) (Gottschall, J.). Indeed, the undisputed evidence is that, as in *Kaminski*, Carstens's conduct was the unfortunate product of his failed relationship

with No. 180, not of sex discrimination in the workplace. In the absence of contrary evidence, the court might nevertheless find that the presumed environment of pervasive sexual harassment could be deemed to have exacerbated No. 180's problem with Carstens, since Carstens may have felt free, in such an environment, to humiliate No. 180 sexually at work. The undisputed evidence, however, is that No. 180's managers took effective remedial action to put an end to Carstens's offensive conduct. Specifically, both No. 180 and Carstens were required to sign an agreement not to have any contact with one another. The agreement specified that disciplinary action, including termination, may result from breaching the agreement, and No. 180 testified that she understood she and Carstens would "get in trouble" at work if they did not abide by the agreement. No. 180 stated that this action was effective in curtailing Carstens's behavior.

That leaves No. 180's allegations relating to Jablonski and Kollins, both of whom appear to have been in supervisory positions to No. 180. No. 180 testified that Jablonski made comments like "Oh, [No. 180], oh, you look so good," and "What I would love to do to you if I wasn't married." No. 180 stated that she believed these comments were inappropriate because Jablonski was her supervisor, but she also said the comments didn't really bother her, that Jablonski was "a real nice guy," and that he never touched her or "suggested anything." In light of this testimony, it is difficult to conclude that Jablonski's comments rendered No. 180's workplace objectively or subjectively hostile. Kollins's comments, however, were less benign. According to No. 180's testimony, during an "off" period of her on-again-off-again relationship with Carstens, Kollins warned No. 180 not to get back together with Carstens, and said that if she did, she would "owe him [Kollins] a blowjob." When No. 180 ultimately did get back with Carstens,

Kollins allegedly called her into his office and said, "what about our part of the deal?" which No. 180 interpreted as a request for oral sex. No. 180 claims she told him no, saying, "I can't. You're my boss." She then walked out of Kollins's office. On another occasion, apparently in the course of No. 180's report to Jablonski and Kollins about Carstens's behavior, Kollins began asking No. 180 "detailed sex questions." No. 180 does not, however, remember any of the specific questions Kollins asked.

While it is clear that No. 180 suffered significantly during the time she worked at IPA (she testified that she became unable to work and requested a leave of absence to seek intensive treatment for depression), the court shares IPA's impression that the bulk of her issues relate to her rocky relationship with Carstens, which IPA management appears to have dealt with effectively. Nevertheless, the court cannot determine, as a matter of law, that Kollins's alleged inappropriate conduct had no role in No. 180's suffering. In an environment of pervasive sexual harassment, a jury could conclude, as No. 180 evidently did, that Kollins was, indeed, soliciting oral sex when he asked, "what about our part of the deal?" Moreover, while it is true that No. 180's inability to recall the specifics of Kollins's "sex questions" makes it difficult to ascertain the impact they may reasonably have had on her, it is also true that a jury might reasonably conclude that any such questions from a work supervisor are inappropriate. IPA contends that in any event, Kollins's comments amount to no more than isolated and non-threatening sexual advances or suggestive comments by a supervisor (No. 180 complains about three incidents involving Kollins over the seven-and-a-half months of her employment), which could not have measurably affected what was already an extremely unpleasant situation for No. 180. This may be true, but it not the court's role to weigh the relative

contributions of No. 180's personal problems and her supervisor's inappropriate sexual comments to determine the origin of her evident workplace suffering.

For the foregoing reasons, IPA's motion as to Claimant No. 180 is denied.

## Claimant No. 186

The court grants IPA's unopposed motion for summary judgment as to Claimant No. 186.

## Claimant No. 187

The parties dispute how long Claimant No. 187 was employed by IPA, but they agree that she was a business coordinator for several weeks in January (and possibly February) of 2002. No. 187 claims that she was subjected to ongoing sexual harassment in the form of sexually suggestive comments or sexual solicitations from the time she began her training at IPA. In particular, she states that during the training, several men made comments such as "you're fine" and asked whether she was married. Although she was not married, No. 187 told the men that she was and even wore a ring to work in attempt to ward off her male colleagues' unwelcome advances. No. 187 claims that she told the men she was not interested, but they persisted in making suggestive comments, such as "I could do anything he could do" and "he doesn't have to know," referring to her (fictitious) husband. Two men in particular continued to harass her by whispering comments in her ear as they walked by, or by ogling her legs while saying, "mmm." On one occasion, one of these men touched No. 187 on the buttocks by sticking his hand on her seat, just as she was about to sit down. No. 187 claims that in context, it was apparent that incident was not accidental.

No. 187 claims that this conduct occurred throughout her employment, often in front of her manager, Dmitri, whose desk was next to her cubicle. Rather than reprimand No. 187's male colleagues for their behavior, Dmitri merely laughed at or ignored their comments. Immediately after the hand-on-the-chair episode, No. 187 complained to Dmitri about the incident. He responded that "that's just the way men are," and observed that her "tight pants aren't helping."

IPA argues that the conduct No. 187 alleges is not severe and pervasive. IPA's version of the facts, however, misrepresents No. 187's testimony. IPA claims she was subjected to "only a few" objectionable comments, whereas No. 187 testified that four or five men initially made comments to her at orientation, and that two of the men persisted despite her request that they stop and the "dirty looks" she would give them. No. 187 further testified that these comments continued after her orientation and throughout the time she worked at IPA, including in front of her manager. That the comments were non-threatening and non-explicit, as IPA argues, is not dispositive. Moreover, IPA's assertion that No. 187 was "never asked for sex" is debatable, as one reasonable interpretation, in context, of comments such as "he doesn't have to know," is as an invitation to engage in a sexual affair.

In sum, the behavior No. 187 describes can reasonably be characterized as pervasive (particularly in light of the short duration of No. 187's employment—a point IPA is quick to raise, but which hurts, rather than helps its cause) and, in an environment in which sexual harassment is presumed to be rampant, could lead a reasonable woman to believe she had been discriminated against based on her sex. The alleged reaction of No. 187's supervisor to her complaint reinforces the court's conclusion that whether a

reasonable woman would find No. 187's work environment hostile must be left for the jury. IPA's motion as to Claimant No. 187 is denied.

**Claimant No. 188**

Claimant No. 188 worked in inside sales and as a business coordinator at IPA from August 2, 2004 through approximately December 30, 2004. During her first few weeks at IPA, she became friendly with a male employee named Vernon Tynes. At some point, No. 188's conversations with Tynes began to venture into the "sexual arena." IPA asserts that these conversations were "initiated by both parties" and that No. 188 knew that she and Tynes were just "joking around." The evidence does not support this characterization. At several points in her deposition, No. 188 responded to the question, "did you think [Tynes] was joking?" by responding that she "hoped" he was. Although No. 188 stated that she tried to "laugh off" or "redirect" Tynes's comments, in context, the interpretation that the two were mutually "joking around" is debatable. For example, in one instance, Tynes asked No. 188 what she wore under her suit, and asked whether, if he bought her a bra and panties, she would wear them. No. 188 told him that she would not, and that she "didn't think he belonged asking [her] those types of things." There is no evidence that No. 188 was joking, or believed Tynes was joking, for that part of the conversation.

In what may have been part of the same conversation (the testimony is muddled on the timing), Tynes asked No. 188 to perform oral sex on him in his office, since she was "too busy at home." No. 188 again stated that she "hoped" Tynes was joking and tried to change the subject. Tynes revisited his request for oral sex later that day, when No. 188 was again in Tynes's office. No. 188 said that she had discussed the topic with

her friend over lunch, and that the friend suggested No. 188 tell Tynes she would perform oral sex on him for $1,000. An exchange ensued between Tynes and No. 188 relating to this suggestion. No. 188 testified that this exchange was indeed a joke, and that she subsequently made clear that although she valued Tynes as a friend, their relationship would never go beyond "platonic and innocent friendship," which she believed Tynes understood.

As No. 188 emerged from Tynes's office on this occasion, she ran into her supervisor, Nick Daglas. She related her exchange with Tynes to Daglas, who was "very concerned" and asked if she wanted to pursue the matter with the HR department. No. 188 declined, telling Daglas that she was "fearful for her job." That same day, No. 188 asked Tynes for a ride home after work. She claims that during the ride, Tynes repeatedly touched her, placing his hand on her thigh, her hand on his thigh, near his groin (which he suggested she "squeeze"), and unbuttoning her blouse and touching her breast. No. 188 "protested profusely" and tried to move away from his contact. No. 188's supervisor reported this incident to the human resources department (No. 188 was dismayed that he had done so, still fearful of losing her job), and No. 188 later met with John Burgess, Richard Atkinson, and Mike Rudd to discuss the incident. According to No. 188, Burgess asked No. 188 what action she would like to see taken, and because she believed Tynes had harassed other women, she said she wanted to see him terminated. No. 188 claims that Burgess said, "okay, done," but that in fact, Tynes was only suspended with pay, then moved to a position in which he worked primarily off of IPA's premises, but still reported to IPA on a daily basis, where No. 188 saw him in the parking lot on at least one occasion and became "very uncomfortable and very scared."

Nevertheless, No. 188 testified that she had no further contact with Tynes after he was transferred.

In the ensuing months, No. 188 was very successful at IPA, and several of her supervisors told her she was "number one" in the business coordination program department. Nevertheless, No. 188 believes that she was treated unfairly at IPA as a result of her complaint about Tynes. She states that she was "shunned" at the office, and that people who once considered her "number one" began to look at her as though she were "a piece of garbage." In particular, No. 188 claims that she was denied promotions that she had been promised and that she was ultimately terminated on the ground that she had abandoned her job, when in fact her absence had been authorized.

IPA's response to these claims is that 1) No. 188's harassment was neither severe nor pervasive; 2) IPA took prompt, appropriate action in response to No. 188's complaint about Tynes, barring her claim insofar as it is based on Tynes's alleged conduct; and 3) No. 188 cannot assert a retaliation claim because no such claim was raised in EEOC's complaint.

In response to IPA's final argument, EEOC states that it is not asserting a retaliation claim. The court thus considers only whether No. 188's claim can withstand summary judgment based on a hostile environment theory.

The court rejects out of hand the argument that the alleged harassment was insufficiently severe or pervasive. No. 188's description of the episode in which Tynes gave her a ride home from work merits EEOC's characterization of the event as an assault (actually, a "battery" might also be appropriate, based on the allegations). The court has no trouble concluding that a jury could find this incident, particularly coupled

with Tynes's comments about buying lingerie for No. 188 and his solicitations for oral sex, severe enough to render No. 188's working environment objectively hostile. Moreover, even assuming that the earlier conversations were "consensual" and "joking" (although as noted, that characterization is not unassailable), the incident in Tynes's car is arguably severe enough, even standing alone, to support No. 188's claim.

IPA's second argument is somewhat more persuasive. Nevertheless, it falls short of proving IPA cannot be held liable as a matter of law. IPA emphasizes that under Title VII, it is a complete defense to employer liability if the employer "took prompt and effective remedial action reasonably likely to prevent the harassment from recurring," *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000), and argues that this is precisely what IPA did by suspending Tynes (it does not dispute that Tynes was suspended with pay) and transferring him to a position in which he would have little or no contact with No. 188. The EEOC derides this response as effectively rewarding Tynes (who received what was in essence a paid vacation, then returned to a full-time position at IPA) while punishing No. 188 (who was "shunned" by her colleagues and supervisors). EEOC also argues that No. 188's supervisor Deglas should have reported Tynes's conduct as soon as he learned of it, despite the fact that No. 188 asked him not to, since No. 188 told him that the reason she did not want to report Tynes was that she "feared for her job." EEOC asserts that had Deglas acted appropriately by reporting the incident in Tynes's office forthwith, the more serious incident that occurred in Tynes's car later that day could have been avoided.

Addressing EEOC's argument about the appropriateness of Tynes's "punishment," IPA insists that "the question is not whether the punishment was

proportionate to [the] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." *Tutman*, 209 F.3d at 1049. In *Tutman*, a worker who had made "grossly inappropriate" comments that a coworker interpreted as a racially motivated physical threat was formally reprimanded and warned that future misconduct would result in more serious discipline; required to participate in a three-day workplace sensitivity seminar; and required to apologize to the victim. In addition, the employer agreed to allow the victim to receive his assignments by telephone and to segregate the two employees by "staggering shifts," the result of which would be that the two would have "no contact with each other at work." *Id.* The aggrieved employee claimed that the employer's response was "insufficiently punitive" as to the aggressor. The court rejected this argument, reasoning that the employer's response "served to terminate all contact between [the harasser] and [the plaintiff] and bring a definitive end to any harassment." *Id.*, quoting *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (modifications in *Tutman*).

Here, No. 188 concedes that Tynes no longer harassed her after she reported him. Nevertheless, the position to which Tynes was transferred was one in which he was still required to report to the premises where No. 188 worked on a daily basis, and No. 188 did, in fact, see him there, which she claims made her feel "very uncomfortable and very scared," enough so that she asked to leave work early that day.[14] Regardless of whether No. 188 considered Tynes's "punishment" insufficiently severe (or whether it corresponded to the punishment No. 188 claims John Burgess promised to mete out), or whether No. 188 managed to avoid Tynes when she spotted him on one of his daily visits

---

[14] She did not, however, leave early, as she claims she was told she would be fired for doing so.

to IPA there is a question of fact as to whether IPA's course of action was reasonably likely to effect a "definitive end" to Tynes's harassment. Similarly, No. 188 is entitled to have a jury decide whether Deglas's decision not to report immediately the comments No. 188 told him Tynes had made while in his office was reasonable under the circumstances. Accordingly, IPA is not entitled to summary judgment on the ground that it took prompt remedial action after learning Tynes had harassed No. 188.[15]

### Claimant No. 189

Claimant No. 189 worked at IPA during the summer of 1999 (the parties dispute the dates of her employment), when she was sixteen years old. No. 189 began as a business coordinator but was terminated from that position after one week. She worked as a recruiter for the remainder of her employment at IPA.

No. 189 claims that while she worked as a business coordinator, she would routinely see a group of female colleagues dressed in provocative clothing[16] hanging around the male managers, sitting on their desks, and touching or caressing them. No. 189 did not wear provocative clothing. She was terminated as a business coordinator at the end of her first week on the ground that she did not make enough phone calls. No. 189 believes that she did, in fact, make the required number of calls (she states that she made about forty calls an hour, and while she cannot recall the exact number she was

---

[15] Because No. 188's claim survives summary judgment on the basis set forth above, the court declines to consider at this stage whether the allegations that she suffered adverse treatment after reporting her harassment support of her claim.

[16] Counsel for IPA began to develop No. 189's testimony about how these women were dressed specifically, but his questioning soon degenerated—as it did on many other occasions throughout the deposition—into a series of interruptions and snide mischaracterizations of No. 189's testimony, with the result that this testimony was not developed. Because the claimant is entitled to all reasonable inferences in her favor, where counsel's questioning obstructed the development of facts underlying her claims—in this example, the manner of dress she considered "provocative"—the court assumes that if these facts were developed, a reasonable jury could interpret them in the manner No. 189 claims she did.

required to make, she believes that she met the minimum number), although she admits that she did not successfully set any appointments in her first week.

Beginning the next week, No. 189 worked in recruiting, where Jason was her supervisor. When she was hired by recruiting, Jason said to her, "you're a cute girl. You'll go far here." No. 189 interpreted this to mean that she had been hired based on her looks, and that because she was attractive, she would be successful at the company. No. 189's job in recruiting consisted of going to malls and other public places and handing out flyers to recruit people to participate in IPA's training sessions to become IPA employees. Jason told her that she needed to "do whatever it takes" to get people to IPA. No. 189 did not initially understand what Jason meant by this, so he explained: she would have to "promise them date[s], go on dates with them to bring them in." Jason also told her that she needed to dress more provocatively and wear shorter skirts, telling her "less is better" and using words like "sexy," to describe the way she should dress. When No. 189 called Jason during the day, he would ask her what she was wearing. No. 189 told Jason on several occasions that she found his comments inappropriate, and that she would not wear shorter skirts. No. 189 felt like a prostitute, and like IPA was "pimping [her] out."

No. 189 also claims that Jason and another man in the department hit on her on a daily basis. Jason asked her on a date once, and she declined. Although he did not ask her out again, he continued flirting with her and commenting on her appearance. Jason told No. 189, "you need to give head to get ahead," which she interpreted as meaning that she needed to perform oral sex to be successful at IPA.

IPA first argues that No. 189's claims are not actionable because they are based on speculation and unfounded assumptions. The court disagrees. IPA argues that there is no factual support for the assertion that No. 189 was transferred from the business coordination department to recruiting for not wearing skirts, since no one told her she had to wear a skirt, and because there was a plausible business reason for her transfer. This argument might have more weight if the claim were that No. 189 was subjected to an adverse employment action for not wearing skirts. That is not the nature of the claim, however. No. 189 claims that her supervisor's *explicit*, repeated instructions to dress "sexy" and wear short skirts (among other things), in addition to his constant flirting and running commentary on her appearance, created an environment in which she believed that she was judged by her appearance, and that her value to the company was similar to the value of a prostitute to a pimp. The manner in which No. 189 saw other employees behaving (scantily clad women hanging around and caressing managers, for example) reinforced her impression that woman were primarily valued as sex objects, rather than professionals, in the workplace.

IPA also argues that No. 189's allegations are insufficiently severe or pervasive, but it wholly mischaracterizes her claim as arising out of one individual comment. No. 189 plainly testified that she was subjected to "constant" unwelcome flirting, in addition to the repeated instructions she received regarding her dress and the manner in which she was to recruit employees to IPA. Whether a reasonable woman in No. 189's shoes would feel she had been discriminated against based on her sex must be left for a jury. IPA's motion as to Claimant No. 189 is denied.

### III. CONCLUSION

For the reasons set forth above, IPA's motions for summary judgment with respect to Claimants Nos. 39, 55, 57, 69, 78, 88, 113, 164, 172, and 186 are granted. IPA's motions for summary judgment with respect to Claimants No. 2, 7, 15, 17, 21, 37, 43, 46, 56, 58, 61, 72, 104, 107, 108, 134, 137, 139, 147, 149, 157, 166, 167, 169, 175, 178, 180, 187, 188 and 189 are denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 7, 2009