**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 01 C 4427 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| INTERNATIONAL PROFIT ASSOCIATES, INC. | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the schedule adopted in this case for streamlining summary proceedings, International Profit Associates, Inc. ("IPA") has moved for summary judgment against individual Claimants Nos. 4, 9, 10, 14, 18, 19, 23, 27, 34, 40, 41, 48, 62, 68, 76, 81, 85, 86, 90, 92, 97, 115, 123, 129, 145, 146, 152, 155, 161, 174, 179, 183, and 190 in this class action suit brought by the Equal Employment Opportunity Commission (the "EEOC"). This memorandum opinion and order picks up where the court's two previous summary judgment decisions left off. *See E.E.O.C. v. Int'l Profit Associates, Inc.*, No. 1 C 4427, 2008 WL 4876860 at *1 (N.D. Ill. 2008, July 14, 2008) ("*IPA SJ-I*") and *EEOC v. Int'l Profit Associates, Inc*., No. 01 C 4427, 2009 WL 1956932 at (July 7, 2009) ("*IPA SJ-II*"). Because the procedural posture, background facts, and governing legal standards were discussed in detail in those opinions, this opinion incorporates those portions of the earlier decisions and proceeds directly to the

disposition of the individual motions. For the reasons set forth below, the motions are resolved as follows.

**Claimant No. 4**

Claimant No. 4 worked for IPA for shortly less than three months, from April to July of 2000. During that time, she claims to have been subjected to comments such as "nice ass" on a near-daily basis, and comments about her legs ("look at those legs") multiple times a week. She alleges that upwards of twenty men made comments like these, including both colleagues in her department and male IPA employees she did not know. In addition, male employees regularly whistled at and ogled her when she walked past. No. 4 states that she would glare at the men she did not know to communicate that she did not appreciate these behaviors, and that she would tell the men she did know to stop looking at her like that.

No. 4 recalls unwelcome behavior by three male employees in particular. On one occasion, No. 4 saw Shayne Wetherall, who led the department in which she worked, pull down his pants and expose his buttocks to the department's female secretary, in view of eight to ten people. Wetherall also repeatedly looked No. 4 up and down, made comments about her buttocks and breasts, and tried to look down her blouse. No. 4 states that she complained to Wetherall about his behavior and comments. She also recalls similar conduct by a colleague, Jim Macelli, who sat next to her. In addition, Macelli asked No. 4 on two or three occasions to go out with him and have sex. Macelli also asked her six to eight times over a several week period whether she would let him take pictures of her to post on a pornographic website. No. 4 declined all of these invitations. Finally, No. 4 asserts that a male individual whose name she does not recall, but who

worked at IPA as a bill collector, would stand over her, without any business reason to be near her, and peer down her blouse. This same individual also asked No. 4 explicitly whether she was wearing panties and what kind. He also asked her out after work, and because he was married, No. 4 interpreted his invitation as a request for sex. No. 4 also testified that she saw male employees at IPA slap the buttocks of female employees, although she does not know the names of these employees.

The summary above is not exhaustive of No. 4's allegations, but it suffices to give the flavor of her claim, and, more to the point, to demonstrate why her claim withstands summary judgment.

IPA asserts that No. 4's allegations describe conduct that is insufficiently severe or pervasive as a matter of law.[1] This argument fails in view of the summary of conduct noted above. As the court previously held with respect to Claimant No. 108, for example, sexual harassment need not be both severe *and* pervasive to be actionable, *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999), and a reasonable jury could find that in the less-than-three-month period in which No. 4 was employed by IPA, multiple overt sexual solicitations, coupled with daily commentary by numerous male employees—including No. 4's boss—about No. 4's body, rendered her workplace objectively hostile. IPA's motion for summary judgment as to No. 4 is denied.

## Claimant No. 9

Claimant No. 9 worked in the inside sales department at IPA from June 8, 2000 to July 21, 2000. Tony Jones was the head of the department, and No. 9's direct supervisor was Scott Hanson. No. 9 claims that both of these men told her repeatedly that she had

---

[1] IPA also argues that the objectionable conduct was not based on sex, referring to No. 4's allegations that her supervisor swore at her. The EEOC has stated that it does not base its claim on these allegations, so the court need not address whether they contribute to a sexually hostile environment.

"nice legs" or a "nice ass." Hanson would comment on her legs while eyeing her up and down. Other male colleagues also commented on No. 9's legs or whistled at her. No. 9 states that she was subjected to this conduct on a daily basis.

In addition, No. 9 claims that Scott Hanson touched her on multiple occasions. Three or four times, Hanson told No. 9, "ooh, you're tense" and rubbed her shoulders, touching down to the tops of her breasts where her bra was. On these occasions, No. 9 would pull away immediately, but Hanson continued to touch her. At some point during No. 9's short tenure at IPA, Hanson moved his workspace next to hers. Thereafter, on three occasions, while No. 9 and Hanson were seated in their chairs, Hanson pulled No. 9's chair close to him, so that the two were facing each other, with her legs between his, close to his groin. Hanson then rubbed No. 9's thighs and asked her out for drinks or dinner. The first time it happened, No. 9 said, "no, Scott. I'm engaged. You're engaged. What are you doing?" Hanson replied that although they were both engaged, they belonged together. No. 9 quit her job on the day Hanson rubbed her thighs for the third time.

IPA argues that this conduct is insufficiently severe or pervasive as a matter of law. The court disagrees. A jury could find that daily comments about No. 9's body, whistles, and at least six separate instances of unwanted touching by No. 9's supervisor[2] in her less than two months of employment is sufficiently severe or pervasive to render her workplace objectively hostile. IPA's citation to *Weiss v. Coca-Cola Bottling Co. of*

---

[2] It is not clear whether IPA disputes that Hanson was in fact No. 9's supervisor. IPA objects that the EEOC has presented no evidence that he was her supervisor. This is inaccurate, of course: No. 9 testified that Hanson was her supervisor, and it not unreasonable to assume that No. 9 knew who her supervisor was. Moreover, although IPA objects to EEOC's purported lack of evidence, IPA does not appear to assert that Hanson was *not* No. 9's supervisor, nor does IPA argue that Hanson status as No. 9's supervisor (or not) is material to her claim. Of course, if the fact is material, the dispute IPA raises precludes summary judgment.

*Chicago*, 990 F.2d 333 (7th Cir. 1993), is inapposite, at least on the basis that in that case, only one male employee was alleged to have engaged in unwelcome conduct. No. 9, by contrast, alleges that both Jones and Hanson harassed her, and further states that she was exposed to daily comments about her body by other male coworkers as well. IPA's invocation of *Adusumilli v. City of Chicago*, 164 F.3d 353, 357-58 (7th Cir. 1998), is likewise unavailing, as that case did not involve repeated touching of the plaintiff's intimate body parts by her supervisor, coupled with invitations to go out with him after work.

For the foregoing reasons, IPA's motion for summary judgment of Claimant No. 9's claim is denied.

## Claimant No. 10

Claimant No. 10 worked as an administrative assistant at IPA from September 14, 1999 to January 7, 2000. No. 10 worked in the mergers and acquisitions department, and her supervisor for the duration of her employment was Scott Wood. No. 10 makes the following allegations in support of her claim:

On one occasion shortly before No. 10 quit her job, she witnessed Tony Jones, the director of the inside sales department, grab a female employee and push her backwards over a desk, then lift his leg over her and simulate having sex with her. No. 10 saw the woman try to push Jones off of her, screaming, "get the hell off me." Jones then pulled the woman from the desk onto the floor, where he kneeled on top of her and further simulated sex, while the woman continued to scream at him and try to push him off. No. 10 described the incident as follows: "Tony had grabbed the girl, and she was by a desk, and pushed her on the desk and pretty much humped her as a dog would go to the

bathroom, and then pulled her down to the floor and as she was screaming, he jumped on her and started humping her again."

On another occasion, as No. 10 was walking by a male manager's office, she saw a female employee straddling the manager's lap and putting eye drops in his eyes. No. 10 heard a lot of giggling as this was going on.

No. 10 claims that in the last month of her employment at IPA, Richard Gottlieb, whose position she did not know, offered her a promotion with a pay increase to become his administrative assistant in a new department that was being created. At the time, No. 10 had spoken to Gottlieb on only a handful of occasions, primarily while the two were outside smoking cigarettes. Over the course of these conversations, Gottlieb explained that he had received a promotion at IPA, and he asked No. 10 about her position and professional background. One day, No. 10 encountered Gottlieb in the reception area near Gottlieb's office, where No. 10 was speaking to Kathy, the receptionist. At the time, Kathy was putting on mascara, and Gottlieb asked No. 10, who was not wearing makeup, why she didn't "paint [her] face." No. 10 found this comment "weird," but she "didn't take [it] seriously," "let it go," and "didn't think about it again." Later that same day, Gottlieb asked No. 10 to bring in her resume so that he could consider her for a position as his assistant. Neither No. 10 nor Gottlieb mentioned the face-painting comment of earlier that day. No. 10 states that she gave her resume to Gottlieb the next day, and that shortly thereafter, he offered her a job as his assistant.

The following day, No. 10 met with Shelle Bareck. According to No. 10's testimony, Bareck confirmed that No. 10 would begin working for Gottlieb and would receive a pay increase, but explained that No. 10 had to stay in her current position for

two weeks until a replacement could be found. No. 10 spoke to Wood about her transfer later that day. The next day, although No. 10 was still working for Scott Wood, she attended a brainstorming meeting of people who were going to be on Gottlieb's team in the new department. No. 10 claims that later that day, as she was making copies at the photocopier, Gottlieb "took out his wallet, threw all his cash out, and said, what the fuck do I have to do to get you to paint your face and shorten your dress?" No. 10 says she was "stunned" by Gottlieb's conduct, and that she reported it to Bareck the same day. She further testified that as a result of Gottlieb's comment, she didn't want the position as his assistant anymore.

The following day, Bareck called No. 10 to her office and said told her that she (Bareck) had spoken to John Burgess, and that they had decided that No. 10 should continue working in the mergers and acquisitions department, rather than become Gottlieb's assistant. No. 10 felt as though she had been slapped on the wrists for reporting Gottlieb. The next time she encountered Gottlieb, he told her that she had "made a very big mistake" and that she was "messing with the wrong person." For the remainder of No. 10's employment at IPA, Gottlieb did not speak to her but would glare at her in a way that made her feel uncomfortable. About a month later, No. 10 quit her job.

IPA argues that No. 10's allegations do not amount to severe or pervasive harassment, and that the company took prompt, remedial action in any event. IPA also disputes that No. 10 was ever offered a promotion. IPA argues that Gottlieb had no authority to extend such an offer and disputes No. 10's assertion that Bareck made the offer on the ground that it is based on inadmissible hearsay. IPA also contends that to the

extent No. 10's claim is based on a retaliation theory, that theory was not advanced in EEOC's complaint and may not be asserted now.

To begin with, the court agrees that because the EEOC did not assert a retaliation claim on behalf of class members, it may not now seek damages for class members based on that theory of liability. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996). It does not appear, however, that the EEOC is pursuing No. 10's claim based on a retaliation theory.[3] Although EEOC's argument is less than crystal-clear, the court understands the EEOC's position to be that IPA's alleged change of course regarding No. 10's promotion is not an independent Title VII violation, but instead rebuts IPA's argument that it took prompt remedial action in response to No. 10's complaint about Gottlieb's harassment, since she was worse off as a result of that action. In other words, the EEOC claims not that IPA violated Title VII because it retaliated against No. 10 for reporting Gottlieb's conduct, but rather that IPA cannot escape liability for No. 10's hostile environment claim on the basis that it took effective action in response to her complaint.

It is indeed well settled that "[a] remedial measure that makes the victim of sexual harassment worse off is ineffective per se," regardless of whether the measure puts an end to the alleged harassment. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000) (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990), and citing cases). IPA insists that No. 10 was not worse off, since there is no admissible

---

[3] IPA has not taken the position that the EEOC is precluded from asserting individual claims on the theory that the individual suffered an adverse employment action. Indeed, although the parties have generally focused on the hostile work environment theory throughout this litigation, the EEOC's complaint, on its face, asserts both theories. Although "failure to promote" claims fall within the realm of actionable adverse employment actions, *see, e.g., Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009) (setting forth prima facie elements of failure to promote claim), if the EEOC intended to assert No. 10's claim based on that theory, it failed to develop this argument in any meaningful way. The court thus assumes that EEOC asserts only a hostile environment claim on No. 10's behalf.

evidence to suggest that No. 10 was slated for any promotion in the first place. Although the court is not entirely persuaded by this argument,[4] it need not resolve the issue. As the court understands the parties' respective positions, the appropriateness of IPA's response is relevant to IPA's defense that it cannot be held liable for Gottlieb's conduct. *See Tutman v. WBBM-TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1048 (7th Cir. 2000) ("In hostile work environment cases, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."). It does not, however, bear upon the independent question of whether No. 10 was subjected to a hostile environment.

No. 10's testimony, taken as a whole, supports IPA's position that the three episodes that No. 10 asserts (or four, if Gottlieb's two face-painting comments are counted separately), are isolated occurrences. Nevertheless, the court is unwilling to find, as a matter of law, that taken together, they are so benign as to fall short of actionable harassment. No. 10's description of Tony Jones's sexual assault of a female coworker depicts not only a sexually suggestive pantomime but a deliberately degrading one. The remaining episodes, including the money-throwing outburst by Gottlieb (which a reasonable woman might indeed find humiliating), arguably reinforced not only a "sexualized atmosphere" at IPA, as EEOC asserts, but also No. 10's impression that female employees—herself included—could be degraded with impunity at the workplace. Under these circumstances, No. 10 is entitled to have a jury decide whether her working

---

[4] IPA argues that Bareck's alleged comments that No. 10 "had the job" and would receive a pay increase are hearsay. Without resolving that issue, the court notes that in any event, other evidence supports the inference that No. 10 was indeed slated for transfer to Gottlieb's team. For example, No. 10 testified that following her meeting with Bareck she attended a brainstorming meeting with Gottlieb and his team, although she was working for Wood at the time. A reasonable inference from this testimony is that No. 10 "had the job" as Gottlieb's assistant. IPA does not appear to dispute No. 10's claim that Gottlieb was hierarchically superior to Wood, so it is also reasonable to infer that the transfer would have constituted a promotion for No. 10.

environment was subjectively and objectively hostile. IPA's motion to dismiss her claim is denied.

**Claimant No. 14**

EEOC does not oppose IPA's motion for summary judgment of Claimant No. 14's claim. Accordingly, the motion is granted.

**Claimant No. 18**

Claimant No. 18 was a business coordinator at IPA from September of 2000 to August of 2001. Her claim is based on the following allegations:

For the last two months of No. 18's tenure at IPA, David Soskin was her zone manager. During that period, Soskin once responded to No. 18's comment that she planned to leave work at the end of her scheduled shift with the question, "what are you going to do, go home and…?" while making a gesture of "tweaking" his nipples. No. 18 understood this to imply that she was going home to masturbate. In a similar vein, No. 18 claims that Soskin said to No. 18's son Jeremy, who also worked as a business coordinator in Soskin's zone, "Jeremy, you jack off in front of the computer, don't you?" Jeremy replied that he did not, to which Soskin retorted, "Well, I know for a fact that your mom does." No. 18 states that other people heard this exchange.

No. 18 also recalls hearing Soskin use vulgar language while he was on the phone. Specifically, she heard him shout, "I don't care what you do. I just want a fucking sale, and I will hire a fucking whore to lick your asshole out."

On two separate occasions, sales representatives with whom No. 18 worked made sexually suggestive comments to her over the phone. In the first instance, Dante DeFabio told her "a sale is better than an orgasm." No. 18 testified that she did not respond to this

comment. On the second occasion, Sam Jones asked her, "do you want to get laid?" No. 18 does not recall whether she responded to that comment.

No. 18 also claims that on one occasion, she saw a female employee massage a male employee's neck, and that the female employee "dragged her breasts up and down against his back." No. 18 recalls saying, "that's disgusting." No. 18 further claims that Keith Link was "always" putting his hands on female employees' "rear ends and on their shoulders."

No. 18 recounts one instance in which she witnessed an argument between zone manager Dmitri Kotsakis and a female employee named Gloria, with whom No. 18 believes Kotsakis may have been involved romantically. During the argument, Kotsakis screamed that Gloria was a "fucking cunt."

Finally, No. 18 testified about two instances involving violence against a particular female IPA employee. No. 18 states that she once ran into the victim in the ladies' room at IPA, and that the woman cried and told her about how a male IPA employee named Victor and two or three of Victor's friends had beaten her with a baseball bat and attempted to rape her after the female employee had agreed to give them a ride. No. 18 states she saw scratches, bruises, and a lump the size of an orange on the woman's body and head, which the woman told her were the result of the attack. No. 18 heard from "everyone" at work that the same female employee was, on another occasion, struck with a manufacturing guide by a male IPA employee in the course of an argument at work, and that the female employee left IPA and never returned. No. 18 did not herself witness the altercation.

No. 18 also describes other conduct that made her scared and caused her to leave work on one occasion. In particular, she described a fistfight between David Soskin and a male employee named Nick, and an episode in which Soskin slammed a plastic clipboard down, causing it to shatter. No. 18 was sufficiently upset by the fistfight that she spoke to Shelle Bareck about it, went home early that day (a Thursday), and did not return to work until the following Monday. She also stated that she tried to steer clear of Soskin after the shattered clipboard incident because she was fearful of what he might do if he got angry. In her deposition, No. 18 stated that she did not believe these instances constituted sexual harassment, but that they illustrated the nature of IPA's work environment.

IPA argues that No. 18's allegations do not describe severe or pervasive harassment, and that the harassment she describes was not based on sex. The court is not convinced on either front. First, IPA makes much of the fact that Soskin's comments about masturbation were made to both women and men. But IPA overlooks that the only male employee identified as a target of such comments is No. 18's *son*, and that the comment to him was largely about *No. 18* masturbating. A reasonable fact finder could interpret Soskin's masturbation comments not as gender-neutral off-color jokes, but instead as deliberate attempts to humiliate No. 18 sexually in front of coworkers, including her son, and that she was singled out for the comments based on her sex.

Next, it is not clear that the totality of No. 18's allegations describe conduct so benign as to fall within Title VII's safe harbor. It is true that the remaining remarks directed at her (Dante DeFabio's comment comparing a sale to an orgasm and Sam Jones's question "do you want to get laid?") are, indeed, fairly tepid. But the court is

mindful that they occurred in a working environment punctuated by the loud use of sexually degrading epithets for women, and in which at least one manager was "always putting his hands all over" female employees.

Finally, IPA conspicuously omits from its opening brief any reference to No. 18's testimony regarding the injuries she claims a coworker showed her in the ladies' room at IPA, which the coworker attributed to a sexual assault by a male IPA employee. IPA objects to the court's consideration of this evidence on the ground that it is based on inadmissible hearsay. Nevertheless, IPA addresses the evidence obliquely in its reply, equating it with the "uncomfortable [workplace] rumors" that were held non-actionable in *McDonnell v. Cisneros*, No. 94 C 4440, 1995 WL 110131 (N.D. Ill. 1995). IPA's position is flawed in several respects. First, IPA's blanket hearsay objection poses no obstacle to the court's consideration of the portion of No. 18's testimony that is based on personal knowledge. No. 18 claims to have seen her colleague's bruises, scratches, and bumps first-hand, and IPA has asserted no basis for excluding No. 18's testimony about what she saw. Second, it is not entirely clear that even the portion of testimony that is based on what No. 18's colleague allegedly told her—that the injuries were caused by a male IPA employee during an attempted rape—is inadmissible hearsay: the court assumes that the statement is not offered for its truth (i.e., whether the named IPA employee in fact assaulted No. 18's colleague), but instead to support No. 18's subjective perception that IPA's workplace was hostile towards women.

In addition to attenuating IPA's evidentiary objection, a focus on the impact of the ladies' room encounter on No. 18 underscores the analytical distinction between her claim and the ones asserted in *McDonnell*, where the plaintiffs relied on "two anonymous

letters and the rumors circulating throughout the workplace concerning their sexual misconduct" to support their claim of a hostile environment. *Id.* As the Seventh Circuit later explained in *Yuknis v. First Student*, 481 F.3d 552 (7th Cir. 2007), the reason claims "based purely on hearsay or rumor" are not generally actionable is that the offensive acts are too indirect or remote, from the perspective of the claimant, to rise to the level of actionable harassment. Here, however, what IPA cavalierly calls the "shock value" of No. 18's "sensational" allegations (and the court does not hesitate to conclude that a reasonable woman could indeed find her allegations shocking) is that she claims to have witnessed, first-hand, what she believed was evidence of a violent sexual assault of a female coworker by a male coworker.[5] In this light, it is clear that No. 18's claim is not "based purely on hearsay or rumor." *Yuknis*, 481 F.3d at 555-56.

No. 18 may or may not ultimately persuade a jury that her own working environment was objectively hostile, but IPA has not demonstrated that it was not so as a matter of law. Accordingly, IPA's motion for summary judgment of her claim is denied.

## Claimant No. 19

Claimant No. 19 is one of two original complainants in this case. EEOC and IPA have each submitted copious statements of fact in support of their respective positions on summary judgment. Certain facts are indeed undisputed, and they are discussed below. Nevertheless, the parties offer vastly differing accounts of: No. 19's relationship with IPA's managing director John Burgess; the quality (and quantity) of No. 19's work for IPA; No. 19's entitlement to commissions she alleges were due and unpaid; the manner

---

[5] That the alleged brutality occurred outside the workplace is not dispositive. *See Doe v. Oberweis Dairy*, 456 F.3d 704, 715-16 (7th Cir. 2006).

in which No. 19 was (or was not) accorded certain benefits at IPA; and the circumstances surrounding her termination.

The parties agree that: No. 19 began her employment at IPA on July 5, 1994 and worked as a business coordinator until August 14, 1994. She then worked in the quality control department from August 15, 1994, to August 29, 1994, in the accounting department from August 30, 1994, to September 14, 1997, as a business analyst from September 15, 1997, to November 30, 1997, as an outside sales representative from December 1, 1997, to January 11, 1998, and as an inside sales representative from January 12, 1998 to March 20, 1998, when she was terminated. No. 19 claims that she was summarily fired by John Burgess shortly after refusing his sexual advances. IPA asserts that Valerie Ramsdell, No. 19's manager in her last position at IPA, terminated No. 19 because of poor performance and habitual tardiness.

The parties agree that No. 19 had sexual intercourse with John Burgess on several occasions. IPA claims that the relationship between Burgess and No. 19 was consensual, and that No. 19 welcomed their sexual intercourse.[6] No. 19 disputes that her sexual relationship with Burgess was either welcome or consensual. She claims that John Burgess harassed her continuously from the time she began working in the accounting department. He made comments such as, "lean over so I can see your tits," and "you

---

[6] It appears that among the evidence on which IPA intends to rely for this position is evidence that No. 19 had sexual relationships with other IPA employees. EEOC objects to this evidence on the ground that it is inadmissible for this purpose under Fed. R. Evid. 412. Rule 412 establishes a procedure for determining whether the type of evidence IPA seeks to offer is admissible, and it is premature to determine the admissibility of IPA's evidence at this stage. Fortunately, the ultimate admissibility of this evidence is not material to the court's resolution of the present motion. To the extent IPA's motion relies on the factual finding that No. 19's sexual relationship with Burgess was consensual, No. 19's testimony that it was not is sufficient to raise a triable issue of fact. The admissibility of IPA's evidence can thus be determined at a later time, following the procedure set forth in Rule 412.

have nice ankles; you must give good blowjobs."[7]  No. 19 claims that Burgess pressured her to go out with him for a year, during which time she refused his advances, and that he touched her inappropriately on six or seven occasions while she was in his office.  For example, she claims that on one occasion, he backed her against a wall, grabbed his crotch, and tried to kiss her on the mouth and touch her breasts.  She alleges that on another occasion, Burgess grabbed No. 19's arm and tried to pull her into a side room of his office and kiss her.  She claims that Burgess also insinuated, in front of other IPA employees, that he and No. 19 had a sexual relationship by making suggestive comments such as, "yea, she's really good" and "what time are we meeting tonight?" even though at the time, No. 19 had consistently refused his advances.   She claims that Burgess became "obsessive," writing her love letters, paging her to his office repeatedly, and calling her fifteen to twenty times a day, demanding to know why she would not go out with him.  Burgess himself admits that he became "infatuated" with No. 19.

No. 19 states that she ultimately agreed to have sexual intercourse with Burgess to protect her job because she feared Burgess would retaliate against her inside and outside of work if she did not give into his advances.  No. 19 claims that Burgess "frequently made suggestions about keeping [her] job," and that she was afraid she would be demoted if she did not agree to go out with him.  During the period in which Burgess was harassing her, No. 19 was involved in a child custody battle with her ex-husband.  She claims that she spoke to Burgess about her child custody case, and that on several

---

[7] There is some discrepancy in No. 19's testimony about the actual words Burgess used, as she testified during her deposition that Burgess's actual statement was, "you know what they say about women with nice ankles, they give good blowjobs."  This discrepancy is immaterial, since a reasonable conclusion based on the context is that Burgess was referring to No. 19 specifically, regardless of his exact turn of phrase.  Moreover, even if Burgess were not referring to No. 19, his statement could still be construed as sexually harassing.

occasions, she sought advances from the company to pay her attorney. No. 19 alleges that Burgess approved one such request, but denied another, telling her, "you don't need an advance if you see me." No. 19 feared that if she did not sleep with Burgess, he might retaliate by making false statements to her ex-husband that would negatively affect her ability to win custody of her child. No. 19 states that she did not trust Burgess's "mental stability," and that she feared he was capable of anything. No. 19 claims that she had sexual intercourse with Burgess approximately four or five times between early and late 1997, although she does not remember the specific dates.

It is undisputed that while No. 19 worked in the accounting department, she arrived at work late on "several occasions," though No. 19 claims that she had been authorized to arrive late because she was doing a good job and working a lot of hours. No. 19 acknowledges, however, that at some point during that period she received a verbal warning relating to her tardiness.

In late 1997, No. 19 asked to be transferred to a position as a business analyst, which was a position that would require her to work off-site, rather than in IPA's office. She claims that one reason she requested the transfer was to get out of the building to avoid contact with Burgess. No. 19 began working as a business analyst in September 1997. She claims that Burgess continued to harass her by regularly calling her cell phone and pressuring her to have sex with him. Burgess allegedly promised No. 19 that she could have assignments that would keep her closer to home (which was important to No. 19 because she wanted to be near her child), if she would continue having sex with him.

No. 19 then transferred successively to the outside sales department and the inside sales department. The parties dispute numerous facts relating to her tenure in these

departments. IPA claims that No. 19 generally performed poorly; No. 19 claims she performed well but was not credited for the sales she made. Specifically, IPA asserts that No. 19 made no sales while working in the outside sales department, and "generated commissions for only two sales" during her employment in the inside sales department. Meanwhile, No. 19 claims that she made at least one sale each week in the outside sales department, and that she made one to two sales a week in inside sales. IPA asserts that while in inside sales, No. 19 frequently came in late, and that she did not spend as much time on the phone as required to perform well. No. 19 claims that she rarely came in late, and that she was on the phone most of each day.

No. 19 also states that while she worked in the outside sales department, she and a guest were invited on a weekend trip to Las Vegas sponsored by IPA. She claims that John Burgess asked her who she planned to invite as her guest, and she replied that she would be bringing her boyfriend. Within days of this conversation with Burgess, No. 19 received a letter in the mail from Shelle Bareck, telling her she had been "excluded" from the Las Vegas trip because IPA "was unable to procure any additional lodging in Las Vegas" and was not "capable of increasing the size if [its] banquet facilities."[8] No. 19 states that at the time, she called Bareck to find out why she had been "uninvited" to Las Vegas, and that Bareck replied, "you know how John is." No. 19 is unaware of any other IPA employee who was "uninvited" to Las Vegas.

No. 19 alleges that in March of 1998, she complained to Gregg Steinberg that she had not been paid commissions that were due to her. She claims that she showed Steinberg a report indicating that No. 19 was owed $4000, but that Steinberg just laughed

---

[8] The EEOC attached a copy of Bareck's letter to No. 19's declaration.

at her.[9]  The following day, John Burgess called No. 19 into his office.  In the presence of four other department heads, Burgess shouted at No. 19, "You're fucking fired.  You have two minutes to get out of this building."  IPA asserts, however, that the decision to fire No. 19 was taken by Valerie Ramsdell and was based on No. 19's poor performance.  No. 19 claims that she was fired because she had stopped giving in to John Burgess's pressure for sex.

The foregoing summary is not intended to be exhaustive of the allegations No. 19 makes in support of her claim.   They suffice, however, for the resolution of the present motion.

IPA asserts that No. 19's claim cannot withstand summary judgment because she cannot demonstrate that she was subjected to a "tangible" adverse employment action, and because her hostile environment claim is both time-barred and based upon conduct that is insufficiently severe or pervasive as a matter of law.

The court begins by noting the Seventh Circuit's observations in *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 753-54 (7th Cir. 2006), one of the cases IPA now cites:

> [S]ummary judgment briefs that present multiple versions of the facts arouse our attention at the outset because under the Federal Rules of Civil Procedure, a judge may grant summary judgment for a moving party only where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. [Citations omitted].  Because our only task upon review of a summary judgment motion is to determine "whether there is any material dispute of fact that requires a trial," (*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994)), multiple versions of the facts increase the chances that at least one of those conflicting facts will be material to the outcome of the case.

---

[9] IPA disputes No. 19's claim that she was not paid commissions, relying on IPA's business records, and appears to object to No. 19's reference to an unidentified report that she claims support her position.  IPA's objection is noted, but a jury is entitled believe No. 19's testimony that she was owed commissions regardless of the existence of any "report," and to discredit IPA's documentary evidence.  *See Payne v. Pauley*, 337 F.3d 767, 774 n. 2 (7th Cir. 2003) (jury may credit plaintiff's testimony that she was detained by police for half an hour over dispatch records indicating police were on scene no longer than six or seven minutes).

*Id.* As the court observed at the outset, the parties have offered extensive factual statements that, while overlapping to some degree, present starkly differing versions of events that marked No. 19's employment. Having reviewed the "tangled web of facts" at issue, *id.* at 753, the court concludes that No. 19 is entitled to have a jury adjudicate her claims.

First, No. 19's hostile environment claim is not time-barred. IPA acknowledges the continuing violation doctrine set forth in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002), under which a plaintiff may bring a hostile environment claim "so long as an act contributing to that hostile environment takes place within the statutory time period," but argues that No. 19's claim is barred because No. 19 last had sexual relations with Burgess in July of 1997 (a fact that No. 19 disputes),[10] and because No. 19's allegations with respect to incidents that occurred after November 25, 1997 (the relevant cutoff date in this action) are unrelated to her allegations of a hostile environment. IPA's argument is meritless. To begin with, when No. 19 last had sexual relations with Burgess is irrelevant in view of her allegation that Burgess continued to harass her long after the last time the two had sex. IPA argues that the court should disregard this allegation because it was first made in a declaration accompanying the EEOC's response to IPA's motion. The basis for IPA's position is that the declaration contradicts No 19's deposition testimony. IPA relies on *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006), in which the court held that a plaintiff cannot create an issue of material fact "by submitting an affidavit that contradicts an earlier deposition."

---

[10] EEOC acknowledges that No. 19 stated, at one point during her deposition, that she last had sex with Burgess in July of 1997, but points out that she stated elsewhere in her testimony that while she was not sure of the date she last had sex with Burgess, she recalls that she was "wearing a jacket, so it had to be cold," and that it was "before Christmas" of 1997.

Having reviewed No. 19's deposition in its entirety, however,[11] the court concludes that *Pourghoraishi* is inapposite. In that case, which involved a claim of racial discrimination, the plaintiff stated in his deposition that he had no physical attributes that made him appear to belong to a racial minority. In his legal memorandum, however, the plaintiff argued that "any reasonably aware and knowledgeable person would have identified [the plaintiff] as Middle Eastern, both by his appearance and speech," and cited to an affidavit by plaintiff's lawyer. *Id.* at 758. The court disregarded the affidavit because it "directly conflict[ed]" with the plaintiff's own testimony. *Id.*

In this case, there is no such direct conflict. While it is true that, under IPA's questioning, No. 19 testified primarily (though not exclusively) to Burgess's conduct prior to November 25, 1997, she neither affirmatively stated that his unwelcome advances stopped after that time, nor stated that the pre-November 25, 1997, conduct about which she primarily testified represented the entirety of the harassment she experienced by Burgess. The fact that IPA focused its questioning on the period of No. 19's employment preceding her sexual relationship with Burgess is consistent with IPA's theory of her claim, which is that it must be limited to Burgess's conduct prior to the time he and No. 19 began a sexual relationship.[12] It is not at all clear that IPA did not make a tactical decision not to develop No. 19's testimony relating to the period after her sexual relationship with John Burgess ended, and the court presumes that if such testimony were developed, it would support her claim. *See IPA SJ-II* at *56 n. 16 (counsel's failure to

---

[11] Although EEOC filed only excerpts of claimants' deposition transcripts as exhibits in their second round of oppositions, the court requested and received the transcripts in their entirety. The transcript of No. 19's deposition itself suggests that IPA intended to continue her deposition to a second day, but there is no evidence that this occurred, and the court assumes that the transcript it receive reflects the entirety of her deposition. The court takes this opportunity to note that although it reviewed the entirety of many claimants' deposition transcripts, its consideration of any testimony not included in the record was immaterial to the ultimate resolution of the present motions.

[12] Recall that IPA asserts the relationship was consensual.

develop testimony about harassment claimant asserts allows for presumption, on summary judgment, that additional testimony would have supported her claim). In any event, the court finds no direct conflict between her deposition testimony and her later declaration. Accordingly, *Pourghoraishi* does not control.

IPA also argues that the statements in No. 19's declaration are too vague to support her claim. But No. 19's statement that during the limitations period, Burgess continued to pressure her to have sex with him by calling her regularly and offering her more desirable work conditions (specifically, "smaller jobs and jobs closer to home") if she would agree to have sex with him are substantially more precise than the ones the court found too vague in the case upon which IPA relies, *Spencer v. City of Elkhart*, 1995 WL 358819 at *29 (N.D. Ind. 1995). In that case, the court rejected "vague assertions that…'some of [the plaintiff's] supervising officers made unwelcomed sexual advances toward [her] and engaged in verbal and physical conduct of a sexual nature in [her] presence.'" While the allegations cited in *Spencer* are devoid of any meaningful detail, the same cannot be said of No. 19's statements in her declaration. Moreover, the court sees no reason to consider No. 19's declaration in isolation—indeed, IPA's own position appears to emphasize that the declaration cannot be analyzed independently of No. 19's deposition testimony. Viewed in the light of her testimony as a whole, the statements in No. 19's declaration are not too vague to support her claim.

Next, IPA's assertion that No. 19's allegations relating to conduct after November 25, 1997, are unrelated to facts contributing to her hostile environment claim simply overlooks certain of No. 19's allegations. IPA focuses on the allegations that No. 19 was denied commissions and advances in early 1998, then argues that these allegations have

nothing to do with John Burgess, whose conduct is at the heart of No. 19's hostile environment claim. This argument falls, however, with the court's conclusion above that No. 19's testimony amounts to adequate evidence that Burgess continued to harass her, calling her multiple times a day and pressuring her to have sex, throughout her stint as a business analyst (which ended on November 30, 1997, within the limitations period) and into her tenure in the outside sales department.

Based on the foregoing, the court concludes that No. 19's claim is not time-barred, and that it may consider "the entire scope of [her] hostile work environment claim, including behavior alleged outside the statutory time period," *National Railroad*, 536 U.S. at 105. Having made that determination, there is no need to linger on IPA's argument that the conduct No. 19 alleges is insufficiently severe or pervasive as a matter of law. IPA does not even argue that, if Burgess's conduct over the course of No. 19's entire period of employment is considered, the harassment she alleges is not severe or pervasive. The court has no trouble concluding that a reasonable jury could find in No. 19's favor on that issue.

Less clear is whether No. 19's claim of sex discrimination based on one or more actionable adverse employment actions can survive summary judgment. The EEOC offers merely seven lines of text in response to IPA's argument that No. 19 has failed to raise a triable issue of fact on this question. In a cursory fashion, EEOC insists that the evidence is sufficient to demonstrate a material dispute as to whether No. 19 was terminated, denied commissions, and/or "uninvited" on IPA's Las Vegas weekend as a result of sex-based discrimination. IPA replies that: 1) No. 19 was terminated not because of sex discrimination but because she was a poor performer; 2) the undisputed

facts prove that No. 19 was not denied any commissions to which she was entitled; and 3) because No. 19 had no entitlement to the Las Vegas trip, her exclusion from the trip is not actionable as a matter of law.

Although neither of the parties makes reference to the standards that are by now familiar in the Title VII context, No. 19 can ultimately prove her adverse employment action claim in one of two ways: the direct method or the indirect method. *Raymond v. Ameritech Corp.*, 442 F.3d 600 (7th Cir. 2006). The court begins with her claim of unlawful termination, since there is no question that termination is a materially adverse action. Under the direct method of proof, No. 19 need not come forward with an admission of discriminatory animus to survive summary judgment, provided that she can construct "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Despite IPA's protestations to the contrary, the court finds that No. 19 has minimally met that burden here. IPA argues that in order to conclude that No. 19 was terminated because of her sex, a jury would have to "ignore[] all of the events leading up to her termination." Not so. It is IPA who ignores the events from which a jury could reasonably conclude that No. 19's termination was the ultimate result of her refusal to continue a sexual relationship with John Burgess.

As the court understands the EEOC's theory of No. 19's case, John Burgess exercised an enormous amount of discretionary control over the terms and conditions of No. 19's employment, and that he exercised his discretion in a way that rewarded her for agreeing to have sex with him and punished her for rebuffing him. At her deposition,

No. 19 gave specific examples of Burgess's discretionary control. For example, No. 19 testified that at while she worked in accounting, there was no company policy regarding when advances would be paid. Instead, "it was whenever John Burgess wanted to, whenever he felt like it, and how much he wanted to give you." No. 19's undisputed testimony that she personally managed the advance accounts of IPA employees suggests that she can competently testify to Burgess's exercise of discretion, at least as to how advances were awarded. In addition, No. 19 testified that Burgess told her, "you don't need an advance if you see me," which she understood as a solicitation for sex, and that he also made suggestions about "keeping [her] job." Finally, No. 19 claims that when she complained to Shelle Bareck about Burgess's conduct, Bareck's responses reinforced that Burgess called the shots: when No. 19 complained about her "problems" with John Burgess,[13] Bareck allegedly asked her, "What do you want me to do about it? It's John Burgess." Similarly, when No. 19 called Bareck to ask why she had been excluded from the Las Vegas trip, Bareck replied, "You know how John is."

The court concludes that these facts, taken together, are sufficient to construct a minimally "convincing mosaic" from which a jury could conclude that No. 19's termination was the result of sex discrimination. That is, a rational jury could conclude that No. 19's termination was motivated not by her alleged tardiness and poor performance, but rather by her refusal to continue having sex with John Burgess.[14]

---

[13] It is not entirely clear from No. 19's testimony which "problems" she complained about, but she stated that "one of the issues she brought to [Bareck's] attention" was that she had not received commissions to which she was due, which she believed was the result of discriminatory decisions on Burgess's part.

[14] IPA insists that No. 19's claim that she was terminated because she refused to continue having sex with John Burgess is purely speculative, and that it is not supported by any competent evidence. Meanwhile, however, the competency of the evidence IPA offers in support of its own version of No. 19's termination is at times questionable. For example, IPA relies on the affidavit of Valerie Ramsdell, who states, among other things, that her "gut feeling" is that No. 19's claim is frivolous, that "if you only knew [No. 19], you would know she is not very hard working," and that No. 19 "enjoys socializing much more than working."

Moreover, as the Supreme Court recently observed, 42 U.S.C. § 2000e-2(m) explicitly authorizes discrimination claims under Title VII where an improper consideration was "'a motivating factor' for an adverse employment action," even though other, non-discriminatory factors may also have prompted the action. *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2349 (2009) (distinguishing the Age Discrimination in Employment Act, which requires that improper consideration play a "but-for" role in the adverse action, from Title VII, which requires only that the improper consideration be "a motivating factor.") As for No. 19's allegations that she did not receive commissions to which she was entitled, IPA's contention that its business records "prove" that No. 19 was never denied commissions also does not support summary judgment. A jury is entitled to discredit IPA's documentary evidence and believe No. 19's testimony that she was indeed denied commissions. *See Payne v. Pauley*, 337 F.3d 767, 774 n. 2 (7th Cir. 2003) (jury may credit plaintiff's testimony that she was detained by police for half an hour over dispatch records indicating police were on scene no longer than six or seven minutes).[15] Accordingly, IPA is not entitled to summary judgment on No. 19's claim that she suffered one or more adverse employment actions based on her sex.[16]

Based on the foregoing analysis, IPA's motion for summary judgment of No. 19's claims is denied.

---

Ramsdell further asserts that "Mr. Burgess finds it very difficult to refuse a request for help." The evidentiary value of such statements is obviously limited.

[15] This is true regardless of the existence or contents of the "collection report" to which the EEOC refers in support of No. 19's claim.

[16] As for whether No. 19 suffered a material adverse employment action when she was "uninvited" to the Las Vegas trip, the court tends to agree with IPA that this is the type of discretionary decision that, although it made No. 19 unhappy, did not amount to a material change in the terms and conditions of her employment. *See Murray v. Chicago Transit Authority*, 252 F.3d 880 (7th Cir. 2001) (supervisor's refusal to approve employee's travel plans after she rejected his dinner invitation not actionable adverse action). Of course, No. 19 remains free to assert her allegations relating to the Las Vegas trip in support of her hostile environment claim.

**Claimant No. 23**

Claimant No. 23 worked as an outside sales representative from March 15, 2000, to October 17, 2000. Throughout her employment at IPA, she worked out of her home in Lake Zurich, Illinois and rarely visited IPA headquarters in Buffalo Grove. She bases her claim of a hostile work environment on the following allegations:

In the three-and-a-half day training course at the beginning of her employment, a male trainer named Ray made comments "from time to time" about No. 23's appearance or about sales prospects wanting to date her. Approximately a half dozen times, Ray commented that No. 23 had nice legs and said her suit was sexy. He also told her several times that he thought she was very attractive, and said "oh my goodness, look at her in her red suit." No. 23 claims that throughout the training, Ray "picked on" her, singling her out with comments such as, "if our analyst spends the whole day flirting with [No. 23] and trying to get a date with [No. 23], he's not doing his job," and "some guys may not be paying attention if legs like [No. 23]'s are being shown." At one point, a male instructor told a story about a female executive who was "propositioned" by a sales prospect, although No. 23 could not recall the details of the story.[17] No. 23 also claims that words like "sexy" and "hot babe" were "thrown out" over the course of the training.

No. 23 complained about the trainer's comments to Don Parks, her regional manager, after the training ended. She told Parks that she was unhappy about the way

---

[17] It is not clear from No. 23's testimony whether she has any independent recollection of the alleged story at all, as her testimony is muddled and relies heavily on a document apparently created by a male trainee in her training class named Ted Suss. No. 23 stated, "I recall several stories in this tone throughout," but could not remember the specific story referred to in Suss's document and could not remember whether the "proposition" mentioned was for sex, dating, or something romantic, as opposed to a business proposition. EEOC asserts that "the conversation was focused on the woman's appearance, build and sexiness," but No. 23 did not recall those details. Indeed, she stated, "I really think if you want to know this exact thing, Ted Suss could answer that." In response to additional questions about the story, No. 23 stated, "I do not exactly recall. I am looking at what you're looking at" and that she was "guesstimating" about who participated in the story.

she had been talked to in the training, to which Parks allegedly replied, "well, look how good looking you are. Can you blame them?"[18] No. 23 claims that another trainee in her sales training, Ted Suss, wrote a letter complaining about how No. 23 was treated during the training. No. 23 states that after showing the letter to No. 23, Suss gave it to John Harper, the IPA employee apparently responsible for the last day of the training. In front of the class, Suss handed Harper the letter and said, "I've been very offended about what's been going on." Harper looked embarrassed but did not respond to Suss's comment or to the letter.

No. 23 alleges that throughout her employment, Parks made comments she found inappropriate in both conference calls and one-to-one phone calls she regularly had with him. For example, she claims that on one-to-one calls, Parks said things like, "I'm going to come down there yet and take you out and we'll go out on the town and we'll have a great time," and "you're one fine looking lady." No. 23 thought these comments, and the tone of voice in which they were made, were inappropriate because Parks was married. No. 23 claims that on conference calls, Parks said things like, "I'm going to come down, [No. 23], and see you," and "is that [No. 23] on the phone, you sexy lady." Parks allegedly made comments about taking No. 23 out more than five times, and he called her a "sexy lady" or "sexy doll" two or three times.

Finally, No. 23 alleges that her job required her to call IPA's office "all the time" and speak to Keith Link. She claims that Link, whom she met in person on a few

---

[18] IPA's "objection" to this statement in its L.R. 56.1 responses is not well taken. IPA complains that the statement is "irrelevant" to IPA's motion, since the motion challenges only the severity or pervasiveness of the alleged conduct, not the issue of IPA's negligence in addressing complaints. First, the proper place for asserting legal arguments such as relevance is in legal memoranda, not in L.R. 56.1 filings. Second, IPA made a point of underscoring that No. 23 did not report certain of the comments she found inappropriate during her employment. Presumably, IPA thought the issue of reporting was relevant to its motion in some way, and the EEOC is entitled to respond by pointing out that No. 23 did, in fact, report certain conduct.

occasions, "continuously" made comments on the phone that she found offensive, such as calling her "doll" and "sweetheart," and saying that he would come over and stay at her house, and that he'd like to take her out.

IPA argues that No. 23's claim is based on conduct that is insufficiently severe or pervasive as a matter of law. The court disagrees. Although the court has held that conduct alleged to have occurred *only* during a claimant's initial training period is insufficient to render her overall working environment hostile,[19] No. 23 asserts that she was subjected to offensive comments both during training and on a regular basis throughout her employment. It is true that the tenor of the comments No. 23 asserts is less egregious than that described by certain other claimants, but the comments are not so "tepid, intermittent, or equivocal" as to fall within Title VII's "safe harbor," *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir.1998), and she is entitled to have a jury adjudicate her claim. IPA's motion as to No. 23 is denied.

## Claimant No. 27

Claimant No. 27 worked as a business coordinator for approximately two months between May and July of 2001. No. 27 heard about the job through her cousin Phelycia, who began working as a business coordinator at IPA about two weeks before No. 27 did. No. 27 had several different zone managers during her employment, and she claims that she also worked under a man named Garrett, whose position she did not know, but who she believed was hierarchically superior to her immediate supervisors. No. 27 believed that Garrett was a manager at IPA, and that he had the authority to hire and fire people,

---

[19] *See* discussion of Claimant No. 39 in *IPA SJ-II*, at *16-*17. The court's analysis in this respect assumes, of course, that employment continued for some reasonable period without significant further incident after the training was completed.

since she once saw him tell a business coordinator, "go home and don't come back," after which No. 27 never saw the business coordinator again.

The first alleged incident of inappropriate conduct was when a male employee known as "Red," whom No. 27 had seen before at IPA but had never spoken to, grabbed her thigh while she was wearing a skirt and said, "ooh, you got some pretty legs." No. 27 responded by telling him, "don't touch my legs."

On another occasion, a male employee whose name No. 27 does not know, but who she believes was called "Beebos," hit her on her buttocks. No. 27 told the man, "don't touch me," after which he told her repeatedly that she was stuck up. No. 27 reported the buttocks-slapping incident to Garrett, told him she thought it was sexual harassment, and asked him to tell the men to keep their hands off her. Garrett replied that No. 27 could not "file sexual harassment" because the man was not in management.

Garrett's reply was substantially the same after No. 27 reported a third incident of conduct she found offensive: when No. 27 saw a male coworker named Darnell eating something out of a can, she asked him what he was eating, to which Darnell replied, "[t]una fish. It's like eating your pussy." In addition, Darnell would "always" do "freaky stuff" like stick out his tongue at No. 27 and wiggle it in a particular fashion.[20] Darnell behaved in this manner both before and after No. 27 complained to Garrett about him.

No. 27 alleges that Garrett himself behaved in a sexually inappropriate way towards her. On one occasion, Garrett said to No. 27 and Phelycia that if they were not cousins, he would "fuck [them] both." No. 27 told Garrett, "never." On two or three

---

[20] The manner in which Darnell wiggled his tongue was apparently captured on video during the deposition but was not described in detail. The context allows the court to assume, however, that it was a sexually suggestive gesture.

occasions, Garrett rubbed No. 27's shoulders, despite the fact that she told him, "don't do that."

No. 27 also witnessed other female employees being touched by male coworkers on their breasts and buttocks. In particular, she recalls seeing a male employee grab the breast of a female employee who No. 27 believed was only sixteen. She also heard male employees "talk nasty" to female coworkers, telling them what they would do to them and "how they'll fuck 'em."

No. 27 states that she left IPA because she "thought [she'd] get raped up there," and that she quit because of what she felt was sexual harassment.

IPA contends that the foregoing conduct is insufficiently severe or pervasive as a matter of law. This argument is without merit. IPA insists that No. 27 was subjected to no more than two "lewd" comments and isolated, "relatively unobtrusive" physical contact. IPA glosses over the explicit sexual content of the comments, as well as the fact that one of the comments was made by a person No. 27 believed was in a position of authority to respond to sexual harassment complaints, and whose response to her complaints reinforced that belief. In addition, IPA's characterization of the unwelcome physical contact to which No. 27 was subjected as "relatively unobtrusive" is questionable. The court is not persuaded that thigh-grabbing and buttock-slapping are within the scope of what reasonable people ordinarily expect in their working environment. Finally, IPA makes no mention of the sexual gestures to which No. 27 was repeatedly subjected, nor of the fact that she saw other women being grabbed and slapped by male coworkers and heard men making sexually explicit comments to women. None of the cases cited by IPA addresses harassment that is comparable in its variety and

frequency (in relation to the total period of employment) to the conduct No. 27 alleges. A reasonable jury could conclude that No. 23's workplace was sufficiently severe or pervasive to render her workplace objectively hostile. Accordingly, IPA's motion for summary judgment of No. 23's claim is denied.

## Claimant No. 34

Claimant No. 34 was employed at IPA from June 7, 2001 through August 20, 2001. She began her tenure at IPA in the advisory & intermediary services ("A&I") department and was in the inside sales department at the time she left. No. 34 also worked as a business coordinator for one day.

No. 34 states that she began her employment at IPA with a one- or two-day sales training session, which was attended by four women and thirty to forty men. During the training, Brian Rubenstein, the IPA employee who led the training, used language No. 34 found inappropriate. For example, he used profanity including the "f word," described IPA as a "balls to the wall" company, made comments about "jerking off" (and then, hearing a gasp from No. 34's side of the room, continued, "oh, don't act like you don't do it too"), and said that "women use their bodies to get ahead in business, and that's okay." No. 34 states that the men in the class laughed at these comments. Finally, No. 34 asked Rubenstein, "do you kiss your mother with that mouth?" to which he replied, in front of the class, "your mother didn't keep you a virgin very long, did she?" No. 34 was "horrified" and "embarrassed" by Rubenstein's comment. Later, No. 34 spoke to Rubenstein privately, telling him that she thought his comments and behavior were unacceptable, and she asked to speak to someone in human resources. No. 34 claims that

Rubenstein told her that she had to "toughen up" and "let things roll off [her] back." Rubenstein did not tell her whom she could speak to in human resources.

Based on her unsavory training experience with Rubenstein (who she understood was in the inside sales department), No. 34 decided to work in the A&I department because she perceived that department as more "serious." No. 34 reported to Shane Wetherall in the A&I department. While in A&I, a male coworker named Marlin began to threaten No. 34. Marlin called No. 34 a bitch on several occasions, punched the wall next to her head on one occasion, and told her he was going to "get" her. No. 34 also heard Marlin make comments like, "look at the rack on her," and "boy, I'd like to get some of that," in reference to a coworker named Judy. No. 34 reported Marlin's behavior to Claude, an assistant manager in the A&I department. Claude took No. 34 to see Wetherall, to whom No. 34 complained about Marlin. Wetherall responded that there were "two sides to every story," which No. 34 took to mean that Wetherall did not believe her complaint. Wetherall moved No. 34 to a different cubicle in the same room, but Marlin still bothered her. No. 34 claims that she was scared of Marlin because he followed her after work on two occasions. No. 34 also heard Marlin say to a male colleague that he would "like to get under [No. 34's] skirt, and show her who's boss." No. 34 complained a second time to Wetherall, who again responded, "there are two sides to every story." Wetherall suggested No. 34 transfer to the business coordination department, which she did. Marlin remained in A&I.

On No. 34's first (and only) day as a business coordinator, she saw "pornography pictures all over the place, hanging on cubicles." She claims to have seen over twenty pictures of women with their breasts and vaginas exposed. No. 34 did not want to work

in that environment, so she went back to Wetherall, who suggested she transfer to the inside sales department.

In the inside sales department, No. 34 sat near Shawn Fishman and Shawn Smoker, whom she overheard talking constantly about "pussy" and "the bitch they got with last night." No. 34 claims that Fishman and Smoker repeatedly told a story about a party John Burgess took them to in Las Vegas. Highlights of the story, among other distasteful details, were topless stewardesses in Burgess's private jet and prostitutes Burgess hired for the men.[21] No. 34 also claims that on one occasion, Smoker ran his hand up No. 34's calf and said to Fishman, "who knew [No. 34] had such foxy legs?" On another occasion, No. 34 saw a female colleague get slapped on the buttocks by a male colleague.

No. 34 cried every day when she came home from work, and she finally quit her job at IPA as a result of her coworkers' conduct.

IPA asserts that No. 34's allegations describe conduct that is insufficiently severe or pervasive as a matter of law. The court disagrees. IPA disingenuously characterizes her claim as "predominantly based" on Marlin's conduct.[22] In fact, No. 34 describes harassing conduct by various IPA employees in each of her three departments, as well as

---

[21] IPA disputes this statement on the ground that it is based on inadmissible hearsay. This objection is without merit. The point is not whether the story is true, but whether the impact on No. 34 of its telling and retelling at the workplace is such as would render her working environment hostile.

[22] Equally disingenuous is IPA's assertion that Marlin's threatening conduct occurred in the course of an "argument" with No. 34. No. 34 makes no reference to any argument. The testimony IPA cites in support of its assertion reads: "Q: What do you mean threatened? A. He punched a wall next to my head. And he told me that – I'm paraphrasing, because I don't remember exactly what he – what he said. But he was calling me names and telling me that I – and he was going to get me. Stuff like that. I don't even remember why." IPA further mischaracterizes No. 34's testimony when it asserts that "[a]ll of these alleged incidents [relating to Marlin] occurred during the first week of her employment." This assertion is based on the following testimony: "Q. Now you said during the first week when you started in A&I, this Marlin made these threatening comments to you? A. Yes. He had started being very belligerent and -- [testimony interrupted by attorney for IPA]." The only conclusion that can reasonably be drawn form No. 34's aborted testimony is that Marlin's threatening behavior *began* during No. 34's first week.

in the context of her training. Among other factual omissions in its motion, IPA makes no mention of Fishman and Smoker's audible, ongoing commentary about their sex lives, which featured pejorative, sexually explicit terms for women, or of No. 34's claim that she witnessed a female colleague get slapped on the buttocks.

The court has no trouble concluding that a jury could find the conduct No. 34 alleges to be severe or pervasive enough to render her workplace objectively hostile, and there is little question that No. 34 subjectively found it to be so. IPA's cited authorities, *Spencer v. Commonwealth Edison*, No. 97 C 7718, 1999 WL 14486 (N.D. Ill., Jan. 6, 1999) (Hart, J.), and *Alexander v. CIT Technology Financing Services*, Inc., 217 F.Supp.2d 867 (N.D. Ill. 2002), do not compel a contrary conclusion. The plaintiff in *Spencer* was employed by the defendant for over twenty years, and it is not clear from the court's opinion in that case over what period of time the circumstances alleged to have contributed to a hostile environment occurred. In *Alexander*, the court considered allegations about a handful of remarks that were made to the plaintiff over a period of more than a year and concluded that they were insufficient to support her hostile environment claim. 217 F.Supp.2d at 886. Moreover, neither *Spencer* nor *Alexander* addressed allegations of physically threatening behavior at work. In short, the facts of those cases are materially distinguishable from those at issue here.

For the foregoing reasons, IPA's motion for summary judgment of No. 34's claim is denied.

## Claimant No. 40

Claimant No. 40 worked as a business coordinator at IPA for approximately two years, from December of 1998 to January of 2001. She claims that after about six months

at IPA, her then-zone manager, Dean Kalomiris, asked her if she wanted to do "something more for the company," telling her that she could "make some more money entertaining" the salesmen who came in. No. 40 felt this request was inappropriate.[23] No. 40 claims that after she told Kalomiris that she did not want to do anything "more" for the company than the job she was hired to do, she was called "bitch," "mother fucker," and "stupid whore" by five to seven different male employees who she believed were managers. No. 40 alleges that she was called these names "routinely everyday" for a year and a half, until she finally quit her job. No. 40 recalls hearing other female business coordinators being "constantly" called these names, but does not recall hearing male employees get called names, demeaned or sworn at. She explained that "[IPA] management didn't call them bastards and mother fuckers and stupid son of a bitches or any of that if they wanted to either leave for the day because they had [to] do something for their child or because of something else that was taking place. But if a woman wanted to leave they used all kinds of different things…."

No. 40 also describes two incidents in which John Burgess called her "bitch" after she greeted him in passing.[24] In addition, No. 40 describes seeing a male coworker, Fedel St. James, fondle three separate women on three occasions, one on the leg, one on the buttocks, and one on the breast. Once No. 40 herself had to tell St. James to get back, and to push him away from her four of five times, after he kept "walking up on" her

---

[23] It appears from her deposition transcript that No. 40 began to explain what she understood the request to mean, but her testimony was cut off by questioning: "A: He asked me would I like to do something more for the company and pretty much he was saying -- Q: And you said --  A: -- that -- Q: -- what? A: No." IPA's complaint that No. 40's allegations are insufficiently precise is not well taken where its counsel's questioning appears to have thwarted her attempt to clarify her meaning.

[24] IPA disputes that these incidents occurred, which of course gets IPA nowhere on summary judgment.

while talking to her. She explained that by "walking up on her," she meant that St. James was trying to hug her and touch her hand while speaking to her.

No. 40 once saw male employees passing around a Hustler magazine on the business coordination floor. When the magazine was passed in front of her, she saw a picture of a woman whose breasts and vagina were visible.

IPA argues first that No. 40's allegations are too vague to be actionable and second that the conduct she describes is insufficiently severe or pervasive as a matter of law. Neither argument merits prolonged discussion.

In support of its first argument, IPA asserts that "*Claimant No. 40 could not name or identify a <u>single</u> woman she claims was harassed.*" (Original italics and underline) This statement is absurd, since No. 40 claims to have been the target herself of the majority of the harassing conduct she alleges. While it is true that No. 40 could not identify by name all of the male employees whose conduct she found offensive, this is not fatal to her claim. *See Dey v. Colt Construction*, 28 F.3d 1446, 1456-57 (7th Cir. 1993). In view of the totality of the conduct No. 40 alleges, a jury could conclude that her working environment was hostile, regardless of whether she can identify by name each of her alleged harassers or each of the women she claims was harassed.

Equally preposterous is IPA's suggestion that the allegation that No. 40 was routinely called "bitch" and "stupid whore" *every day* for a year and a half, by multiple male employees, is legally insufficient to state severe or pervasive conduct.[25] Indeed, IPA cites no authority for this argument.

For at least these reasons, IPA's motion for summary judgment of No. 40's claim is denied.

---

[25] IPA does not contend that this harassment was not sex-based.

**Claimant No. 41**

Claimant No. 41 worked as a business coordinator from January 12, 1998 to February 27, 1998. She claims that on one occasion, her zone manager, Rich Lubicz, called her and a female colleague named Tawanda over to his desk. Lubicz allegedly leaned back in his chair, nodded his head at the women, and commented on their bodies, saying they looked really nice in their black jeans. On another occasion, as she walked by two male colleagues, she heard one comment to another, "she has a nice ass." No. 41 also heard men comment about other women, "man, she look good" or "damn, she look good," "man, she's got a nice body," "she's got a nice ass." She claims to have heard comments about her own body "a couple times a week" and comments about her colleagues' bodies on a daily basis. No. 41 did not report these comments because she assumed, based on the "working atmosphere" – which she described as "rowdy" and filled with comments such as those she described – her complaint wouldn't make a difference.

IPA argues that the harassment No. 41 describes is not severe or pervasive as a matter of law. IPA basis this argument on its characterization of No. 41's claim as based on three specific comments directed at her and "a few other vague comments" directed at No. 41's coworkers. This mischaracterizes No. 41's claim. First, although No. 41 remembered three specific comments that were directed at her, she testified that she was the subject of similar comments "a couple times a week." Second, No. 41 called several specific comments she heard male employees of IPA make about female coworkers, and she testified that she recalled hearing these types of comments on a daily basis. No. 41 need not remember each detail of each comment for her claim to be actionable. As the

Seventh Circuit observed in *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994), where a claimant alleges a pattern of harassing conduct, she need not recall every instance of harassment with specificity.  In this case, not only does the court assume that the EEOC has established a pattern or practice of pervasive harassment at IPA generally, it also interprets No. 41's allegations of daily exposure to comments about women's bodies, including her own, coupled with her general description of her working atmosphere, as asserting a pattern or practice to which she was directly exposed.[26]  That she recalls certain of these comments with specificity, and recalls others with enough specificity to characterize them as similar to the ones she recalls more exactly, is sufficient to withstand summary judgment under *Dey*.  Accordingly, IPA's motion as to Claimant No. 41 is denied.

## Claimant No. 48

Claimant No. 48 worked in IPA's inside sales department from June 7, 2001 to June 15, 2001.  She bases her claim on the following allegations:

- During training at the beginning of her employment, she asked the trainer for an employment verification letter.  The trainer asked, "how bad do you need this letter?"  When she responded that she needed it badly, he said, "well, why don't you come and take a ride with me in my car and give me a blowjob?"  After No. 48 refused, the trainer told her to go to the human resources department for the letter.

---

[26] Despite IPA's insistence that No. 41 merely "overheard" many of those comments, her exposure to these comments may appropriately be construed as "direct" under *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007) (contrasting non-actionable, "second hand" claims based "purely on hearsay or rumor" with actionable claims based on "hearing or seeing" allegedly offensive conduct).

- Also during the training session, No. 48 heard a male employee say to No. 48's fiancé (also an IPA trainee) that there were some "real nice looking women" at IPA.

- No. 48 witnessed conduct she found inappropriate directed toward a female colleague, [Claimant No. 34]. First, during training, the trainer engaged in an exchange with No. 34 in front of the class, during which the trainer said, "I know that you had sex with your husband before you got married to him." No. 48 felt "pity" and "more or less hurt" for No. 34, who cried and turned red after her exchange with the trainer. On another occasion, No. 48 heard a male employee tell No. 34 that she should wear heels and a skirt. Finally, No. 48 saw a male employee staring at No. 34 in a manner that suggested he was "taking her clothes off." The man stared at No. 34 for a minute or two in this manner. No. 48 felt disgusted.

- Once, after No. 48 critiqued a male coworker's sales style in front of a group, the man replied, "well, you know, [No. 48]…everybody is not like you. Everybody is not all bitchy…like they're on their period."

IPA argues that the alleged conduct is not severe or pervasive enough to amount to actionable harassment. It is true that No. 48 alleges only a handful of incidents, and that at least one of these (the comment about "real nice looking women") is too mild to support her claim. Nevertheless, in light of No. 48's extremely short tenure at IPA, a jury could find that the remaining conduct No. 48 asserts—which included a statement literally inviting No. 48 to perform oral sex[27] as well as a comment arguably designed to

---

[27] IPA underscores the fact that after No. 48 turned down the invitation, the trainer directed her to human resources, where she obtained the necessary letter. While it is possible that the trainer's comment was

humiliate No. 48 in front of coworkers by referring pejoratively to her menstrual cycle—was sufficiently severe or pervasive to give rise to an actionable claim. None of the cases cited by IPA addresses conduct alleged to have occurred over such a short period of employment. Of course, any damages to which No. 48 may ultimately be entitled will be commensurate with her short-term exposure to the hostile environment; but the court declines to hold, at this stage, that her entitlement is zero as a matter of law. Accordingly, IPA's motion for summary judgment of No. 48's claim is denied.

## Claimant No. 62

Claimant No. 62 was a business coordinator at IPA from April 18, 2001 to July 20, 2001, when she was seventeen years old. She claims that over the course of her employment, she was subjected to two instances of unwanted physical touching: once when she was pinched on the buttocks, and turned around to see three male employees laughing, and another time when a male coworker who was walking past No. 62 while she was seated using the telephone ran his finger along the top of her pants, near her underwear. In addition, No. 62 was subjected to multiple, sexually explicit comments relating to a piercing in her lip. No. 62 explains that while working at IPA, she wore a one-centimeter long "spike" in her lower lip, and that multiple male coworkers, one of whom was the manager of the hybrids department, made comments such as, "doesn't that stab the guy when you give him a blowjob?" and "doesn't that hurt when you go down on someone?"

No. 62 claims that she was especially bothered by a particular male coworker, whose name she does not recall, but whom she described in a fairly detailed fashion.

---

merely a crude joke, rather than a genuine solicitation for sex, a jury could conclude that its impact on No. 48—who was new to the job and arguably ill-positioned at that point to gauge the seriousness of the suggestion—was substantial.

According to No. 62, this coworker made the aforementioned comment, "doesn't that hurt when you go down on someone?" and also told her she must be a "freak" in bed and asked her on two separate occasions when she was going to "hook up" with him. No. 62 responded by telling the man that she was seventeen, and asking him whether that mattered. He replied, "that's old enough for me." No. 62 excused herself from the conversations and returned to work. A week later, the same man told No. 62 that she should wear tighter clothes to work because she has a nice body, then said, "them are some nice titties." After hearing this comment, No. 62 left the room. Shortly thereafter, No. 62 and her friend Ashley complained about this individual to Ray, the assistant zone manager of their zone. In No. 62's presence, Ashley told Ray, "creepy guys keep harassing or hitting on [No. 62]". Ray apparently sought no further details, telling No. 62 to "be tough."

In addition, No. 62 claims that she also saw a male colleague drop pennies down the back of her friend Ashley's pants so that he could watch her get them out. No. 62 saw Ashley complain to Ray about the pennies, and Ray asked the man to stop, which he apparently did.

IPA argues that these allegations, which it characterizes as "isolated and relatively harmless," are insufficiently severe or pervasive to be actionable. IPA cites dicta from *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798 (7th Cir. 1995), in which the court observed that although the unwelcome physical contact alleged in that case (a forcible "French" kiss on the mouth and an attempt to unfasten the plaintiff's bra) was sufficient to withstand summary judgment, less egregious physical acts, such as "a pinch of the buttocks" may be considered insufficiently severe, in isolation, to give rise to an

actionable claim. *Id.* at 808. The *Hostetler* dicta do not, however, preclude submitting No. 62's claim to the jury. First, the "pinch" No. 62 alleges appears to have been designed to embarrass her in front of coworkers. Second, the unwelcome contact No. 62 alleges did not occur "in isolation," but rather in an environment generally pervaded (the court assumes) with sexual harassment. That several of No. 62's male colleagues felt free to make sexually explicit comments about No. 62's piercing,[28] and that one also commented upon her "titties" is evidence that No. 62 was directly exposed to IPA's generally hostile environment.

For the foregoing reasons, IPA's motion for summary judgment of Claimant No. 62's claim is denied.

## Claimant No. 68

Claimant No. 68 worked at IPA for approximately one week in May of 2001. Despite her short tenure at the company, No. 68 has a lot to say about her experience as an IPA employee. Indeed, her deposition in this case lasted nearly six hours and generated 364 pages of testimony—significantly more than any other claimant whose claims are before the court on summary judgment. Nevertheless, No. 68's claim ultimately rests upon a narrow scope of allegations. No. 68 claims to have been subjected to two strains of objectionable comments: 1) remarks relating to how women should dress at IPA, and 2) comments referring to No. 68 as a "sad old bitch." No. 68 describes the comments themselves, the identity of the speakers, and the circumstances in which the comments were made, with varying degrees of clarity and consistency over the

---

[28] At least one other court in this district has held that similar comments contributed to an environment that a jury could find objectively hostile. *Valadez v. Uncle Julio's of Illinois, Inc.*, 895 F.Supp. 1008, 1011 (N.D. Ill. 1995) (male coworker "told plaintiff in vulgar terms that he thought the reason that she got her tongue pierced was so that she could have better oral sex").

course of her deposition. She clearly alleges, however, that the comments she found offensive were made repeatedly, by multiple individuals, throughout her employment. No. 68 also claims to have been subjected to at least one unwelcome stare at her chest and to have witnessed an inappropriate workplace scene involving colleagues. As best the court can ascertain from her meandering, frequently confused, and sometimes inconsistent testimony, the details of her allegations are the following:

During the three-day training that began her employment, No. 68 was told multiple times that if she "wore her tops lower, her skirts shorter and high heels she would get more sales." She states that two or three unidentified male employees told her this,[29] one of whom was a trainer.[30] No. 68 asserts that the same individuals also referred to "dressing sexy," but that she did not find those comments to be offensive or harassing. No. 68 also alleges that another unidentified male employee (or possibly one of the two or three aforementioned employees) said something that No. 68 could not recall, but that was "in reference to being more polished but then referring to like wearing your clothes tighter." No. 68 states that she had "no problem" with the comment about wearing a tighter dress, but that "the guy was staring at my chest while he was saying it."[31] She claims that after each incident, she "complained to the person doing the training at the

---

[29] Sometimes No. 68 states that three men made this comment in the training room (e.g., 141:23-142:2), and sometimes she says that two did (128:9-11, 140:2-4), and that a third said something different (128:13-16). Unless otherwise noted, all references in this section refer to No. 68's deposition transcript, cited portions of which were attached as Exh. 14 to EEOC's combined response to IPA's summary judgment motions.

[30] Because the court must interpret all evidence in the light most favorable to the EEOC, the court assumes that one of the referenced individuals was a trainer, although No. 68 first testified that she could not distinguish trainers from co-trainees among the men who made these comments in the training room, then testified that the men who made the comments were fellow trainees, then said she thought one of the men was a trainer, then affirmed that he was indeed a trainer.

[31] Elsewhere in her testimony, No. 68 stated that the man or men who told her to wear her tops lower, skirts shorter and high heels also stared at her chest, and that it was the staring that made the comment objectionable to her.

training" that she was "getting inappropriate conversations with the people that are next to me," referring to her "fellow workers."[32]

According to No. 68's testimony, the "head trainer" described the dress code at IPA as "standard business attire," but then singled out all but one of the women in the training, including No. 68, and had them stand up, then told them, apparently referring to his earlier statements about wearing lower tops, shorter skirts, and heels, that "if you want to make more money, then you'll do it," and "if you want a job here, then you'll do it." No. 68 testified that the trainer said this multiple times a day on each of the three days of training. No. 68 told the trainer that "your dress has no relevance on your job performance…as long as you dress professionally, it doesn't matter whether you wear a skirt or pants or heels or if you don't wear heels." She told the trainer that she would "do what [she] can" and would "look professional at all times."

No. 68 claims that comments about her attire continued after her training, into the days she worked in the inside sales department. She states that either two or three managers, none of whom was No. 68's manager, told her that if she wore a lower top, shorter skirts and high heels she would get more sales or make more money or get more leads.[33] This comment was made each day No. 68 was in the inside sales department, and each time she complained to her manager. Her manager told her not to pay attention to what anybody says and just make her phone calls so that she could make her quota.

---

[32] She later testified that she did not know whether the people next to her were trainers or trainees. She further testified that she "tried to" complain about the trainer's comments to "the other people that came in to cross-train…[a]nybody that came in any time anything occurred" (142:24-143:6), but it does not appear that she did, in fact, complain about the trainer's comments, other than to the trainer himself.
[33] No. 68 initially testified that three managers made these comments (136:9), but stated shortly thereafter that two managers and one person whose position she did not know made them (140:10-13).

During the time No. 68 worked in inside sales, she was called a "sad old bitch" on four occasions, either behind her back or to her face. On the first and second occasions, No. 68 heard the words "sad old bitch" and turned around to see several managers, none of whom was No. 68's manager, pointing at her. She then heard them say, "[No. 68] is a sad old bitch." At the time, No. 68's manager was seated two chairs away. No. 68 complained to her manager, telling him that she thought she had just been called a sad old bitch. The manager suggested that the comment could have referred to someone outside the room, and No. 68 agreed and "let it go." Later that same day, No. 68 asked about "what time we would have lunch or, you know, what the lunch break was or if we could get a bathroom break or whatever," and in response, a manager (again not No. 68's manager) responded, out of nowhere, "you know, you're really a sad old bitch." The following day, yet another manager (neither No. 68's manager nor the manager who had called her a sad old bitch the previous day), said to another manager, referring to No. 68 while in her presence, "the sad old bitch over there isn't getting any sales." It is not clear what, if anything, No. 68 said anything to the men in response, since she testified, in quick succession, that she "didn't say anything," that she "told them that – that the profanity was inappropriate," and that she was "on the phone with a customer" at the time and said nothing until a minute later (after her phone call ended), at which point she turned her chair around and asked the offending men "why are you picking on me?"

No. 68's testimony as to whether she complained to her own manager about the last in the series of "sad old bitch" comments is similarly muddled. No. 68 first testified that she did not complain to anyone besides the men who had made the comment. A moment later, she testified that the "tried to complain to [her] row manager," but the row

manager "wouldn't listen to [her] about anything." She then stated that she said to her manager, "the guys over there, they're – they're profane and they're – they're obscene, and it's inappropriate business behavior….can you get those guys to cool it on their language?" to which the manager allegedly replied, "it gets hot in the sales environment. They're just blowing off steam. You have to not get so emotional." No. 68 states that she then said, "okay, I'll adapt to the situation."

Finally, No. 68 claims that she witnessed a scene that took place as a female employee, who No. 68 later found out was named Trinda,[34] was taking lunch orders from employees in No. 68's department. No. 68 claims that she saw two or three or four employees look down Trinda's cleavage, and that one of them also said "doesn't she have a nice ass" or "doesn't she have a really nice body" and patted Trinda on the buttocks. At some point during this incident, one of the men said that Trinda's skirt was "nice and short" and that she was wearing a nice top and heels.[35] The man also grabbed Trinda's arms. No. 68 claims that Trinda turned red and was shaking and crying. No. 68 heard male employees talking about how Trinda had been raped by "a couple of the guys that worked there."[36]

IPA asserts that No. 68's claims do not allege conduct that is sufficiently severe or pervasive to withstand summary judgment. As the foregoing account of No. 68's

---

[34] No. 68 usually refers to the woman as "Trina," and recalls her last name as "Hedrickson," "Hendricks," or "Hendrickson," while IPA refers to "Trinda" and "Ms. Heinrich." IPA appears to acknowledge that No. 68 was referring to an IPA employee named Trinda Heinrich.

[35] No. 68's account of additional comments made during this episode, of comments No. 68 herself made after witnessing the scene, and of the reactions of the individuals involved is so hopelessly confused that the court excludes these allegations from consideration.

[36] IPA's objection to this allegation as hearsay is meritless, since it is not being offered for the truth of whether Heinrich was in fact raped. The statement is admissible to show that No. 68 was exposed to a sexualized work environment, as well as to substantiate her claim that she found the environment intimidating. Nevertheless, this statement ultimately does little to support No. 68's claim. *See Yuknis v. First Student, Inc.,* 481 F.3d 552, 554 (7th Cir. 2007) (offense based purely on hearsay or rumor generally insufficient to support a claim).

allegations demonstrates, a jury may indeed have difficulty pinning down exactly what was said, by whom, and on how many occasions, and that variations and inconsistencies in her testimony undermine her credibility.  It is not the domain of the court, however, to decide whether No. 68's allegations are believable.  As the court noted at the outset, even the confused portions of No. 68's testimony clearly allege that in merely a week of employment at IPA, she was subjected to repeated comments linking her potential for success at the company with her willingness to dress in a sexually suggestive manner.  These allegations are similar to those raised by No. 37, who claims her supervisor told her, "you know…if you dressed like that more often you'd get that raise and promotion you were looking for.  Otherwise, you're going to end up staying here forever."  As the court held in denying summary judgment of No. 37's claim, "a jury could find that No. 37 reasonably believed that her professional success was indeed dependent upon how much of her own body she exposed to her male colleagues, and that the resulting pressure on her constructively changed the terms and conditions of her employment."  To the extent a jury credits No. 68's testimony about the comments she repeatedly heard, the same is true in this case.  Moreover, No. 68 alleges that she witnessed a workplace scene in which a female colleague was praised for complying with the suggested dress code and treated in a manner that reinforced No. 68's impression that female employees at IPA were valued for their sex appeal.   In the context of No. 68's weeklong employment at IPA, a jury could find the alleged conduct sufficiently severe or pervasive to render her workplace hostile.  Accordingly, IPA's motion for summary judgment of No. 68's claim is denied.

**Claimant No. 76**

Claimant No. 76 was a business coordinator from September 28, 2000 to November 17, 2000. She claims that a male colleague whom she identifies by the nickname "LA" told her she was very beautiful, asked for her telephone number, and told her that he would "really, really like" to see her after work. No. 76 declined to give LA her number, telling him to give her his number instead. When LA insisted that he wanted her number, she told him, "Well, then forget it. I – I'm not really interested anyway. Just leave me alone." LA stared at No. 76 for a few moments, then gave up and left. No. 76 reported the incident to her manager, John Greco, who told her that he would take care of it. No. 76 saw Greco push LA into his office and heard the two men yelling, although she does not know about what. The following day, LA asked No. 76 out again, and she again reported him to Greco. LA continued to ask No. 76 out on two or three other occasions and also said "hey beautiful" to her on an unidentified number of occasions when he passed her in the hall. This conduct went on for "a week or two" but ultimately stopped. No. 76 states that LA did not ask her out during the last three or four weeks of her employment.

No. 76 also claims that a male manager in the inside sales department whom No. 76 had never met told her that she didn't "belong" in the business coordination department and mentioned that there might be a position for her in "reception or something available outside of that floor room." No. 76 said "wow, thank you" and felt really happy because she thought the manager might help her find a position in which she could really use her skills. No. 76 later concluded, however, that the man was only interested in a physical relationship with her, since he gave her his home telephone

number, told her about his place downtown, and concluded their conversation by saying, "okay, well, give me a hug" and putting his arms around her. No. 76 claims she felt physically threatened by the hug, since she was afraid that he might want something more from her. Sometime later, the inside sales manager asked No. 76 out for dinner. She said, "I don't know" then ignored him. No. 76 does not recall having any other interactions of this nature with the inside sales manager.

Finally, No. 76 claims that on one occasion, she witnessed a scene in which a female employee approached Keith Link and asked him for a "tiny, weenie favor." In reply, Link placed his hands on his genitals and said, "I don't have a tiny weenie."

IPA contends that the foregoing allegations fall short of actionable sex-based harassment. The court agrees. Although LA allegedly asked No. 76 out repeatedly, including after No. 76 complained about his advances to Greco, nothing in LA's alleged conduct can reasonably be construed as threatening, obscene, humiliating, or sexually suggestive. Moreover, although LA's advances were repeated, they stopped after one or two weeks, and No. 76 does not claim to have been bothered by him for the remainder of her employment.

Similarly, despite No. 76's claim that she felt physically threatened when the manager whom she had never met before hugged her, the totality of the contact she describes is not so offensive as to have constructive altered the terms or conditions of her employment. Even assuming that the manager was indeed interested in No. 76 only physically, the conduct she attributes to him (i.e., telling her she didn't belong in her department, suggesting there may be positions available elsewhere, giving her his home

phone number, and asking her out to dinner) is too mild to amount to actionable sexual harassment.

Indeed, the totality of the harassment No. 76 alleges is less severe than the conduct the Seventh Circuit held to be "merely offensive" in *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534-35 (7th Cir. 1993). In *Saxton*, the court held that although the "uninvited and unwelcome advances" by the plaintiff's supervisor (who rubbed the plaintiff's leg and forcibly kissed her on one occasion and "lurched" at her on a separate occasion) caused the plaintiff "significant discomfort and distress," the alleged conduct did not support a hostile environment claim because it was "relatively limited, presumably because [the plaintiff] was forthright and persistent in making clear that the advances were unwelcome." *Id.* at 534. Similarly in this case, No. 76 clearly and consistently told LA she was not interested, and he ultimately left her alone. Likewise, neither of the two incidents involving the inside sales manager can, standing alone, be characterized as egregious sexual harassment, and even No. 76's equivocating response to his dinner invitation ("I don't know") was apparently sufficient to curtail his unwanted advances. Finally, the incident in which No. 76 claims Keith Link made reference to the size of his own "weenie" is too trivial to contribute meaningfully to an objectively hostile environment. IPA also cites *Weiss v. Coca-Cola Bottling Company of Chicago*, 990 F.2d 333 (7th Cir. 1993) and *Howard v. Sheahan*, 546 F.Supp.2d 566 (N.D. Ill. 2008) as cases in which allegations similar to, or more serious than, No. 76's were held insufficient to support a hostile environment claim. In *Weiss*, the court held that plaintiff's allegations that her supervisor told her she was beautiful; repeatedly asked her for dates, despite the fact that she told him she wasn't interested; jokingly called her a "dumb blond"; put his

hand on her shoulder several times; placed "I love you" signs in her work area; and attempted to kiss her once in a bar and twice at the work place did not amount to a hostile environment. 990, F.2d at 334, 337. The *Howard* court, citing, *inter alia*, *Saxton* and *Weiss*, held that allegations of a supervisor's repeated requests for dates and comments such as "you are a beautiful woman" and "you are a sexy woman" were insufficient to survive summary judgment. 546 F.Supp.2d at 570, 571. EEOC makes no attempt to distinguish the allegations in these cases from those No. 76 asserts, nor does it cite any authority for its own position. The law of the circuit is clear and dooms No. 76's claim.

For the foregoing reasons, IPA's motion for summary judgment of No. 76's claim is granted.

## Claimant No. 81

Claimant No. 81 was a business coordinator at IPA from November 12, 1999 to December 10, 1999. She alleges that during that time, Fedel St. James, who she believed was some type of supervisor at IPA, harassed her in the following ways: On one occasion, after No. 81 said "excuse me" upon inadvertently colliding with St. James face-on at work, St. James said, "no, excuse me" in a sexually suggestive manner, then said, referring to No. 81's breasts, "you got to be more careful with those girls." On this occasion, St. James also brushed against No. 81's breasts. On four other occasions, No. 81 observed St. James looking down her shirt at her breasts while speaking to her. No. 81 states that Tanya Thurman, another business coordinator, witnessed most of the foregoing incidents.

No. 81 also alleges that she witnessed sexual harassment of other women at IPA by St. James and other managers. Specifically, she claims that she heard St. James and

other managers make "inappropriate sexual comments" to female employees every day, including to women who may have been named Edwina, Ruby, and Josetta or Josita. No. 81 could not recall the content of any of the comments she heard. Once, she saw St. James brush his fingertips against the buttocks of the woman who may have been named Edwina, and another time she saw St. James standing "up on [Edwina's] leg" in a manner she found inappropriate. No. 81 claims that she also saw about five other instances of "behind touching" between unidentified employees.

No. 81 once overheard a conversation among several male supervisors who were "huddled up talking" about the upcoming IPA Christmas party. She heard the men say that they were going to rent rooms to "get some of these girls to go up there," and that they were going to "lay it down" and "get so-and-so to suck my dick." According to No. 81, the men did not know that No. 81 was in the vicinity.

No. 81 claims that during her training, she saw a photograph in the training area of a woman wearing a thong bikini. The woman's buttocks were exposed, but her vagina and nipples were covered. Although No. 81 testified that she felt the picture "wasn't right," she does not claim to have felt "upset" or "degraded" by it.

Finally, No. 81 witnessed a scene in which a female employee approached her male supervisor and asked if she could get more hours. The supervisor responded with "a joking comment like…what you going to do for me?"

IPA argues first that No. 81's allegations are too vague to support her claim, and second that they depict harassment that is insufficiently severe or pervasive as a matter of law. The court agrees that many of No. 81's allegations are insufficiently precise to allow a jury to determine whether the conduct alleged is actionable. Indeed, the court

has previously noted that allegations of comments "of a sexual nature" are, standing alone, too vague to support a hostile environment claim. *See, e.g.,* Claimant No. 37, *IPA SJ-II* at *15. EEOC responds that under *Dey v. Colt Construction*, 28 F.3d 1446, 1456-57 (7th Cir. 1993), a claimant is not required to recall each instance of the alleged harassment in detail. *Dey* is distinguishable from the present case, however. In *Dey*, although the plaintiff could recall some of her harasser's inappropriate comments only generally, she remembered others "in some detail," and she asserted that the ones she remembered generally were similar to the ones she recounted in detail. In this case, by contrast, No. 81 cannot remember a single comment with enough specificity to determine whether any or all of the comments were more like "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which is generally non-actionable, or more like "uninvited sexual solicitations; intimidating words or acts; [or] obscene language or gestures," which are generally actionable. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 61, 67 (1986)). Accordingly, despite the fact that No. 81 claims to have heard inappropriate comments on a daily basis (which frequency surely satisfies the pervasiveness threshold on summary judgment), these allegations cannot support her claim because it is impossible to evaluate the potential effect of the comments as she alleges them on a reasonable woman.

No. 81's remaining allegations, even taken together, do not depict severe or pervasive sexual harassment. The most egregious incident—St. James's sexually suggestive "excuse me," coupled with an apparent (though rather odd) reference to, and brief brush against, No. 81's breasts—falls short of the type of threatening, obscene, or

humiliating conduct that would cause a reasonable woman to believe she had been discriminated against based on her sex. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361-362 (7th Cir. 1998) (ambiguous comments, isolated incidents of touching, and stares at plaintiff's breasts insufficient to support hostile environment claim).

While No. 81 was understandably offended by hearing her male colleagues discuss their plans for sexual adventures at the company Christmas party, her testimony indicates that their conversation was a private one, not directed to, or intended for, anyone other than its participants. No. 81's allegation can thus be likened to the plaintiff's complaint in *Yuknis v. First Student, Inc.,* 481 F.3d 552 (7th Cir. 2007), that her manager viewed pornography on his office computer. On that issue, the *Yuknis* court mused, "what if a male coworker is believed…to be watching pornography on his office computer? It wasn't any of the plaintiff's business what the manager was looking at on his computer. It is not as if pornographic pictures were exhibited on the walls or the workplace or emailed to the plaintiff." *Id.* at 555. The episode No. 81 describes falls into the category of non-actionable "remarks and behaviors unrelated to the complainant except for [her] having overheard, or heard of, them." *Id.* at 556.

For the foregoing reasons, IPA's motion for summary judgment of No. 81's claim is granted.

**Claimant No. 85**

EEOC does not oppose IPA's motion for summary judgment of Claimant No. 85's claim. Accordingly, the motion is granted.

**Claimant No. 86**

The parties dispute the exact duration of No. 86's employment at IPA, but they appear to agree that she worked there from at least March of 1999 through August of 2000, and that she worked in the inside sales and mergers and acquisitions departments during that time. The court need not recount each of No. 86's allegations of harassment because a sampling of them is sufficient to demonstrate why IPA's motion for summary judgment fails.

Tony Jones was No. 86's immediate supervisor in the inside sales department and was the head of that department. No. 86 alleges that on one occasion at the beginning of her employment, Jones walked into the inside sales department office (in which No. 86 was alone) and said to her, with his fly open and part of his penis exposed, "what do you think of that, [No. 86]?" No. 86 claims that Jones regularly referred to her as a "broad," using demeaning expressions such as "hit the bricks, broad," in response to questions No. 86 would ask. No. 86 understood "hit the bricks" to mean "get lost" and understood "broad" as a derogatory name for a woman. Jones said this around twenty times to No. 86, who felt denigrated and disrespected.

No. 86 also claims that she heard a supervisor named Alan call a female switchboard operator "dumb black bitch" or "dumb bitch" on numerous occasions. Although No. 86 heard profanities directed to both men and women at IPA, and that the work environment was denigrating to both men and women, she testified that profanities were used more often with women and that "it was more unpleasant to women."

No. 86 saw female colleagues "pushed into corners by men" where the women's "escape was blocked." On one occasion, a woman in inside sales whom No. 86 does not

remember by name, but who she recalls was from Kenosha, Wisconsin, in her early 30's, and had blond hair, was cornered by a man who rubbed his body against her body.

IPA argues that the foregoing does not amount to severe or pervasive harassment as a matter of law, and that the alleged harassment was not based on sex. Both arguments are meritless. First, the incident in which Jones exposed himself to No. 86 is arguably egregious enough, even standing alone, to have rendered her work environment objectively hostile. IPA argues that No. 86's allegations are insufficient even in light of that episode, citing *Durkin v. City of Chicago*, 199 F.Supp.2d 836 (N.D. Ill. 2002) (summary judgment granted on female police recruit's hostile environment claim, despite allegation that a male classmate exposed his penis to her while urinating and said "suck this"). In *Durkin*, however, it was not the plaintiff's supervisor who exposed himself, but rather a classmate in her training class. A jury reasonably could conclude that the impact of having one's direct supervisor engage in such behavior is more substantial than the effect of the same conduct by one's peer. Perhaps more importantly, however, the *Durkin* court noted that the defendant in that case did not dispute that the alleged acts amounted to sexual harassment, and that "the only question" was whether the defendant "was negligent in remedying it." *Id.* at 849. By contrast, and as IPA is quick to point out in its responses to the EEOC's statements of fact, its motion for summary judgment against No. 86 "is not based on whether the Company was negligent in addressing any purported complaints." (Original emphasis) For at least these reasons, *Durkin* is inapposite.[37]

---

[37] The *Durkin* court's dictum observing that the defendant could also have prevailed on summary judgment on the basis, not asserted in that case, that the alleged indecent exposure was insufficiently severe, standing alone, to constitute sexual harassment, 199 F.Supp.2d at 851, is unpersuasive in this factually distinct case. As noted, it was No. 86's direct supervisor, whom she was routinely in contact with, who exposed himself

In any event, No. 86's remaining allegations, in which she describes an environment in which women were name-called more frequently than men, and in which she herself was routinely referred to as a "broad" in her supervisor's denigrating expressions, are sufficient to raise a triable issue as whether the alleged harassment was motivated by gender and whether it was severe or pervasive enough to cause a reasonable woman to believe she had been discriminated against based on her sex. Accordingly, IPA's motion for summary judgment of No. 86's claim is denied.

**Claimant No. 90**

EEOC does not oppose IPA's motion for summary judgment of Claimant No. 92's claim. Accordingly, the motion is granted.

**Claimant No. 92**

Claimant No. 92 worked as a business coordinator from November 19, 1999 to December 10, 1999. She alleges the following in support of her hostile environment claim:

No. 92 recalls two or three male business coordinators who made inappropriate comments to her in the break room. For example, the men would comment on her clothing and say they would "sure like to see what was under the clothing."

On No. 92's first day of work, a man approached her in the break room, introduced himself, then asked No. 92 on a date. No. 92 declined, telling the man that she was married. The man said "ok" and told her he didn't know she was married. The next day, however, he again approached No. 92 in the break room and asked her out. When she reminded him that she was married, he asked her whether she wanted to go to

---

to her. *Jones v. Clinton*, 990 F.Supp.657, 675-76 (E.D. Ark. 1998), which *Durkin* cites in support of its dictum, and which IPA references in its reply, is likewise distinguishable on its facts.

bed with him. No. 92 declined, but the man laughed "like it was funny." The following day, the same man returned with a "sly grin on his face" and asked why No. 92 had turned down his invitation to go to bed with him. When she told him she "didn't want to do that with [him]" and "didn't want to have…any kind of a relationship like that," he kept smiling and saying "well, if I keep on talking to you…eventually you'll give in." True to his word, the man sat next to No. 92 in the break room the following day. No. 92 got up to leave, but the man told her to sit down and put his hand on her arm "to keep [her] in place." After this episode, No. 92 reported the man's conduct to her supervisor, Mr. Gray, although she could not identify the harasser. The man continued to bother No. 92, so she again reported his conduct to Mr. Gray, this time indicating which zone the man worked in and asking Mr. Gray to talk to the man's supervisor. No. 92 was not bothered by the man again.

Another man, however, whom No. 92 had never met, but who No. 92 later discovered was "buddies" with the first man and worked in his zone, then began to bother No. 92. The second man approached No. 92 in the break room and began to stroke her neck with his fingers. No. 92 told him that she did not like it, but he continued to touch her. No. 92 asked the man to stop, which he ultimately did. No. 92 reported the second man's conduct to Mr. Gray. The next day, the second man approached No. 92 in the break room, asked why she had reported him, and called her a bitch. The man then said, "[m]y buddy was right. You are a tease. You pretend that you don't like it but you really like it." No. 92 asked the man to leave and told him that she didn't want him to say anything else to her. When he didn't leave, No. 92 excused herself and tried to return to her area. The man "kept getting in [her] face" and, after blocking her exit with his foot,

began fondling her breasts with both hands. When No. 92 tried to push his hands away, he grabbed her wrists and shook her, saying "you know you want this." No. 92 told him that she did not, and began crying and begging the man to let go. Finally, No. 92 kicked the man in the shin and he let go. No. 92 immediately reported this incident to Mr. Gray, telling him that she had been sexually harassed and explaining the details of the second man's conduct. Gray said that he would return to the supervisor and ask him to "strongly encourage" the male workers in his zone not to bother the female workers in No. 92's zone.

Sometime after this incident (how long is unclear), No. 92 quit her job. She told Mr. Gray that it "wasn't the environment" for her, that she didn't like the job and didn't like the experiences she had had with the two men who had harassed her.

IPA moves for summary judgment on the ground that No. 92 alleges conduct that is insufficiently severe or pervasive as a matter of law.[38] This argument fails in light of No. 92's short tenure at IPA—a mere three weeks. Although IPA asserts that a "handful of advances" and "two brief incidents of physical contact" are not actionable under Title VII, none of the cases it cites in support of this argument (*Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705 (7th Cir. 1995), *Weiss v. Coca-Cola Bottling Company of Chicago*, 990 F.2d 333 (7th Cir. 1993), and *Enriquez v. U.S. Cellular Corp.*, No 06 C 3135, 2008 WL 4925012 (N.D. Ill., Nov. 14, 2008) (Kendall, J.)), addresses allegations of similar conduct in such a short term of employment. Moreover, the physical contact alleged in IPA's cited cases is generally less severe than the more aggressive contact alleged by No. 92. Accordingly, IPA's motion for summary judgment of No. 92's claims is denied.

---

[38] Although IPA argues, in reply, that No. 92's failure to identify the two men she claims harassed her prevented any meaningful opportunity for IPA to investigate her claims, the court does not understand IPA's motion to be based on the argument that the company took adequate steps to address the problem.

**Claimant No. 97**

Claimant No. 97 worked at IPA from July of 2000 at least through the end of October of 2000. She first worked in inside sales and was later transferred to the business coordination department.

As is always the case at summary judgment, the court must accept the EEOC's version of the facts, provided those facts find some support in the record. With respect to No. 97's claim, however, summary judgment is inappropriate even on IPA's version of the facts. By IPA's own account (undisputed by EEOC), at least five individually identified male employees—Tyler Burgess, "Gordon," Scott Hanson, Richard Gottlieb, and Tony Jones—as well as multiple, unidentified male employees in the business coordination department, made comments to No. 97 such as, "when are we going to wake up together, so that I can make you breakfast" (Tyler Burgess, repeatedly); "let's hit the hay," or "when are we going to hook up?" (Gordon, often); "a woman can't do this job … This is a man's job. A woman doesn't need to be in here" (Jones and Hanson); "your chest looks great in that outfit" (Gottlieb); "you can't wear that suit anymore, you are giving everyone in the office a hard on!" (Jones); and "great ass," "nice tits," and "can't wait to get you in the sack" (unidentified male business coordinators, frequently). It is hard to imagine how this array of comments, which encompasses a broad range of sexually offensive and gender-hostile remarks, and which were delivered, sometimes repeatedly, by multiple male employees who held positions that apparently spanned IPA's hierarchy, could have done other than pervade No. 97's working environment in the three to fourth months she spent at IPA. None of the cases IPA cites addresses allegations of harassment by so many individuals in such a short period of time.

Moreover, No. 97 alleges that she was subjected not only to these comments, but also to daily, unwanted physical contact by Scott Hanson, and that she saw Hanson grab and try to kiss another female IPA employee. The court has no doubt that a jury could conclude, based on the totality of No. 97's allegations, that her working environment at IPA was subjectively and objectively hostile. Accordingly, IPA's motion for summary judgment of her claim is denied.

## Claimant No. 115

Claimant No. 115 worked as a business coordinator at IPA for two separate periods: first from January 11, 2001 to February 9, 2001, then from September 27, 2001 to October 5, 2001. During her first period of employment, a male colleague asked her whether she had a boyfriend. No. 115 did not find that question offensive. But after No. 115 replied that she did have a boyfriend, the man asked her whether she needed a boyfriend at work. No 115 felt that this second question was "very inappropriate" and made her feel "funny." The following day, No. 115 walked past the same man at lunch, while the man was seated with three friends. The man said to his friends, loudly enough for No. 115 to hear, "y'all, that's gonna be my woman. And she got a big ol' ass too." No. 115 heard the men laughing and felt embarrassed. The man also patted No. 115 on the behind as she walked by. At some point, the man said to No. 115, "you know what I'd do to you girl. I'd treat you right." No. 115 heard the man continue to tell his friends every other day that No. 115 would "be his woman."

During her second stint at IPA, No. 115 alleges that a second male coworker asked her if she had a man, and she told him that she did. Shortly thereafter, as No. 115 passed by the man in the hallway, he turned to brush the front of his body against No.

115's rear end, as if he were going to hug her. No. 115 asked the man what his problem was, and he smiled, said she was pretty, and walked away. No. 115 later heard the man tell his friends that No. 115 was mad because he had brushed against her and also heard him say, "she think she all that, that old fat bitch." No. 115 heard the men laughing.

During both periods of employment at IPA, No. 115 heard people on the business coordinator floor calling women "bitches," "whores," and "sluts" every day. Although she heard women call each other bitches, she never heard women call each other whores or sluts. She also witnessed, on seven occasions during her first period of employment and on five occasions during the second period, a man slap a woman on her buttocks.

IPA asserts that the foregoing allegations describe conduct that is insufficiently severe or pervasive to amount to actionable sexual harassment. It is true that all of the comments directed to No. 115, as well as the comments about her but directed to others (though arguably intended for her as well), are seemingly within the realm of relatively mild, non-threatening, non-obscene remarks that although inappropriate, are typically considered to fall short of sexual harassment. And, although No. 115 may have felt "funny" or "embarrassed" by her harassers' comments, particularly those made in front of other colleagues, the comments were neither sexually explicit nor particularly humiliating. The first harasser's reference to No. 115's "big ol' ass" and his "pat" on her buttocks are more serious, but both of those incidents occurred only once. The same can be said of the second harasser's somewhat ambiguous physical contact and subsequent snide remark.

Nevertheless, although the first harasser's comments were fairly mild (that No. 115 would "be his woman"), they were repeated every other day of No. 115's

employment. This frequency can reasonably be considered pervasive. Moreover, while not sexually explicit, the first harasser's persistent comments and conduct, taken together, appear to have been designed to draw the attention of No. 115's coworkers to No. 115 as the object of his romantic or sexual desires. In addition to the unwanted attention No. 115 (and her buttocks) received, No. 115 claims she saw other women at IPA treated in a fashion that arguably denigrates woman as professionals, either by treating them as available sex objects, or by using sexualized, gender-specific terms of abuse, such as "slut" and "whore." There is no evidence that No. 115 witnessed male employees, or their bodies, subjected to similar unwanted attention or verbal abuse.

The court is mindful, moreover, that the conduct No. 115 alleges is presumed to have occurred in an environment in which sexual harassment was generally rampant. No. 115's allegations demonstrate that she was not insulated from exposure to either the widespread, daily use of gender specific terms of abuse such as "bitch," "slut," and "whore," or to harassing workplace conduct such as bottom slapping. IPA argues that No. 115's inability to identify either the alleged harassers or the alleged victims of the conduct she observed is fatal to her claim. It is true that claimants must generally specify the identity of the harassing party, along with other details. *Buttron v. Sheehan*, 2003 WL 21801222, *3 (N.D. Ill. 2003) (citing *Gabrielle M. v. Park Forest-Chicago Heights, Ill. School Dist.* 163, 315 F.3d 817, 822 (7th Cir. 2003)). In this case, however, sexual harassment is presumed to have been commonplace among IPA's hundreds or perhaps even thousands of employees, most of whose names may never have been known to short-term employees like No. 115. These circumstances need not prevent a jury from determining that in a generally harassing environment, the cumulative effect of the

ongoing comments and occasional physical contact to which No. 115 was exposed and the workplace scenes she witnessed was sufficiently severe or pervasive to alter the terms or conditions of her employment. Accordingly, IPA's motion for summary judgment of her claim is denied.

**Claimant No. 123**

Claimant No. 123 is an intervenor in this case and one of the claimants who took her allegations of sexual harassment at IPA to the EEOC, prompting this law suit.

No. 123 worked at IPA from April 1996 to March 3, 1998, first in the inside sales department and then in recruiting, and, for some period of time within that time frame, in both departments.[39] Painted in broad brush strokes, No. 123's claim is similar to that of Claimant No. 19 (another original complainant), and IPA raises many of the same arguments—and presents similar types of evidence—in both summary judgment motions. Like No. 19, No. 123 claims that she had sex with John Burgess, IPA's managing director, and that her sexual relationship with him was neither welcome nor consensual. Also like No. 19, No. 123 claims that her success at IPA, and the terms and conditions of her employment there, rose and fell with her willingness to submit to Burgess's advances. As discussed above, No. 19 claims she was terminated shortly after making it clear to Burgess that she would no longer have sex with him; No. 123 claims that she was constructively discharged under the same circumstances.[40] The similarities between the two women's claims do not end there: both women also allege that in addition to having unwelcome sexual intercourse with Burgess on a handful of occasions, Burgess subjected

---

[39] No. 123 asserts that she also worked for American Mortgage Co., a company apparently affiliated with IPA, for some time during this period, but the parties have not given any indication that this fact is material to IPA's motion.

[40] No. 123 at times appears to argue that she was actually terminated, but she ultimately identifies constructive discharge as the theory underlying her claim.

them to ongoing pressure for sex, which took the form of both direct solicitations for sex and suggestive comments that implied the women's jobs were at stake. Finally, both women claim that Burgess frequently made sexually explicit comments and jokes, especially about oral sex. In particular, both claimants describe specific comments that are variations on the theme that women with "good ankles" are good at oral sex.

IPA moves for summary judgment of No. 123's claim on many of the same grounds it asserted in its motion against No. 19. Specifically, IPA claims that No. 123 suffered no tangible adverse employment action; that the harassment she alleges is insufficiently severe or pervasive as a matter of law to support a triable hostile work environment claim; and that her claim is time-barred. In addition to these arguments (all of which were raised in its motion as to No. 19), IPA further asserts that No. 123 has not established any nexus between the harassment she alleges and any adverse employment action.[41]

Again echoing its motion for summary judgment of No. 19's claim, IPA offers evidence including affidavits or deposition testimony of Shelle Bareck, John Burgess, and other IPA employees or former employees. An overarching theme of much of this testimony is that not only was No. 123's relationship with Burgess consensual, but that in fact No. 123 instigated the relationship, which was unwelcome from Burgess's perspective.[42] No. 123 disputes material portions of these affidavits in an affidavit of her

---

[41] In its reply brief, IPA also argues that No. 123's constructive discharge claim is barred because the EEOC found no reasonable cause for that claim. Whatever the merits of this argument, IPA did not raise it in its opening brief, and "arguments raised for the first time in a reply brief are waived." *Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007).

[42] In its L.R. 56.1 responses, IPA disputes No. 123's factual statement that her relationship with Burgess was not welcome. Although IPA does not squarely argue that it is entitled to summary judgment on this basis (an ill-advised argument indeed, since welcomeness is a factual dispute that a jury must decide, *see, e.g., Doe v. Oberweis Dairy*, 456 F.3d 704, 713 (7th Cir. 2006)), it teeters on the brink of this position by folding the issue into its argument that No. 123's claim is legally insufficient. Indeed, portions of the

own. IPA argues, however, that its evidence demonstrates conclusively that No. 123 was an increasingly poor performer, and that her performance problems—not sexual harassment by Burgess—are what that caused her workplace environment to deteriorate.

Upon review of the parties' respective submissions, the court concludes that IPA's motion fails for reasons substantially similar to those discussed in relation to No. 19's claim. Obviously, the details of the two women's allegations differ. Nevertheless, the claims are sufficiently similar in material respects to be capable of similar resolution without the need, here, for a drawn-out examination of the factual record or discussion of the legal issues. In short:

- No. 123's hostile environment claim is not time-barred for the same reasons the court concluded that No. 19's claim was not barred: Under the continuing violation doctrine set forth in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002), a plaintiff may bring a hostile environment claim "so long as an act contributing to that hostile environment takes place within the statutory time period." As the court

---

evidence on which IPA rests its motion strikes the court as similarly ill-considered. Naturally, IPA is entitled, and, indeed, expected to submit evidence in support of its factual contentions. Nevertheless, because much of the evidence offered in support of IPA's motion (and not merely to rebut plaintiff's asserted facts) focuses on No. 123's conduct, and appears designed to attack her credibility on welcomeness and other factual issues, it appears to undermine IPA's summary judgment position at least as readily as it supports it. For example, in an affidavit in support of IPA's motion, Shelle Bareck spends several paragraphs describing unflattering anecdotes and comments No. 123 allegedly made about men during her employment at IPA. Bareck further states that John Burgess "told [her] that he was not interested in [No. 123's] advances, that he was shocked by her behavior, and that, in fact, did not even consider [No. 123] attractive." Bareck continues, "[t]o put this in perspective, let me say that [No. 123], at that time, was going on 45 years of age and she had deep wrinkles in the sides of her face, and she had a bad back and foot problems, and she appeared to be going through a mid-life crisis.… By way of contrast, John Burgess is a well-educated gentleman and has a wife who was then 27 years of age and very beautiful and charming and well-spoken." Given that IPA does not dispute that Burgess and No. 123 had sexual relations, the relevance of such statements is at best questionable. Moreover, much of Bareck's testimony is clearly hearsay and likely inadmissible. The obvious problems with evidence such as this leave the court with the distinct impression that IPA's purpose was to obscure the relevant legal questions with colorfully contrasting portraits of the individuals involved. This approach only complicates the court's task, and the court does not look kindly on it.

explained in relation to No. 19's claim, the date on which the claimant last had intercourse with Burgess is immaterial, since she claims that Burgess continued to harass her long after the last episode of sexual intercourse.

- Because the continuing violation doctrine allows No. 123 to rely on conduct outside the limitations period in support of her hostile environment claim, IPA's argument that the alleged harassment is insufficiently severe or pervasive is without merit. Additionally, to the extent IPA argues that Burgess's conduct does not amount to actionable harassment because No. 123 welcomed their sexual relationship, factual disputes preclude summary judgment of her claim.

- Material factual disputes regarding No. 123's job performance and the circumstances surrounding her departure from the company preclude summary judgment of her adverse employment action claim. Among these factual disputes are whether Shelle Bareck ever warned No. 123 about her declining performance and whether No. 123 was demoted.

- The court rejects IPA's argument that it is entitled to summary judgment on that ground that No. 123 cannot demonstrate a causal nexus between harassment by John Burgess and any adverse employment action. The court understands the theory of No. 123's case to be roughly similar to the theory advanced by No. 19: that "John Burgess exercised an enormous amount of discretionary control over the terms and conditions of [her] employment, and that he exercised his discretion in a way that rewarded her for agreeing to have sex with him and punished her for rebuffing him."

The court acknowledges that the factual record on which No. 123 relies in support of this theory is somewhat more tenuous than in No. 19's case. It is not so barren, however, as to warrant denying No. 123 the opportunity to have her claim decided by a jury.

For the foregoing reasons, IPA's motion for summary judgment of No. 123's claims is denied.

**Claimant No. 129**

Claimant No. 129 was a business coordinator at IPA for at least three, and possibly as many as five, months in mid-2001. She alleges a *potpourri* of harassing conduct during that time, which includes both unwelcome physical contact and "raunchy" comments, such as one made by a male colleague, Eugene Edens, who told her, "I want to take you to the Sybaris and strap you on a harness. You can ride me like a pony." Another male colleague named "Sabot" told her that he would not give her a ride to work unless she showed him her "titties," and that he was "gonna lay down and I can see up your dress." No. 129 also alleges that she received phone calls from male colleagues while at work, in which the caller would say, "why do you have meat on your ass and not your chest?" or "I can see you from across the room. Your booty looks luscious." These examples are not exhaustive of No. 129's allegations of harassing comments.

No. 129 also describes several incidents of unwelcome physical touching. In the more egregious instance, she describes boarding a public bus at a stop "right outside IPA," where IPA employees were "the only people that was there." As she boarded the bus, with four or five men standing behind her, "somebody grabbed [her] from behind underneath [her] butt with the fingers like up [her] crotch."

IPA asserts that the conduct No. 129 alleges is insufficiently severe or pervasive under the controlling case law. But none of the cases IPA cites compels that conclusion. Among other differences, the plaintiffs in those cases—*Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998); *Alexander v. CIT Technology Financing Services*, Inc., 217 F.Supp.2d 867 (N.D. Ill. 2002); *Enriquez v. U.S. Cellular Corp.*, No 06 C 3135, 2008 WL 4925012 (N.D. Ill., Nov. 14, 2008) (Kendall, J.))—were employed by the defendants for substantially longer periods than No. 129. As the court has repeatedly noted, this fact is relevant to whether episodic conduct can reasonably be considered pervasive. Moreover, in at least *Adusumilli*, both the comments and, particularly, the alleged unwelcome physical contact, were considerably less severe than at least one of the episodes No. 129 describes. IPA insists that the incident in which No. 129 was touched on her "crotch" occurred off of IPA's premises; but it offers no explanation or legal authority on the relevance of this point. Indeed, harassing conduct "need not be committed in the workplace...to have consequences there." *Doe v. Oberweis Dairy*, 456 F.3d 704, 715 (7th Cir. 2006). A jury could reasonably conclude that the conduct No. 129 describes, taken together, was severe or pervasive enough to render her workplace environment objectively hostile. IPA's motion for summary judgment of her claim is denied.

**Claimant No. 145**

Claimant No. 145's employment status at IPA is disputed. It is undisputed, however, that she participated in a training session for business analysts at IPA headquarters, which lasted no more than a week. (IPA asserts that the training was only three days, but No. 145 claims that it lasted a week. This dispute is not material to the resolution of IPA's motion.) It is also undisputed that at the time No. 145 participated in

the training, she was a Canadian citizen, lived in Ottawa, Ontario, and would work as a business analyst from her home.

IPA bases its motion for summary judgment, in large part, on the argument that No. 145's claims are not actionable under Title VII because No. 145 is a non-United States citizen who was employed outside the United States, and that to the extent she was (or would have become) employed as a business analyst after completing her training at IPA, her employer would have been Integrated Business Analysis, Inc., ("IBA"), a Canadian company.

As IPA asserts, Title VII provides that the protections of the statute "shall not apply to an employer with respect to the employment of aliens outside any State," and also "shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer."[43]  42 U.S.C. § 2000e-1(a); 42 U.S.C. § 2000e-1(c)(2).  IPA argues that either of these provisions is sufficient to warrant summary judgment of No. 145's claim, citing *Gantchar v. United Airlines, Inc.*, No. 93 C 1457, 1995 WL 137053 (Mar. 28, 1995) (Hart, J.), and *Iwata v. Stryker Corp.*, 59 F.Supp.2d 600 (N.D.Tex. 1999), in support of the proposition that non-United States citizens working outside the United States are not protected by the statute.

The EEOC's response is insufficient to demonstrate that the authorities IPA cites do not entitle it to summary judgment based on the factual record here.  First, the EEOC acknowledges that No. 145 is a non-United States citizen, and it fails to controvert IPA's contention that she would be employed in Canada.  The EEOC admits that as a business

---

[43] In passing, the court notes that the second of these provisions appears to leave open the possibility that IBA may be considered an employer covered by the statute if it is controlled by IPA.  While it is perhaps suspicious that IPA omitted the words "not controlled by an American employer" from its citation to this provision, EEOC does not raise this point or submit any evidence to dispute IPA's position.

analyst, No. 145 would work "out of her home" in Ontario but argues that "[No. 145] was supposed to be assigned to a territory covering eastern Canada and portions of the northeastern United States, including Maine, Vermont, and New Hampshire." IPA identifies both factual and legal flaws in the EEOC's position: first, the assertion that No. 145's "territory" included parts of the United States is unsupported by any competent evidence; and second, in any event, the "determination of a plaintiff's location of employment for… Title VII…purposes focuses on the location of the employee's *primary workstation*," *Shekoyan v. Sibley Intern. Corp.*, 217 F.Supp.2d 59, 68 (D.D.C. 2002) (emphasis added), and EEOC does not even contend that No. 145's "primary workstation" was the United States. Both of these challenges have merit.

As to the evidentiary challenge, IPA points out that the EEOC failed to include the portion of No. 145's testimony in which it claims she stated that her "territory" was supposed to include parts of the United States. Moreover, even assuming that No. 145 testified as such, the basis for her purported understanding of her "territory" remains a mystery. As the court has previously acknowledged, a claimant's testimony may suffice to raise a triable issue of fact, even in the face of documentary evidence to the contrary. *See e.g.*, *Payne v. Pauley*, 337 F.3d 767, 774 n. 2 (7th Cir. 2003). Nevertheless, "summary judgment is the 'put up or shut up' moment in the lawsuit," *Argyropoulous v. City of Alton*, 539 F.3d 724, 737 (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)), and No. 145 must demonstrate more than mere speculation about a fact on which her claim relies. On the issue of the country of No. 145's employment, however, the only undisputed facts are that No. 145 would have worked out of her home in Canada, and that she completed only Canadian tax forms in conjunction with her employment.

Moreover, IPA offers evidence that she applied for insurance coverage through a Canadian insurance company. To controvert these facts, the EEOC offers only No. 145's unsupported and extremely general testimony that her "territory" would have included, in addition to "eastern Canada," portions of the northeastern the United States, without any further details (such as how often she was to work in each region). On this record, no reasonable jury could conclude that No. 145's "primary workstation" was in the United States.

Similarly, although EEOC disputes IPA's assertion that No. 145 was to be employed by IBA, not IPA, EEOC does not squarely contend that No. 145 was ever in fact employed by IPA. Instead, EEOC argues only that No. 145 "believed that she was employed by IPA." EEOC cites no authority, however, for the notion that a claimant's subjective belief about the identity of her employer is relevant to the applicability of Title VII. Moreover, even assuming No. 145's subjective belief were relevant, the belief she asserts is unreasonable in light of the evidentiary record. To begin with, the employment agreement No. 145 signed in conjunction with her employment as a business analyst identifies IBA as her employer.[44] Next, No. 145 admits that she received no wages, nor any type of earnings statement, from IPA. According to No. 145's own testimony, the only basis for her belief that she was an employee of IPA is that during the training, Shelle Bareck "came into the class and asked us to sign some documents for insurance purposes because she stated that we were already considered employees of

---

[44] This document, on its face, does not identify the citizenship of the company. It is not clear whether EEOC disputes that IBA is, indeed, a Canadian company, or whether it disputes only that that company was No. 145's employer. In any event, however, while there is perhaps room for "metaphysical doubt" about the citizenship of IBA, the record as a whole reasonably supports the conclusion that it is, indeed, a Canadian company, and EEOC has not introduced any evidence to the contrary. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party must do more than show some "metaphysical doubt" as to the material facts).

IPA." This testimony is the only evidence the EEOC cites in support of its argument that IPA is liable for sex discrimination under Title VII as No. 145's employer. It is plainly insufficient to withstand summary judgment.[45]

For the foregoing reasons, No. 145's claim falls outside the reach of Title VII, and the court need not address the merits of her claim. IPA's motion for summary judgment is granted.[46]

## Claimant No. 146

Claimant No. 146 worked at IPA as a business coordinator (according to IPA) and also as an administrative assistant (according to No. 146) for three months from September to December of 2000. No. 146 alleges the following exposure to IPA's (presumed) pattern or practice of sexual harassment:

- She saw Dan Drugan, the director of sales and marketing, pat a female colleague named Jozetta Rockiett on her behind;

- She witnessed a scene in which either Tony Jones or John Greco, both male managers at IPA, rubbed Rhonda Porter, a female employee, on her behind. Porter responded by throwing papers at the man who rubbed her, after which the man grabbed Porter by her arm and "slung" her against the wall;

---

[45] Among other problems, IPA offered evidence that the referenced "insurance forms" were, in No. 145's case, for coverage through Great-West Life, a Canadian insurance company, for coverage in Canada.

[46] In conjunction with its opposition to IPA's previous round of summary judgment motions, the EEOC moved to strike the affidavit of Larry Lang. The court denied that motion as moot, without adjudicating its merits, since it resolved the first set of motions without reliance on the Lang affidavit. Although the EEOC did not renew its motion to strike in conjunction with the present round of motions, the court wishes to clarify that it has resolved these motions, including the motion as to No. 145's claim, without reliance on the Lang affidavit.

- On a separate occasion, No. 146 saw Tony Jones rub his penis against Rhonda Porter's buttocks. No. 146 said, "why did you do that?" to which Jones replied, "you didn't see me do nothing."

- No. 146 heard John Greco tell a female employee named Karen, "[y]our nipples are hard. Am I the one that's making 'em hard?" She also heard Greco tell Karen to go to the bathroom and take off her panties, then come back;

- In a separate incident, No. 146 heard a male employee whose name she does not know ask Rhonda Porter if he made her nipples hard;

- No. 146 saw a male employee named Jason grab two female employees on the buttocks;

- No. 146 saw a male employee named Roger Thomas put his hands under a female employee's dress, provoking a fight. No. 146 could not identify the fondled woman by name, but identified her as the daughter of another employee named Stephanie, who worked with Shelle Bareck.

- On a separate occasion, No. 146 saw a male employee named Jason put his hands up the skirt of a female employee named Charlene Walker. A second male employee, also named Jason, approached and asked, "is there room for me to get under there too?"

No. 146 testified that she never felt physically threatened at IPA, but that she felt "intimidated" and "embarrassed" because of how women were treated there. IPA argues that the conduct No. 146 asserts is insufficiently severe or pervasive to rise to the level of

an actionable claim, likening her allegations to those of Claimants Nos. 89 and 99, whose claims the court previously held did not withstand summary judgment. *IPA SJ-I* at *6-7.

No. 146's claims are readily distinguishable from those of No. 89, who claimed only to have heard male employees refer to female employees as "honey," "sweetie," or "bitch," and to have seen pictures of bikini-clad women in male employees' cubicles. *IPA SJ-I* at *6. Notably, No. 89 did not claim to have witnessed any unwelcome or offensive physical contact. Although No. 146's allegations have more in common with certain of those of raised by No. 99, *see IPA SJ-I* at *7-*9, No. 146's claim succeeds where No. 99's failed for several reasons. First, the gravamen of No. 99's claim was essentially that she believed women who engaged in consensual "sexual shenanigans" at IPA had better working conditions than she herself had. The court noted that even if this were true, male employees at IPA were presumably subject to the same disadvantageous conditions as she, so that the harassment she alleged was not based on her sex.[47] Moreover, the most specific of No. 99's allegations of untoward comments was her testimony about hearing "male bosses" tell "the women" to "suck [their] d-i-c-k-s," while the remainder of her allegations about offensive verbal conduct referred generically to "sexually-oriented" and "real filthy" comments.[48] By contrast, the court understands No. 146's claim to be based on her impression—arising from the specific instances she relates in some detail—that women at IPA were subjected to sexually humiliating conduct and comments to which male employees were not subjected, and that such behavior rendered the environment at IPA hostile to women employees generally, including No. 146. The court concludes that

---

[47] The analysis is distinct here, since No. 146's claim is based on her offense at witnessing degrading or humiliating sexual behavior, not on the theory that she received less favorable treatment than women who consented to sexual behavior.
[48] These specific allegations were not discussed in the court's decision in *IPA SJ-I*, but they were part of the record that the court considered in granting summary judgment of No. 99's claim.

No. 146's allegations (excluding certain that are based on rumors and hearsay, which the court intentionally omitted from the factual summary above), taken together, and viewed in light of the court's presumed finding of a pattern and practice of harassment at IPA, are minimally sufficient to survive summary judgment under *Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2007). In particular, No. 146 describes harassing conduct by several male employees and alleges a variety of harassing conduct aimed at a number of different women. A jury could conclude from these allegations that women, as a group, were generally subjected to harassing treatment, and that even if No. 146 herself was not slapped, grabbed, or the object of sexually offensive comments, she was nevertheless in the "target area" of sexual harassment at IPA. *Yuknis*, at 554 (conduct that makes workplace uncomfortable for women as a group may be actionable). Accordingly, IPA's motion for summary judgment of No. 146's claim is denied.

## Claimant No. 152

Claimant No. 152 was an employee of Bannockburn Travel from 1998 to 2003. IPA is one of Bannockburn Travel's corporate clients. The two companies are not otherwise affiliated; at all relevant times, Bannockburn had its own management distinct and unrelated to IPA's management, and it was not owned, operated or controlled by IPA or any of IPA's affiliates or principals. IPA was not responsible for compensating or providing benefits to Bannockburn employees. According to No. 152, seven Bannockburn travel agents, not including No. 152, were regularly staffed onsite at IPA. Of these, six were staffed in the "executive" building, and one was staffed in the "BC" building. All of these agents reported to a Bannockburn manager, whose office was in the larger, "executive" office.

Although No. 152 was not regularly staffed at IPA during her employment at Bannockburn, she filled in at IPA as a "floater" on about fifteen occasions in the approximately one-year period from January 2001 to January 2002. No. 152's claim arises out of an incident that occurred on January 22, 2002, when she alleges that an employee of IPA, Joe Paxton, touched her breast and made inappropriate, sexually suggestive comments. On the day of the incident, No. 152 sent an email to her manager at Bannockburn, who told her that she should return to Bannockburn's corporate office, and that someone else would take her place at IPA. No. 152 understood that she would not be required to return to IPA, but she was again sent to work there for one day in early March of 2002. Although she was promised that her office door would be locked, and that Joe Paxton would not be allowed to enter, he did, in fact, enter the office twice during that day, where he gave No. 152 dirty or intimidating looks. Shortly thereafter, No. 152 met with a human resources person for Bannockburn, who gave No. 152 a letter informing her that she would not longer be required to work at IPA. Indeed, No. 152 never returned to IPA.

IPA argues that No. 152's claim against IPA cannot survive summary judgment for the simple reason that IPA was not her employer. EEOC does not dispute that Bannockburn, and not IPA, was No. 152's employer. Nevertheless, EEOC claims that IPA should be held liable under a de facto/indirect theory of liability. EEOC cites only one case in support of its argument: *Hernandez v. Valet Parking Service, Inc.*, No. 04 C. 7559, 2005 WL 2861054 (N.D. Ill., Oct. 27, 2005) (Der-Yeghiayan, J.) The EEOC's choice of authority is rather puzzling. While the *Hernandez* court acknowledged that other courts in this district have, indeed, adopted the "de facto/indirect liability" theory in

Title VII cases, *id.* at *5 (citing *Kerr v. WGN Continental Broadcasting Co.*, 229 F.Supp.2d 880 (N.D. Ill. 2002), and *EEOC v. Foster Wheeler Const., Inc.*, No. 98 C 1601, 1999 WL 515524 (N.D. Ill., July 14, 1999) (Coar, J.)), the *Hernandez* court itself roundly rejected the theory and the reasoning of its sister courts, noting that "Title VII specifically provide[s] for liability of an employer and make[s] no provisos for other entities that relate to a plaintiff in an indirect manner." *Hernandez* at *5.    In any event, however, the parties seem to agree that the court must apply a five-factor test to determine whether IPA can be held liable for the harassment No. 152 alleges, which takes account of the following: "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations." *EEOC v. North Knox School Corp.*, 154 F.3d 744, 747 (7th Cir. 1998).    The parties also agree that the first factor is the most significant.

The factual record in this case simply does not support the conclusion that IPA exercised the type of control over No. 152 that is required for Title VII liability under the de facto/indirect theory.  As the court noted in *Kerr*, "this theory of liability addresses the situation where a formal employment relationship may be absent, but the putative defendant is so extensively involved with the plaintiff's day to day employment that the putative defendant is the 'real' employer for all intents and purposes, including Title VII liability." *Kerr*, 229 F.Supp.2d at 886.  In this case, where it is undisputed that No. 152's

ongoing employment relationship was with Bannockburn Travel, and that, but for the approximately fifteen days she spent at IPA in 2001 and 2002, No. 152 spent the entirety of her more-than-four-year tenure with Bannockburn at sites other than IPA, it is well-nigh impossible to imagine that IPA was "so extensively involved with [her] day to day employment" that it could be considered her de facto employer "for all intents and purposes." Indeed, No. 152 herself acknowledged that even on the days she was on site at IPA, if she had any questions about her assignment or duties, she would contact her superior at Bannockburn. Similarly, she stated that she reported to Bannockburn's on site manager while working at IPA, and that she did not report Paxton's harassment to anyone at IPA because "[t]hey are not my employer."

EEOC argues that "a Bannockburn agent's employment status could be altered if an IPA employee requested that s/he work or not work at IPA, and that the agent could get fired or demoted based upon an IPA employee's complaint." But EEOC has not pointed to any facts that support this conclusory statement. EEOC also argues that IPA should be deemed No. 152's employer because "the days and hours worked by the Bannockburn travel agents assigned to IPA were set based upon IPA's needs," and because IPA required Bannockburn agents to make IPA reservations in accordance with the "IPA Travel Policy."[49] This is type of control that inheres in many contractual relationships, however, and "is significantly different that the discretionary control an employer daily exercises over its employees' conduct." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002) (quoting *North Knox*, 154 F.3d at 748) (declining to find employment relationship despite defendant's control over plaintiff's working hours and requirement that she comply with various policies and procedures).

---

[49] IPA denies that any such policy exists, but this dispute is irrelevant to the court's ruling on this motion.

For the foregoing reasons, IPA's motion for summary judgment of Claimant No. 152's claim is granted.

## Claimant No. 155

Claimant No. 155 worked as a business coordinator for IPA for about six months, from October 1999 to March 2000. Her claim is based on two general categories of allegations: allegations that she earned less money than she was entitled to because she did not submit to her supervisors' sexual advances and allegations that she heard and saw male IPA employees engage in sexually inappropriate comments and conduct. A short account of her allegations, beginning with the latter category, and not intended to be exhaustive, follows.

For the first several weeks of her employment, No. 155 took public transportation to work, which dropped her off at a location from which an IPA-operated van picked her up and took her to IPA's premises. One of John Burgess's sons (possibly Tyler) drove the van, and made constant, sexually explicit remarks to female employees during the ride, such as that he "didn't care how old women were, he didn't care what they looked like, but he wanted all of the women…in that van to…sit on his face and let him lick their pussy." Burgess would say that "all the time" in the van, as well as other, similar comments, to the point that No. 155 decided not to take the van anymore. No. 155 also saw Burgess put his hands between a woman's legs while in the van, then laugh when she pushed his hand away.

A few weeks into her employment, No. 155 saw her supervisor, Dean, viewing and discussing with male business coordinators pictures of naked or partially naked women. No. 155 saw that one of the pictures was of a woman wearing a thong and high

heels, viewed from behind with her buttocks spread open. No. 155 heard the men comment loudly that they liked to "stick their dick into" women in that position, and to "give it to them from the rear." Dean said, "that's the way I like it also," and "I like to have a woman to get down on her knees and give me some head."

Dean revisited the topic of "head," either explicitly or implicitly, in other instances: on one occasion, after No. 155 approached Dean with a question about being credited for sales, Dean told her, "well, you know what you got to do, I told you…I like the women to get on their knees and give me some head….if you don't do it like everybody else then you're not going to make any money." On subsequent occasions, No. 155 would ask why sales she had made "disappeared" from the board on which they were posted, and he replied, "you know what you got to do. You know why they're not there, and they're not going…back there until you do it."

This brings the court to the second category of No. 155's allegations: that she did not receive commissions to which she was entitled. EEOC asserts that these allegations support a claim of *quid pro quo* sexual harassment, since tangible job benefits (i.e., increased pay) were premised on her agreement to give oral sex to her supervisor. IPA calls this claim "absurd" and without factual support, submitting evidence to show that No. 155 was paid in accordance with the terms of her contract. EEOC does not dispute IPA's factual assertion that No. 155 was paid according to the terms of her employment, but insists that an "alternative compensation scheme" existed at IPA, according to which women who yielded to their supervisors' advances were better paid than those who did not. IPA derides this theory as pure speculation and argues that the EEOC lacks sufficient evidence of such a scheme to withstand summary judgment, citing *Hildebrandt*

*v. Illinois Department of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003) ("[b]are allegations not supported by specific facts are insufficient in opposing a motion for summary judgment.") (Modification in original) (Citations omitted). In *Hildebrandt*, the plaintiff stated in her deposition that she had "generally observed that it takes longer for the support staff to complete her work than it does to complete work for the men." 347 F.3d 1014 at 1036, n. 15.The court noted, however, that she did not cite any "specific instances of such." *Id.* The *Hildebrandt* court dismissed similarly generic and unsupported allegations, such as that the plaintiff "was not allowed to work with interns as extensively as the men" on the same basis. *Id.* at n. 17.

By contrast, EEOC's theory of an "alternative compensation scheme" is not wholly without evidence. EEOC's best evidence, perhaps, is No. 155's testimony that she personally saw ample checks issued to a woman whom she often saw "going in the back rooms with different managers," and leaving in the evenings with male managers including Dean, Rich, Scott, and possibly Keith. The well-paid woman explained to No. 155 and other female employees who asked about her paychecks, "I know what I have to do, so I did it."[50] The EEOC may well have an uphill battle to persuade a jury, based on this evidence, that No. 155 was denied compensation that she would have received if only she had submitted to her supervisor's advances; but the evidence, though largely circumstantial, is not so flimsy as to be disregarded entirely. Unlike the plaintiff in *Hildebrandt*, No. 155 cites at least one specific example of a female employee whose paycheck was artificially inflated as a reward for engaging in sex with managers.[51] IPA

---

[50] IPA did not object to the court's consideration of this statement based on hearsay in its L.R. 56.1 responses.

[51] As the court has previously observed, male employees would presumably be "equally disadvantaged if the male IPA managers were favoring their young female paramours," *see* Claimant No. 99, *IPA SJ-I* at *6,

asks, rhetorically, "what proof does the EEOC have to show" that this woman was unfairly compensated? The answer is: No. 155's account of what she saw and heard: the paycheck, the explanation for it, and—let us not forget—the explicit and implicit remarks by her supervisor that giving "head" was the way to make money at IPA.

No. 155's allegations are also sufficient to withstand summary judgment of her hostile environment claim. As the court discussed with reference to No. 17's claim, *see IPA SJ-II* at *12, a jury could conclude, under the totality of the circumstances presented in this case, that No. 155 reasonably interpreted Dean's comments as pressure to engage in oral sex with him, and that these comments, coupled with the other sexually offensive and harassing conduct No. 155 describes (only some of which was related above) gave rise to an objectively hostile environment. IPA's motion for summary judgment of No. 155's claim is therefore denied.

## Claimant No. 161

Claimant No. 161 worked as a business coordinator from August 10, 2000, to February 2, 2001. She testified at her deposition that during her employment, she was aware that a female colleague named Karen had what she believed were consensual relationships with two male managers, Jim Jordan and Dan Drugan. Once, Jordan paid No. 161 and her friend Yvonne Knight (also an IPA employee), to babysit for Karen's child while Jordan and Karen spent the night out. No. 161 testified that after Jordan's relationship with Karen ended, Jordan asked No. 161 out on three occasions. The first time, he told her that if she would go out with him, she could have "the things that Karen

---

but the analysis here is somewhat different. Unlike No. 99, who was not personally solicited for sex, and whose claim therefore depended on a finding that she was within the "target area" of sex-based harassment, Claimant No. 155 was directly solicited for sex and refused her manager's advances. The evidence EEOC cites provides some support to No. 155's claim that she was punished for not submitting to those advances.

had and more." No. 161 said, "no, thank you," and Jordan walked away. The second time, Jordan invited No. 161 to the Sybaris hotel to "have some fun." After she again turned Jordan down, Jordan said, "well just come on over here and just let me rub on your butt." No. 161 shook her head and walked away. The third time, Jordan did not approach No. 161 directly, but Yvonne Knight told No. 161 that Jim Jordan really wanted No. 161 to go to a hotel with him, and that she should go because if she did, Knight would get $100. No. 161 told Knight that she would not go out with Jordan.

The remainder of No. 161's allegations are: that she saw David Soskin hit a female employee named Rhonda Porter on the buttocks twice; that Tony Jones once said to Rhonda Porter, while Porter was sitting next to No. 161, that he "wouldn't mind having [No. 161] and [Porter] at the same time"; that an employee named Carmello "bumped" No. 161 on the buttocks; and that Carmello also made comments like, "let me rub on your butt" on several occasions as No. 161 walked past him. No. 161 testified that she was not sure whether Carmello's "bumps" were intentional, and that she ignored his comments and kept walking. In addition, No. 161 claims to have heard about other offensive comments or conduct from other people at IPA. No. 161 testified that the harassment at IPA "bothered [her], but [she] just didn't pay any attention to it."

IPA argues that these allegations do not depict actionable harassment. The court agrees. First, nothing about Jordan's advances, as No. 161 describes them, was particularly intimidating, threatening, sexually explicit, or demeaning. And although Jordan was No. 161's supervisor, No. 161 does not claim that Jordan made any serious effort to pressure her, for example by suggesting that her job was somehow dependent on her agreeing to go out with him. While No. 161 may have found Jordan's effort to win

her over by bribing her friend offensive and odd, it is apparent that No. 161 effectively rebuffed Jordan's advances without further incident, and there is no evidence that the effect of his unwelcome attentions on No. 161's overall working environment was significant. *See Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534-35 (7th Cir. 1993) ("uninvited and unwelcome advances" by the plaintiff's supervisor—who rubbed the plaintiff's leg and forcibly kissed her on one occasion and "lurched" at her on a separate occasion—did not give rise to hostile environment because the conduct was "relatively limited" due to the plaintiff's unequivocal rejection of the advances). *Id.* at 534. Moreover, unlike in *Saxton*, where the court granted summary judgment despite its finding that the supervisor's conduct caused the plaintiff "significant discomfort and distress," *id.*, No. 161 testified that she found nothing wrong with the fact that Jordan asked her out three times.

As to No. 161's remaining allegations, even taken together, they do not amount to conduct that was so severe or pervasive as to cause a reasonable woman to believe she had been discriminated against based on her sex. With respect to this claimant, IPA's comparison to *Weiss v. Coca-Cola Bottling Company of Chicago*, 990 F.2d 333 (7th Cir. 1993) is apt. In that case, the plaintiff's supervisor repeatedly asked her for dates despite her consistent refusals, attempted to kiss her on multiple occasions, put his hand on her shoulder, called her a "dumb blond" in front of other employees when she made errors at work, placed "I love you" signs in her work area, and gave her unwelcome compliments about her appearance. The Seventh Circuit found this conduct insufficiently severe or pervasive to be actionable. While it is true that No. 161 alleges untoward conduct by several male employees (and not just her supervisor, as in *Weiss*) during her

approximately six-month tenure at IPA, the majority of that conduct was either not harassment at all (No. 161's awareness of consensual relationships between coworkers); remote as to No. 161 (the two slaps to Porter's buttocks); or too isolated or ambiguous to have a severe or persistent negative effect on No. 161's overall working environment (Jones's sexually suggestive comment to Porter and Carmello's attentions to her buttocks). Indeed, from all that No. 161's testimony suggests, she brushed off all of these incidents as minor annoyances, and they had no apparent effect on her ability to do her job.

To be sure, isolated incidents of sexually offensive conduct and direct exposure to harassment (even if aimed at others) can, in some circumstances, contribute to an actionable claim. Indeed, the court agrees with EEOC that the harassment No. 161 alleges must be considered in the context of an environment in which pervasive harassment is presumed. The problem with No. 161's claim is that her testimony does not suggest she was personally exposed, to any significant extent, to the presumed pattern of harassment at IPA. Unlike claimants who allege a handful of specific incidents in a context that also includes daily, gender-specific verbal abuse (*see, e.g.,* Claimant No. 40), or exposure to routine comments about women's bodies (*see, e.g.,* Claimant No. 41), and unlike claimants whose specific allegations include sexually explicit comments, embarrassing physical contact in front of coworkers, and remarks about sensitive body parts (*see, e.g.,* Claimant No. 62), or suggestions that professional success is linked to sex (*see, e.g.,* Claimant No. 68), No. 161 does not offer sufficient evidence to enable a jury to conclude that the harassment to which she was directly exposed was either severe or

pervasive enough to render her work environment subjectively and objectively hostile. Accordingly, IPA's motion for summary judgment is granted.

## Claimant No. 174

EEOC does not oppose IPA's motion for summary judgment of Claimant No. 174's claim. Accordingly, the motion is granted.

## Claimant No. 179

Claimant No. 179 worked at IPA for three months, from August to November of 2003, as an outside sales representative out of her home in Pensacola, Florida. Her claim is based on an incident she alleges occurred on a business trip to Macon, Georgia, where she was to receive training from her regional manager, Howard Siegel. No. 179 testified that on the first evening of her trip, Siegel entered her hotel room unexpectedly through a door leading to his adjoining hotel room (which No. 179 apparently believed was locked). Siegel approached No. 179, backed her against a wall, and tried to "push himself on" her, placing his arms against the wall on either side of her while telling her how attractive she was and how unattractive his wife was. No. 179 testified that she became confused and flustered, told Siegel that she was there for work, and told him that he needed to leave the room. She stated that although the encounter probably lasted only about thirty seconds, "it felt like it was forever."

No. 179 alleges additional conduct by Siegel the following day that need not be enumerated because standing alone, No. 179's testimony about the above incident is sufficient to withstand summary judgment. A reasonable woman could find that being pinned against a wall by a superior, while unexpectedly alone with him inside a hotel room during a business trip, is a sufficiently intimidating experience to render her work

environment hostile. The cases IPA cites, *Koelsch v. Beltone Electronics Corp*, 46 F.3d 705 (7th Cir. 1995), and *Paape v. Wall Data, 934 F.Supp.* 969 (N.D. Ill. 1996), do not compel a contrary conclusion, since the sexual advances alleged in those cases did not occur in a similarly isolated environment, and therefore were arguably less intimidating than the one described here.[52] IPA's motion for summary judgment of No. 179's claim is denied.

## Claimant No. 183

Claimant No. 183 worked at IPA for approximately two weeks in March of 2004.[53] She alleges that on the first day of her training, and "throughout the whole thing almost," she saw "how the men were trying to fondle the women." She heard the women respond with comments such as, "don't touch me." No. 183 was herself subjected to unwelcome physical contact during her training when a man in the training "grabbed" her buttocks and told her he could "handle [her] ass." When No. 183 told the man never to touch her again, he said he wanted to "pat [her] ass." No. 183 said that the man tried to talk to her again after this incident, but that she ignored him.

No. 183 also alleges that she was exposed to a number of harassing incidents during her short stint on the business coordination floor. On her first day on the floor, a male employee approached her and said, "[D]amn you're fine. What are you doing tonight?" No. 183 ignored the man. The following day, a different male employee went over to her, touched her hair, told her she had pretty hair, and asked why she didn't have

---

[52] *DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996), a housing discrimination case in which the court's description of the plaintiff's allegations does not suggest any circumstances that would have rendered the defendant's behavior particularly intimidating, is likewise inapposite.

[53] According to her testimony, she worked there for only a week, of which two days were spent in training, and three days were spent on the business coordination floor. But because EEOC does not dispute IPA's assertion that No. 183 worked at IPA from March 11, 2004 through March 26, 2004, the court relies on these dates, rather than on No. 183's testimony.

a man, telling her he would "do [her] right." A third male employee approached No. 183 the following day and asked her what she was doing that night and whether he could get to know her a little better. No. 183 told him no, but the man continued to talk to her, despite the fact that she was on the phone, and (apparently on one or more other occasions, though the testimony is unclear) tried to talk to No. 183 again, but she ignored him. No. 183 also recounts an incident on the last day of her employment, when a male colleague asked her if she smoked "weed." When she replied that she did not, he said that she should because it would make her "horny."

The backdrop for these events, as No. 183 acknowledged, was a generally sexualized environment in which "men and women would hang on each other." In one instance, No. 183 saw a male employee "rubbing on" a female employee, and heard him say he couldn't wait to get off work to "attack the pussy." On another occasion, No. 183 saw a male employee and a female employee kissing and "rubbing on each other." The man "took her, spread her legs open, and threw her up on top of the desk" in front of everyone on the business coordination floor. When No. 183 complained to her assistant zone manager about their unprofessional behavior, he replied, "well, the day is almost over."

IPA argues that the conduct No. 183 alleges is insufficiently severe or pervasive to withstand summary judgment. To the contrary, however, the prevailing impression left by No. 183's testimony is that from the moment she began her training at IPA until the moment she quit her job, she was subjected to a near-constant stream of romantic advances, punctuated with a few incidents of more egregious or explicitly sexualized conduct, including the grab of No. 183's buttocks (and accompanying suggestive

remark), and the workplace scenes of simulated sex. One of the factors the court must consider in evaluating whether harassment is severe or pervasive is the degree to which it interferes with the plaintiff's ability to perform her job. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000). No. 183 testified that, on at least one occasion, the colleague who approached her for a date persisted, despite the fact that she was on the phone, presumably in execution of her job duties. Indeed, No. 183 testified that the alleged harassment "interrupted" her work and made her feel uncomfortable.

IPA argues that No. 183 alleges only isolated incidents of misconduct, and further complains (without squarely asserting that No. 183's claim fails for vagueness) that she cannot identify her harassers. The first argument is without merit because taken together, No. 183's allegations depict a stream of disruptive behavior for the duration of her employment. The conduct may not have been as egregious as that alleged by some other claimants, but the court is persuaded that a jury could reasonably conclude that the conduct was inappropriate and pervasive.

IPA's complaint that No. 183 cannot identify her harasser is also of no moment. As the court explained in its discussion of IPA's motion as to Claimant No. 115:

> In this case…sexual harassment is presumed to have been commonplace among IPA's hundreds or perhaps even thousands of employees, most of whose names may never have been known to short-term employees like No. 115. These circumstances need not prevent a jury from determining that in a generally harassing environment, the cumulative effect of the ongoing comments and occasional physical contact to which No. 115 was exposed and the workplace scenes she witnessed was sufficiently severe or pervasive to alter the terms or conditions of her employment.

The same reasoning applies to No. 183's claim. Accordingly, IPA's motion for summary judgment of No. 183's claim is denied.

**Claimant No. 190**

Claimant No. 190 began working at IPA in 1998 and was still employed there as of the date of her deposition, in January of 2005, when she was seventy-six years old. In approximately July of 2003, No. 190 moved first to Los Angeles then to Arizona, and continued to work for IPA out of her home. She testified that she was not sexually harassed after that time. She claims, however, that the years she spent working at IPA's offices in Buffalo Grove, however, were marked by conduct that she believes (and the EEOC asserts) amount to sexual harassment. Her allegations embrace:

1) Sexually hostile or suggestive comments directed at her (e.g., Scott Hanson called her a "fucking cunt," and Fedel St. James told her, "you're a sexy woman and I bet you are good in bed");

2) Sexually explicit or suggestive comments made directly to her about other women (e.g., on multiple occasions, Larry Edwards pointed out female employees and made comments to No. 190 such as, "she's hot. She'd be good in bed and I bet she'd give a good blow job." Edwards would also tell No. 190 that he bought certain female employees clothes so that they would give him blowjobs);

3) Sexually offensive or degrading comments No. 190 overheard (e.g. Dmitri, a manager in the business coordination department, told a woman named Jackie Siegel, "You're only acting like that because you're on the rag," and Dean Kalomiris told Siegel, in front of her colleagues, that she should masturbate if she wasn't getting sex. No. 190 also heard Keith Link make comments about female employees' breasts, and she heard Fedel St. James tell Mary Anderson that her legs and stomach were fat and that she would never get a man);

4) Unwelcome physical contact directed to No. 190 (frequent two-armed embraces by Scott Collins – "[e]very time he saw me he grabbed me. I wouldn't put my arms around him. He would do it to me.");

5) Unwelcome or degrading physical contact No. 190 saw other women subjected to (e.g., she saw Scott Collins and David Soskin hit Gloria Levy on the buttocks—Collins with a clipboard and Soskin with his hand—on multiple occasions);

6) Sexually charged or ambiguous workplace scenes witnessed by No. 190 (e.g., she saw a male employee named Jay Rogers "fondle" a female employee named Oksana Ward, and she saw various male employees approach a business coordinator named Renee on a daily basis, telling her, "Dan Drugan wants you and thinks you're gorgeous"); and

7) Sexually offensive comments and conduct that other female employees reported to No. 190.

IPA argues that No. 190's allegations describe conduct that is insufficiently severe or pervasive to withstand summary judgment. If the specific incidents identified above were the only basis for No. 190's claim, IPA might have a leg to stand on, since these individual instances, even taken together, cannot reasonably be considered to have "pervaded" No. 190's working environment over the course of more than six years of employment, nor is any of them so serious in itself that it could individually render the totality of that time objectively and subjectively hostile. Nevertheless, IPA's argument falters because although No. 190 specifically described only a handful of instances in many of the categories above, she reiterated throughout her deposition that the type of conduct she alleged occurred routinely, using words such as "constantly," "everyday,"

and "always." As the court has previously noted, No. 190's inability to remember or describe each instance of harassment in detail is not fatal to her claim.[54] *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994) (where a claimant alleges a pattern of harassing conduct, she need not recall every instance of harassment with specificity).

Moreover, IPA's assertion that No. 190 alleges primarily "second hand harassment" is incorrect. As the Seventh Circuit made clear in *Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2008), and as the court has reiterated throughout its analysis here and in its previous summary judgment rulings, although harassment that a claimant hears about through rumor or hearsay, but does not directly witness, may properly be termed "second hand" and is generally non-actionable, *id.* at 555-556, comments and conduct to which a claimant is *directly exposed* (i.e., "offense based on hearing or seeing," *id.* at 556) may support an actionable claim, regardless of whether the comments or conduct were directed at the claimant individually. Of the seven categories of allegations enumerated above, only the last is appropriately deemed "second hand" under *Yuknis*. The allegations in the remaining categories properly support her claim.

For the foregoing reasons, IPA's motion for summary judgment is denied as to Claimant No. 190.

### III. CONCLUSION

For the reasons set forth above, IPA's motions for summary judgment with respect to Claimants Nos. 14, 76, 81, 85, 90, 145, 152, 161, and 174 are granted. IPA's

---

[54] In passing, the court notes that the examples set forth above are not exhaustive of the specific incidents No. 190 recounted.

motions for summary judgment with respect to Claimants Nos. 4, 9, 10, 18, 19, 23, 27,

34, 40, 41, 48, 62, 68, 86, 92, 97, 115, 123, 129, 146, 155, 179, 183, and 190 are denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  August 12, 2009