# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 C 4427 |
| | ) | |
| v. | ) | The Hon. Joan B. Gottschall |
| | ) | |
| INTERNATIONAL PROFIT ASSOCIATES INC., | ) | Mag. Judge Morton Denlow |
| | ) | |
| | ) | |
| Defendant. | ) | |

## INTERNATIONAL PROFIT ASSOCIATES, INC.'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT ON THE EEOC'S "PATTERN OR PRACTICE" CLAIM

Dated: November 13, 2009

Myron M. Cherry
Jacie C. Zolna
MYRON M. CHERRY & ASSOCIATES, LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF CASES…………………………………………………………………...ii-iii

INTRODUCTION………………………………………………………………………1

ARGUMENT……………………………………………………………………1-17

A.    The EEOC's Efforts to Avoid the True and Accurate Workforce Numbers
      Derived From IPA's Employment Records Should Be Rejected…………………...1-3

B.    The Court Should Reject the EEOC's False Calculation…………………………...3-7

      1.    The EEOC's "Estimate" of 1,700 Female Employees As The
            Pertinent Workforce Is An Unsupportable Falsehood………………….…3-5

      2.    The EEOC's Estimate of 170 Complaints is Equally Unsupportable………5-7

            a.    The EEOC Failed To Present Any Evidence to Support
                  Its Contention That Non-Claimants Were Subjected
                  to Sexual Harassment…………………………………………...5

            b.    The EEOC Includes Individuals Who Are Barred From
                  Testifying At Trial and Who Asserted Conduct That
                  Is Not Actionable Under Title VII……………………………5-7

C.    The Statistical Analysis In This Case is Compelling and No Other
      Circumstances Warrant a Denial of Summary Judgment………………………..7-10

D.    The EEOC's Response Only Further Demonstrates
      That Injunctive Relief Is Not Warranted ………………………………………10-17

      1.    The Evidence Demonstrates That IPA Has Appropriately
            Handled Recent Complaints of Sexual Harassment and That
            Its Revised Sexual Harassment Policies and Retraining
            Have Been Resoundingly Effective………………………………...11-14

      2.    There Is No Evidence of Any "Ongoing"
            Problems With Sexual Harassment………………………………….14-16

      3.    There is No "Threat" of Continuing Sexual Harassment
            Simply Because Some of the Accused Employees Are
            Still Employed at IPA……………………………………………16-17

CONCLUSION……………………………………………………………………...17-18

## <u>TABLE OF CASES</u>

*Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001)……………………………………..17

*Carlson v. C.H. Robinson*, 2005 WL 758602 (D. Minn. 2005)…………………………………...7

*Cody v. Harris*, 2004 WL 1254129 (N.D. Ill. 2004)…………………………………………....6

*EEOC v. Carrols Corp.*, 2005 WL 928634 (N.D.N.Y. 2005)…………………………1, 6-7, 9-10

*EEOC v. Clayton Residential Home, Inc.*, 874 F. Supp. 212 (N.D. Ill. 2001)…………………...14

*EEOC v. CRST Van Expedited, Inc.*,
611 F. Supp. 2d 918 (N.D. Iowa Apr. 30, 2009)……………………………………...1, 4-5, 8-10

*EEOC v. Custom Companies, Inc.*, 2007 WL 734395 (N.D. Ill. 2007)…………………………17

*EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539 (9th Cir. 1987)…………………………...14

*EEOC v. Gurnee Inn Corp.*, 914 F.2d 815 (7th Cir. 1990)…………………………………….16

*EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997)………………………………...16

*EEOC v. International Profit Associates, Inc.*,
2007 WL 844555 (N.D. Ill. 2007)………………………………………………………….3, 10

*EEOC v. International Profit Associates, Inc.*,
2008 WL 4876860 (N.D. Ill. 2008)………………………………………………………….4

*EEOC v. International Profit Associates, Inc.*,
2009 WL 1956932 (N.D. Ill. 2009)………………………………………………………….4, 8

*EEOC v. International Profit Associates, Inc.*,
2009 WL 2507891 (N.D. Ill. 2009)………………………………………………………….4, 8

*EEOC v. Scolari Warehouse Markets, Inc.*, 488 F. Supp. 2d 1117 (D. Nev. 2007)……………6, 7

*Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722 (10th Cir. 2006)……………………..3

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)………………………………………………..7

*Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C.
v. City of Cleveland*, 478 U.S. 501 (1986)……………………………………………………...1

*NAACP v. City of Evergreen*, 693 F.2d 1367 (11th Cir. 1982)………………………………...14

*Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970)……………………14

*Shafer v. Army & Air Force Exchange Svs.*, 376 F.3d 386 (5th Cir. 2004)………………………17

*Spina v. Forest Preserve Dist. of Cook County*,
2002 WL 1769994 (N.D. Ill. 2002)……………………………………………………...17

*Turner v. Archer-Daniels-Midland Co.*, 2007 WL 2670289 (C.D. Ill. 2007)……………………5

*Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000)…………………………………………3

## INTRODUCTION

No matter how it attempts to spin the numbers, the bottom line is that the EEOC is trying to prove a "company-wide" practice of discrimination against female employees at IPA that under any supportable calculation *did not affect over 99% of the female workforce*.  Under the most recent and analogous case law on the subject, when presented with such evidence no "reasonable jury [could] find it was standard operating procedure at [IPA] to tolerate sexual harassment."  *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 953 (N.D. Iowa Apr. 30, 2009); *see also EEOC v. Carrols Corp.*, 2005 WL 928634 (N.D.N.Y. 2005).

Yet the EEOC insists on setting aside several weeks, if not months, for a needless trial on a claim that is unsupported by the evidence and seeks solely an injunctive remedy that has been rendered moot or otherwise unnecessary.  Indeed, the EEOC has already achieved its primary purpose with respect to the injunctive aspect of this case as IPA has already implemented and followed the policies, procedures and retraining the EEOC redundantly seeks to impose.  The fact that IPA voluntarily implemented these changes is irrelevant, at least in the context of Title VII as the statute's focus is on obtaining voluntary – not court-ordered – compliance.  *See Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 515 (1986) ("We have on numerous occasions recognized that Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII.").

In light of these circumstances, the EEOC should not force everyone to go through a lengthy trial on a "pattern or practice" claim that would serve no purpose other than to unnecessarily punish IPA, waste judicial resources and delay what has always been the primary (only, in fact) focus of the EEOC's case – the monetary damage trials for individual claimants.

## ARGUMENT

### A.     The EEOC's Efforts to Avoid the True and Accurate Workforce Numbers Derived From IPA's Employment Records Should Be Rejected

The EEOC does not, and cannot, dispute the numbers presented in IPA's motion for summary judgment, which demonstrate that that the EEOC's claimants (81) represent a *di minimus* percentage (.56%) of IPA's female workforce during the relevant time period (14,545). In an effort to avoid the statistical analysis that dooms its claim of a "pattern or practice," the EEOC asks the Court to disregard the workforce number derived from IPA's employment records and instead rely on the EEOC's own "estimate" of the workforce (1,700), which is

limited to a 46 month period of time from over a decade ago and contains other qualifications and "estimates" that result in a number that is not just misleading, but outright false.

In asking the Court to accept its false "estimate" of the workforce over the true and accurate number derived from IPA's records, the EEOC argues that (1) IPA's workforce numbers were allegedly not pursued in discovery because IPA purportedly "never indicated that it intended to rely on [them]" (EEOC's Response to IPA's SOF, ¶ 42), and (2) information on claimants prior to November of 1997 and after September of 2001 was allegedly "never made available to [the] EEOC." EEOC's Resp. Brief, p. 5. Both of these assertions are baseless.

First, IPA has maintained since day one that it intends to rely on a statistical analysis to rebut the EEOC's claim of a "pattern or practice." The EEOC's suggestion that it never anticipated this defense does not pass the straight-face test. In fact, just two months ago the EEOC pointed out to the Court that IPA raised its statistical argument at least as far back as 2003 – years before discovery in this case closed. *See* EEOC's Motion to Reconsider (Doc. 691), pp. 4-5 ("IPA failed to remind the Court that it considered making a statistical argument years before *CRST*," citing to a November 26, 2003 court transcript in which IPA's counsel stated "[W]hat I want to do is have someone look statistically in terms of whether or not there was a hostile environment…. For example, if there were one out of a potential 10,000 possibilities, and there is only one that occurred, I think that's very relevant to determine whether or not there was a hostile environment."). Since then, IPA has relied on its workforce numbers on a number of occasions, which for years the EEOC never disputed or challenged in any manner.

Second, the EEOC was never prevented from obtaining discovery or other information outside the time period of November of 1997 to September of 2001. Magistrate Judge Denlow only denied the EEOC's request for further payroll records (an order to which the EEOC never objected), but acknowledged and allowed other avenues that were available to the EEOC for adding claimants, including, but not limited to, IPA turning over to the EEOC on an ongoing basis information regarding internal complaints, which employees the EEOC routinely added to its case throughout the litigation. *See* July 30, 2002 Transcript, pp. 14:19-15:12, attached as Tab B to IPA's Response to the EEOC's Statement of Facts ("IPA's Resp. to EEOC's SOF"); *see also* December 16, 2002 Order (Doc. 122) (granting EEOC's motion to compel post-May 2002 sexual harassment information). In fact, the EEOC routinely pursued and added claimants to its

case who never worked during this limited time period, never received a solicitation letter from the EEOC and were not on the payroll records provided to the EEOC.

In any event, the EEOC's arguments about IPA's workforce numbers are red herring. The numbers presented in IPA's motion for summary judgment are based on employment records kept in the ordinary course of business that could not seriously be disputed in any fashion with further discovery. Moreover, if the EEOC truly wanted to challenge these numbers, it should have filed an affidavit explaining its grounds pursuant to Rule 56(f). *See Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000) (holding that a party opposing a summary judgment motion on the grounds that additional evidence is needed must "file an affidavit outlining his reasons for needing further discovery as contemplated by Rule 56(f)."); *Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722, 732 (10th Cir. 2006) ([Plaintiff's] statements, made in her response brief to [defendant's] motion for summary judgment, to the effect that she 'has not had a chance to review [defendant's] payroll records to determine if the [employee] number represented ... is correct or incorrect,' are obviously insufficient to comply with Rule 56(f).").

In other words, the EEOC's efforts to avoid IPA's true and accurate workforce numbers are not just ill-founded, but, like in *Hackworth*, are also procedurally inappropriate.

**B.    The Court Should Reject the EEOC's False Calculation**

**1.    The EEOC's "Estimate" of 1,700 Female Employees As The Pertinent Workforce Is An Unsupportable Falsehood**

The EEOC's "estimate" of IPA's total female workforce should be rejected as it is baseless and false. To artificially reduce its workforce number, the EEOC argues that the "relevant time period" for determining the applicable workforce should be limited not only to a 46 month time period from a decade ago, but also to those employees who were directly solicited by the EEOC. But the EEOC's case has never been so limited. In fact, the EEOC has maintained throughout this case that the purported "pattern or practice" is "ongoing" to this day. *See, e.g., EEOC v. International Profit Associates, Inc.*, 2007 WL 844555 (N.D. Ill. 2007) ("The EEOC alleges that, *since* at least 1991, [IPA] has engaged in an *ongoing* pattern or practice….") (emphasis added). Discovery was never limited to the time period proposed in its response brief and the EEOC routinely pursued other avenues to obtain claimants. In fact, a large number of the EEOC's current and past claimants worked outside of this time period.

In other words, the EEOC created a false number by *excluding* from the "relevant" workforce side of the equation all female employees who worked at IPA after September of

2001, but *including* in the complainant side of the equation all of its current and dismissed claimants, including individuals who worked in 2002, 2003, 2004, 2005, etc.  See, for example, *EEOC v. International Profit Associates, Inc.*, 2009 WL 2507891, *43 (N.D. Ill. 2009) ("Claimant No. 179 worked at IPA … from August to November of 2003); *id.* at 44 ("Claimant No. 183 worked … in March of 2004); *id.* at 45 (Claimant No. 190 worked as recently as January of 2005); *EEOC v. International Profit Associates, Inc.*, 2009 WL 1956932, *42 (N.D. Ill. 2009) ("Claimant No. 167 worked at IPA … from mid-December of 2001 through mid-March of 2002); *id.* at *45 (Claimant No. 172 worked "at IPA, from January 6, 2003 to February 14, 2003."); *id.* at 49 (Claimant No. 178 worked at "IPA from July 22, 2002 until … August of 2002."); *id.* at 51 ("Claimant No. 180 worked … from September 8, 2003 to April 20, 2004."); *id.* at 54 ("Claimant No. 188 worked … at IPA from August 2, 2004 through approximately December 30, 2004."); *EEOC v. International Profit Associates, Inc.*, 2008 WL 4876860, *9 (N.D. Ill. 2008) (Claimant No. 170 "worked at IPA for four to six months in 2003.").

The EEOC also apparently included in the complainant side of its calculation several past claimants who were dismissed on statute of limitations ground because they worked prior to November of 1997.  In other words, in order reach its "10%" calculation, the EEOC *included* in its number of women who were allegedly harassed both employees who worked prior to November of 1997 and employees who worked after September of 2001, but *excluded* from the workforce side of the calculation all female employees during those time periods.  The EEOC's estimated "calculation," therefore, is not just skewed, it is false.  The EEOC artificially reduces the pertinent workforce by placing an arbitrary time period and other parameters on that number, but imposes no such limitations on the alleged complainants.  The result is a false number that does not at all reflect the true percentage of allegedly affected female employees.

The EEOC cannot have the best of both worlds.  If, as it asserts in its response brief, the "pattern or practice" ended in September of 2001, the alleged conduct of which it complains ended nearly a decade ago and the Court should summarily deny any injunctive relief.  Otherwise, to get an accurate percentage of the workforce represented in this case (which the EEOC has consistently alleged is "ongoing" and includes a number of claimants who worked after the arbitrary September 2001 cutoff used by the EEOC) the Court must use the true and accurate percentage from November of 1997 to the present (.56%), which number is "insufficient

… for a reasonable jury to find it was standard operating procedure at [IPA] to tolerate sexual harassment." *CRST*, 611 F. Supp. 2d at 953.[1]

### 2. The EEOC's Estimate of 170 Complaints is Equally Unsupportable

#### a. The EEOC Failed To Present Any Evidence to Support Its Contention That Non-Claimants Were Subjected to Sexual Harassment

The EEOC does not dispute, nor could it, that only 81 claimants remain in this case. This is the number that should be compared to the total female workforce in calculating the percentage of women who were allegedly subjected to actionable harassment. Like its efforts to reduce the workforce side of the equation, the EEOC's attempt to increase the complainant side of the equation is baseless and disingenuous.

Presumably, the EEOC includes the 81 remaining claimants in its estimate of 170 complainants, which IPA presumed (for purposes of summary judgment only) were subjected to severe or pervasive sexual harassment. *See* IPA's Motion for Summary Judgment, p. 13. With respect to the other 89 purported complainants, the EEOC fails to identify any of these individuals, submit any affidavits from them or introduce any other evidence that would support its conclusion that they were subjected to any sexual harassment (much less actionable sexual harassment) during their employment.

In other words, the EEOC simply asks the Court to assume – without any evidence – that these unidentified women were subjected to sexual harassment during their employment. But "[s]ummary judgment is the 'put up or shut up' moment in a lawsuit, when … [t]he non-moving party must present definite, competent evidence to rebut the summary judgment motion." *Turner v. Archer-Daniels-Midland Co.*, 2007 WL 2670289, *7 (C.D. Ill. 2007). The EEOC's request for the Court to simply assume that these individuals were subjected to sexual harassment does not satisfy Rule 56 and is insufficient to oppose summary judgment. *Id.*

#### b. The EEOC Includes Individuals Who Are Barred From Testifying At Trial and Who Asserted Conduct That Is Not Actionable Under Title VII

The 89 non-claimants should also not be included in the calculation for the following reasons. In its response brief, the EEOC asserts that these non-claimants include "women [who]

---

[1] In addition to all of the above, the affidavit submitted by the EEOC regarding the number of female employees it directly solicited was submitted by a paralegal for the EEOC who was not involved in those efforts or even assigned to this case at the time of those events and, therefore, has no personal knowledge of the matters of which she purports to attest. *See* FED. R. CIV. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge….").

did not show up for their deposition (and were therefore dismissed pursuant to court order) or had claims that did not survive summary judgment." EEOC's Resp. Brief, p. 5. With respect to first category, a process was put in place along time ago that barred any individuals from testifying in this case if they refused to appear for their deposition. *See, e.g.,* February 12, 2003 Transcript, pp. 17:7-12, 18:6-16 (confirming the EEOC's agreement on the record that it will be given an opportunity to reschedule cancelled depositions, but will voluntarily withdraw witnesses who ultimately fail to appear); February 24, 2003 Transcript, p. 10:16-22 (re-confirming the EEOC's agreement that witnesses who refuse to appear for their deposition are "are out [of the case]"); November 26, 2003 Transcript, p. 21:22-25 (Magistrate Judge Denlow reiterating that witnesses who fail to appear at their deposition for a second time "will be barred from testifying."), attached hereto as **Exhibits A-C**, respectively.

Thus, even if the EEOC submitted evidence to support its contention that this group of individuals was subjected to sexual harassment (which it did not), it would be inadmissible at trial and, therefore, could not be considered on summary judgment. *See Cody v. Harris*, 2004 WL 1254129, *3 (N.D. Ill. 2004) ("In ruling on a motion for summary judgment, a court may consider only evidence that would be admissible at trial."). For this reason, the Nevada district court case cited by the EEOC, *EEOC v. Scolari Warehouse Markets, Inc.*, 488 F. Supp. 2d 1117 (D. Nev. 2007), is easily distinguishable. In *Scolari*, the court did not – as the EEOC states in its parenthetical of this case – deny summary judgment based on evidence of 17 claimants out of a potential of 5,200 claimants. EEOC's Resp. Brief, p. 2. To the contrary, the court noted that the EEOC had an additional 500 witnesses "attesting to the hostile work environment at Scolari," which the court stated it will "accept, for now" and "could be further established at trial." *Id.* at 1130-32. Here, unlike in *Scolari*, the EEOC is barred from introducing at trial evidence from any additional witnesses and even if it could, it would still result in a negligible percentage (less than 1%) of IPA's female workforce.

Past claimants dismissed on summary judgment should similarly not be included since they each asserted conduct that, as a matter of law, did not violate Title VII. In *Carrols*, for example, the EEOC submitted 587 affidavits, declarations or statements from female employees who claimed they were sexually harassed. *Carrols*, 2005 WL 928634, *3. In reaching the number of complainants for its statistical analysis, the *Carrols* court reviewed each of these submissions and determined that 333 female employees "allege facts which, if proven, could

constitute sexual harassment" under the Supreme Court's test in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). *Id.* at *3-4. The same should be done here. The process of determining which claimants meet the Supreme Court's test in *Harris*, however, has already taken place through the prior summary judgment motions, which resulted in 81 claimants who alleged facts which, if proven, could constitute actionable sexual harassment.

In any event, thirty (32) claimants were dismissed on summary judgment. Even if – despite the complete lack of evidence submitted by the EEOC – the Court were to add these claimants to the calculation, it would not appreciably increase the number of affected female employees and still result in a percentage (.77%) that is comparable to that found insufficient in *Carrols* and **seven times smaller** than that that found insufficient as a matter of law in *CRST*.

**C.    The Statistical Analysis In This Case is Compelling and No Other Circumstances Warrant a Denial of Summary Judgment**

The 81 claimants in this case represent only .16% of IPA's total workforce and .56% of its female workforce, and the alleged harassers represent only .25% of the male workforce. Put another way, even if all of the EEOC's allegations are true they demonstrate a "practice" that was not followed by 99.75% of the male workforce and did not affect over 99% of the female workforce. Based on the statistics presented in this case, no reasonable juror could conclude that "systemic, company-wide discrimination" existed against female employees at IPA.

Not surprisingly, the EEOC asks the Court to largely ignore the glaringly insufficient numbers that make up its case because, according to the EEOC, "cases which have found a pattern or practice of sexual harassment have not compared the number of victims to the number of women who were not harassed." EEOC's Resp. Brief, pp. 1-2. But none of the cases cited by the EEOC support this statement. There was never "finding" of a pattern or practice in *Mitsubishi* or *Dial* and neither of these decisions even addressed, much less diminish, the importance of statistical evidence in a "pattern or practice" case.[2]

In fact, the only comparable authority on the issues raised in IPA's motion for summary judgment is found in *Carrols* and *CRST*. The EEOC's attempt to "distinguish" these two cases is disingenuous and unpersuasive. Neither of these cases looked to a statistical analysis as a "last

---

[2] The language quoted in the EEOC's response brief from a footnote in *Carlson v. C.H. Robinson*, 2005 WL 758602 (D. Minn. 2005) pre-dates both *Carrols* and *CRST* and was only made in passing in a ruling on class certification completely unrelated to the issues raised in this case. The *Scolari* decision, also cited by the EEOC, is also not helpful to its position for the reasons set forth above on page 6, *supra*.

resort" as suggested by the EEOC. To the contrary the statistical insignificance of the EEOC's case was the crux of both of these decisions. In fact, the *CRST* court expressed surprise at the EEOC's failure to offer its own statistical evidence since "the Supreme Court and the various circuit courts of appeals have long recognized that such evidence is usually an important component of proof in a pattern or practice case." *CRST*, 611 F. Supp. 2d at 953.

Nonetheless, the EEOC asserts that *CRST* is "different" because the claimants in the present case were allegedly "overwhelmingly harassed at one location … and were well aware of the harassment of other women at the company." EEOC's Resp. Brief, p. 4. Not surprisingly, the EEOC cites no evidence to support this assertion. While the physical "location" of the alleged harassment should have little to no legal significance with respect to whether a company's "standard operating procedure" was to tolerate discriminatory conduct, even if it did the EEOC's case is not at all limited to "one location." IPA has two facilities in Buffalo Grove, Illinois and the various departments within each of those facilities are located in completely separate and divided areas. *See* Affidavit of John Burgess, ¶ 9, attached as Tab F to IPA's Resp. to EEOC's SOF. Furthermore, a large number of IPA's employees – more than 50% – work offsite at various locations throughout the country. Id., ¶ 10. The EEOC's case involves claimants from "all" of IPA's various and segregated departments – and several worked at offsite locations around the country. *See, e.g.,* Doc. 436, p. 2 (brief submitted by the EEOC on bifurcation stating that the "EEOC alleges in this case that [there is] severe and pervasive sexual harassment, at all … departments …at IPA").[3]

---

[3] See also, for example, *International Profit Associates*, 2009 WL 2507891, *3 ("No. 10 worked in the mergers and acquisitions department."); *id.* at * 8 (Claimant No. 19 spent most of her employment in the accounting department); *id.* at *13 ("Claimant No. 23 worked as an outside sales representative … out of her home in Lake Zurich, Illinois."); *id.* at *16 ("Claimant No. 34 was employed … in the advisory & intermediary services ("A & I") department); *id.* at *35 (No. 145 "lived in Ottawa, Ontario, and would work as a business analyst from her home."); *id.* at *43 ("Claimant No. 179 worked … out of her home in Pensacola, Florida"); *id.* at *45 ("No. 190 moved first to Los Angeles then to Arizona, and continued to work for IPA out of her home."); *International Profit Associates*, 2009 WL 1956932, *7 (Claimant No. 7 worked in the "coaching department"); *id.* at *14 ("Claimant No. 37 worked at IPA as an administrative assistant"); *id.* at * 24 ("Claimant No. 61 worked … in the quality assurance department"); *id.* at *31 (Claimant No. 107 was "a senior manager [and] worked in the field or from her home"); *id.* at *40 ("Claimant No. 157 worked in the inside sales department"); *id.* at * 41 ("Claimant No. 166 was an outside sales representative … in Florida"); *id.* at * 45 ("Claimant No. 172 was an executive secretary for Valerie Ramsdell, a senior executive at IPA"); *id.* at * 49 ("No. 178 worked as a sales representative for the Norfolk/Virginia Beach area of Virginia."); *id.* at *53 (Claimant No. 187 worked as a business coordinator); *id.* at * 56 (Claimant No. 189 spent most of her employment in the recruiting department).

Moreover, none of the claimants in this case alleged the same conduct and virtually all of them testified that they were unaware of any of the allegations asserted by the other claimants. See examples cited in **Exhibit D**, attached hereto. Therefore, claimants were not allegedly harassed in "one location" and, as demonstrated in the examples set forth in Exhibit D, were almost entirely unaware of the harassment allegedly experienced by the other claimants.

The EEOC's assertion that "the evidence shows that many of the supervisory and managerial employee positions were occupied by men" is similarly unsupportable. EEOC's Resp. Brief, p. 4. The EEOC, again, cites no "evidence" to support this statement and, in fact, knows it to be untrue. As the EEOC is well aware, three of the top eight highest level executives at IPA during the relevant time period were female, and women routinely held other management positions throughout the Company. *See* Affidavit of John Burgess, ¶ 11, attached as Tab F to IPA's Resp. to EEOC's SOF. And of the hundreds of managers that have worked at the Company throughout the relevant time period, the EEOC identifies only five in its response brief that it claims were "repeat offenders" of sexual harassment. EEOC's Resp. Brief, p. 9; s*ee also* Affidavit of Larry Lang, ¶ 4, attached as Tab G to IPA's SOF ("Since November 25, 1997, 396 individuals worked in 'management' positions at the Company.").

The EEOC's recitation of some its more colorful allegations also does not distinguish this case from *CRST*. In fact, the *CRST* court granted summary judgment on the EEOC's "pattern or practice" claim despite the fact that the 146 claimants in that case made allegations that included:

> (1) sexually charged comments; (2) verbal abuse; (3) pornography; (4) graphic stories about sex, including the rape of a child; (5) propositions for sex; (6) urination; (7) exposed penises; (8) masturbation; (9) offensive touching, including unwanted "brushing up," kissing, hugging and patting; (10) crawling into women's bunks uninvited; (11) physical abuse, including punching, kicking, grabbing, fondling and rape; (12) theft of underwear; (13) threats of reprisal if the women did not accede to their sexual demands, including threats that trainees would not graduate to co-driver status; (14) ordering women off of the truck; (15) tossing their belongings out of the cab; and (16) parking the tractor in isolated or otherwise "bad" areas.

*CRST*, 611 F. Supp. 2d at 949. While, like in *CRST*, the colorful allegations asserted by the EEOC in this case may support a claimant's individual claim for damages, the nature of those allegations alone does not support a "pattern or practice" if, like here and in *CRST*, they affected a negligible percentage of the workforce.

Lastly, the court in *Carrols* did not, as the EEOC incorrectly asserts, consider a statistical analysis only after it considered that the case involved 350 restaurants across 16 states. The

*Carrols* court only mentioned this fact in passing and it had little to no bearing on the court's ruling, which focused predominantly on the small percentage of the workforce who asserted actionable sexual harassment claims.  But even if a "dispersed" workforce was relevant, the EEOC's case here, as shown above, involves claimants from different departments located in completely segregated areas, as well as claimants who were dispersed across the country.  The other facts referenced briefly in *Carrols* provide even further support to IPA's motion for summary judgment because, like in *Carrols*, (i) most of the alleged harassers identified in this case no longer work at IPA, (ii) almost all of the EEOC's claimants were unaware of the harassment asserted by the other claimants, and (iii) as this Court previously noted, "IPA has a very high turnover rate," *International Profit Associates*, 2007 WL 844555, *2, and, therefore, contrary to the EEOC's unfounded assumptions in its response brief "there is no basis to conclude … a systematic under-reporting of sexual harassment."  *Carrols*, 2005 WL 928634, *4.

In short, the statistical analysis in this case is compelling and the undisputed evidence contradicts any notion that IPA tolerated sexual harassment as part of its "standard operating procedure."  The conduct alleged by the EEOC affected a negligible percentage of the workforce, was engaged in by an equally negligible percentage of male employees and largely involved non-managerial or lower-level managerial employees.  IPA also had in place policies and procedures for reporting sexual harassment that were significantly upgraded in 2002.  In light of these undisputed facts, no "reasonable jury [could] find it was standard operating procedure at [IPA] to tolerate sexual harassment."  *CRST*, 611 F. Supp. 2d at 953.

## D.    The EEOC's Response Only Further Demonstrates That Injunctive Relief Is Not Warranted

IPA's statistical argument demonstrates that summary judgment should be granted and, therefore, the Court need not even address the alternative argument that the remedy (*i.e.*, injunctive relief) is no longer warranted.  But even if the Court is not persuaded by the fact that the EEOC is attempting to prove a "pattern or practice" of discrimination that did not affect more than 99% of the female workforce, the injunctive aspect of this case should still be dismissed.

As an initial matter, the EEOC "objected" to the undisputable evidence submitted by IPA regarding the cost and efforts relating to its revised sexual harassment policy and retraining because, according to the EEOC, it was purportedly "not produced in discovery."  EEOC's Response to IPA's SOF, ¶ 23.  But this is yet another example of the EEOC wanting its cake and eating it too.  IPA routinely offered this information to the EEOC throughout this litigation in an

effort to potentially resolve any prospective relief in an expedited fashion.  These offers were rebuffed by the EEOC in every instance, as it was always more concerned with increasing its "class" membership as opposed to resolving any legitimate issues with IPA's policies and training.  As Magistrate Judge Denlow noted very early on this case:

> IPA invited the EEOC to work with them and to assist them as they wanted to implement this new policy and procedure, and they never got an affirmative response from the EEOC to doing that.  And if the EEOC really cared about preventing this in the future, then the EEOC should have stepped in and worked and cooperated in that regard to be sure it didn't happen again in the future.

July 30, 2002 Transcript, pp. 14:25-15:7, attached as Tab B to IPA's Resp. to EEOC's SOF.

Despite IPA's repeated efforts to share this information with the EEOC, it expressed a complete indifference to these changes and took no interest in discovery on these matters or other information that it was routinely invited to review.  Indeed, information pertaining to most of the complaint resolutions set forth on pages 6-8 of IPA's motion for summary judgment was produced to the EEOC prior to any discovery cut-off.  Other than contacting the women who submitted the complaints in an effort to get them to join its "class" and assert a claim for monetary damages, the EEOC pursued no follow-up discovery on any of these complaints.  In other words, when presented with evidence during this litigation demonstrating that real and substantial changes have been made at IPA, the EEOC buried its head in the sand like an ostrich and now attempts to use its indifference toward these changes as an excuse for the Court to disregard them.  The EEOC's efforts to ignore these facts should be rejected.  After all, the EEOC is a Government agency bound by its mandate – not a litigant for the sake of litigating.

With respect to the arguments raised in the EEOC's response brief on the injunctive issues, for the following reasons they only underscore how much the Company has changed and the effectiveness of its revised policies and procedures:[4]

**1.    The Evidence Demonstrates That IPA Has Appropriately Handled Recent Complaints of Sexual Harassment and That Its Revised Sexual Harassment Policies and Retraining Have Been Resoundingly Effective**

The EEOC's arguments regarding the effectiveness of IPA's revised policies and retraining are disingenuous.  For example, to support its argument that IPA "failed to handle complaints of sexual harassment appropriately" the EEOC largely relies on deposition testimony

---

[4] The EEOC's argument over the appropriate standard for issuing injunctive relief is largely irrelevant. The "unlikely to repeat the conduct in the future" standard advocated by the EEOC is for all practical purposes no different than the "continuing threat of discrimination" standard relied upon by IPA.

involving complaints that were made to Shelle Bareck. EEOC Resp. Brief, p. 10. But these alleged complaints were submitted in 1997-2001, prior to the implementation of IPA's revised policies and retraining in 2002. *See* IPA's Resp. to EEOC's SOF, ¶¶ 15-21. In fact, Shelle Bareck was replaced as part of these efforts and no longer works at the Company. *See* Affidavit of Larry Lang, ¶ 4, attached as Tab C to IPA's Resp. to EEOC's SOF. In other words, IPA already resolved any complaints the EEOC may have about Ms. Bareck and none of this evidence demonstrates the "ineffectiveness" of IPA's *current* policies and retraining.

Since the implementation of IPA's revised policies and retraining, the EEOC quarrels with only five complaints and does nothing more than quibble and second-guess how they were handled by Ms. Bareck's successors. First, the EEOC relies on the fact that the Court denied summary judgment on the claim of Jennifer Patton because there was a "question of fact as to whether IPA's course of action was reasonably likely to effect a 'definitive end' to Tynes's harassment." EEOC's Resp. Brief, p. 11. But this does not demonstrate that IPA "mishandled" this complaint. Richard Atkinson (Ms. Bareck's successor as Director of Human Resources) conducted a full-scale investigation, demoted Mr. Tynes and reassigned him to work in the field where he would have no further contact with Ms. Patton. *See* IPA's SOF, ¶ 35 and **Tab I-10**. These facts hardly justify the EEOC's conclusion that IPA's current polices are "ineffective."

The only other examples cited by the EEOC involving Mr. Atkinson were two complaints by one of its current claimants, Judy Cannon. One of these complaints involved an alleged incident that occurred off-premises by a non-employee (Oscar Zelaya) that Mr. Atkinson nonetheless still investigated. *See* IPA's Resp. to EEOC's SOF, ¶¶ 5-7.[5] Notably, Ms. Cannon first reported this incident to another employee who, pursuant to IPA's reporting procedures, directed her to the Human Resources Department. *See* Deposition of Judith Cannon, pp. 127:25-129:6. Ms. Cannon also testified that after her complaint was processed she had no further interactions with Mr. Zelaya. *See* Deposition of Judith Cannon, p. 129:10-24.

With respect to Ms. Cannon's other complaint (against Mike Jungles and Norm Carp), the EEOC does not quarrel with the investigation or disciplinary action that was taken, but rather points to a comment made by Mr. Atkinson during the investigation in which he allegedly asked Ms. Cannon's boyfriend why he did not "kick their butts." EEOC's Resp. Brief, p. 11. The fact

---

[5] During this investigation, Mr. Zelaya denied the allegations. *See* Ex. 3 to EEOC's Statement of Additional Facts (IPI 017532-33).

that the EEOC relies on such an insignificant comment only underscores the trivial and petty nature of the alleged complaints it has with IPA's revised complaint processing procedures. Indeed, the evidence reflects that IPA conducted a thorough investigation, issued reprimands and probation to the offending employees and conducted a follow up with Ms. Cannon in which she reported "no further problems."  *See* IPA's SOF, ¶ 34 and **Tab I-9**.[6]

Lastly, the EEOC takes issue with the two complaints handled by IPA's current Director of Human Resources, Larry Lang.  The EEOC does not take issue with the disciplinary action taken in response to these complaints, but rather argues that the documentation "suggests" that Mr. Lang did no "investigation at all."  This assertion is unsupportable and the EEOC knows it. The EEOC asserts that the "Performance Correction Notices" that Mr. Lang used to implement his disciplinary actions indicate that he does nothing more than a "find and replace" on his computer, because they were form documents and contained some of the same language. EEOC's Resp. Brief, p. 10.  But the fact that certain form documents are used as part of Mr. Lang's protocol does not at all demonstrate that "no investigation" was done (it would, in fact, tend to indicate the opposite, *i.e.*, that a standard set of procedures are in place to handle complaints and issue discipline).  It is not at all unusual (and, in fact, is common practice) for employers to use standard disciplinary forms.  More importantly, the EEOC ignores all of the other information in its possession regarding these complaints, such as interview summaries, witness statements, investigation notes and follow-up reports, all which demonstrate that a *thorough* investigation was done.  *See* IPA's SOF, ¶¶ 40-41 and **Tabs I-15 – I-16**; *see also* Affidavit of Larry Lang, ¶ 5, attached as Tab C to IPA's Resp. to EEOC's SOF.

In short, the EEOC's arguments only underscore the trivial and petty nature of its complaints with IPA's current reporting mechanisms and complaint handling procedures.  *See CRST*, 611 F. Supp. 2d at 952-955 (describing the EEOC's various complaints about the defendant's policies and practices as "nitpick[ing]" and rejecting the EEOC's efforts to "excoriate [the] Human Resources Department for failing to make formal findings of fact and, based upon such findings, discipline harassers").  The EEOC's assertion that IPA's revised polices and retraining "have been ineffective" is unsupportable.  To the contrary, "[t]he record contains no evidence that [IPA] consistently fails to properly handle complaints of harassment or

---

[6] Ms. Cannon did <u>not</u> testify that Nick Jones said "Don't fuck with [IPA]" to her boyfriend because of her complaint (as suggested by the EEOC in its response brief), but rather because he had taken certain documents from the file and refused to give them back.  *See* Deposition of Judith Cannon, p. 168:1-15.

discrimination or that its procedures for handling such complaints are basically flawed or consistently ineffective." *Carter v. CTA*, 2001 WL 1035712, *9 (N.D. Ill. 2001).

The fact that IPA revised its policies and retrained its workforce after this lawsuit was filed should not alone warrant the denial of summary judgment. Neither of the cases cited by the EEOC held that injunctive relief must be denied in every instance in which the corrective measures were adopted after the filing of a lawsuit. *See EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1545 (9th Cir. 1987) (stating that on remand the defendant can still prove that "the violation will likely not recur"); *NAACP v. City of Evergreen*, 693 F.2d 1367, 1370 (11th Cir. 1982) (noting that discrimination no longer existed, but was a hiring case and, therefore, noted that "courts have a duty to correct and eliminate the present effects of past discrimination" and that the district court "should fashion an appropriate decree which will be designed to increase the number of blacks in supervisory positions"). As one Appellate Court noted in finding a defendant's post-lawsuit efforts obviated the need for injunctive relief:

> In view of this evidence, we agree with the trial court that no injunction seems necessary or appropriate in this case at the present time. Title VII aims at securing voluntary compliance with the requirements for equal employment opportunities. In enacting the Civil Rights Act of 1964, Congress placed great emphasis on private settlement and the elimination of unfair practices without resorting to the court's injunctive powers.

*Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 429 (8th Cir. 1970).

In light of the substantial time and money already invested in revising IPA's polices and retraining its workforce – and the prompt and consistent manner in which it has handled recent complaints – "the purpose of Title VII will not be advanced further by enjoining [IPA] from doing what it is already not doing, engaging in unlawful employment practices." *EEOC v. Clayton Residential Home, Inc.*, 874 F. Supp. 212, 215-216 (N.D. Ill. 2001).

**2.    There Is No Evidence of Any "Ongoing" Problems With Sexual Harassment**

The EEOC's assertion that "IPA Continues to … Sexually Harass Female Employees" is equally baseless. EEOC's Resp. Brief, p. 7. The EEOC all but concedes that it has no evidence to back up this assertion. EEOC's Resp. Brief, p. 8 ("[I]t would be fundamentally unfair to require EEOC to offer evidence of harassment continuing until the present *** [the EEOC] has no way to contact [recent] employees to find out if they were sexually harassed."). The EEOC's excuses for its lack of evidence are unavailing and disingenuous, as IPA continued to produce

internal complaints of sexual harassment to the EEOC after the close of discovery. *See, e.g.,* April 16, 2006 Letter, attached hereto as **Exhibit E**.

The EEOC also obtained recent internal complaint and a host of other information through its investigation of the charge attached as Ex. 19 to its Statement of Additional Facts. As part of the EEOC's investigation of this charge, it requested and received, among other things, all internal complaints of sexual harassment at IPA since January 1, 2006. *See* Affidavit of Larry Lang, ¶ 14, attached as Tab C to IPA's Resp. to EEOC's SOF. The EEOC's attempt to rely on this charge as "evidence" of an ongoing problem ignores the facts (which, again, are in the EEOC's possession, but omitted from its opposition papers).

With respect to this charge, an IPA employee named Keesha Kimbrew submitted an internal complaint of sexual harassment involving a single alleged incident in 2006 which she claimed another male Business Coordinator touched her leg. Id., ¶ 9. When Ms. Kimbrew told her Assistant Zone Manager, he immediately took her to the Human Resources Department to submit a formal complaint pursuant to IPA's reporting procedures. Id. IPA's Director of Human Resources conducted an investigation, interviewed both Ms. Kimbrew and the alleged offending employee and implemented appropriate disciplinary action. Id., ¶¶ 10-11. At the conclusion of the investigation, the offending employee offered a face to face apology to Ms. Kimbrew and she expressed satisfaction with the way her complaint was handled and resolved. Id., ¶¶ 11-12. Ms. Kimbrew never complained or expressed any further concerns regarding sexual harassment during the remainder of her employment. Id., ¶ 12.

All of this information is in the EEOC's possession, but intentionally omitted from its opposition papers. Notably, the EEOC has taken no action with respect to this charge, nor has it made any finding that a Title VII violation occurred or that IPA's remedial actions were anything but appropriate under the circumstances. The EEOC's reliance on Ms. Kimbrew's charge is misguided and only further demonstrates the effectiveness of IPA's revised sexual harassment policy and reporting procedures.

In short, despite its broad investigative powers and resources, including obtaining recent information through its investigation of Ms. Kimbrew's charge and other avenues, the EEOC could only muster – of the tens of thousands of IPA employees – a *single* individual (Nancy Darsch) from the past *five years* who claims that IPA failed to properly handle her complaints of sexual harassment, an individual who just happens to work for one of IPA's competitors, was on

15

the wrong side of a recent lawsuit filed by IPA and has other serious credibility issues.  *See* Affidavit of John Burgess, ¶¶ 3-8, attached as Tab F to IPA's Resp. to EEOC's SOF.  If the Court is inclined to consider this "declaration," IPA requests pursuant to Rule 56(f) that it be granted leave to depose her so as to demonstrate the falsity of her claims.  The reasons for IPA's request are set forth in the affidavit of John Burgess.  *Id.*

In all events, even if the Court were to accept Ms. Darsch's "allegations," they do not demonstrate that IPA does not *as a matter of practice* follow its revised sexual harassment policy.  At best, it represents a single isolated incident that is not at all consistent with the manner in which IPA regularly handles complaints, as demonstrated by the undisputed evidence summarized on pages 6-8 of IPA's motion for summary judgment.

### 3.    There is No "Threat" of Continuing Sexual Harassment Simply Because Some of the Accused Employees Are Still Employed at IPA

The mere fact that some (but only a fraction) of the accused employees continue to work at IPA does not demonstrate that sexual harassment is "likely to continue."  All of the allegations against this relatively small group of employees occurred long ago (for the most part prior to the implementation of IPA's revised policies and retraining) and none of them have been accused of any harassment for several years.

The cases cited by the EEOC, therefore, are readily distinguishable, as none of them involved a defendant who voluntarily revamped its polices and reporting mechanisms, restructured its Human Resources department, ordered retraining of all of its employees and presented evidence of a long-standing adherence to its revised procedures.  In two of the cases cited by the EEOC, injunctive relief was deemed appropriate because the defendant-employer did not even have in place *any* anti-discrimination policies or grievance procedures.  *See EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990) ("Gurnee had neither an anti-discrimination policy nor a grievance procedure through which employees could complain of sexual harassment; *it is to these deficiencies that the injunctive relief is addressed*.") (emphasis added); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) ("The Meszaroses have offered no evidence to suggest that they no longer will discriminate on account of an employee's religious beliefs; they have instead revoked the company's longstanding accommodation policy…. In these circumstances, we believe that there certainly is a possibility that the discriminatory conduct could persist.").  The remaining cases involved instances in which the plaintiff was still employed by the defendant and/or the policies in place were flawed

or ineffective. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (plaintiff was still employed an defendant ignored its policies); *EEOC v. Custom Companies, Inc.*, 2007 WL 734395, *19 (N.D. Ill. 2007) (policies ignored); *Spina v. Forest Preserve Dist. of Cook County*, 2002 WL 1769994, *2-3 (N.D. Ill. 2002) (plaintiff was still employed and continued to be harassed all the way up to the trial and defendant previously "had no mechanism in place for investigating and remedying complaints of sexual harassment and discrimination prior" and "its existing policies either are not being properly implemented or are ineffective").[7]

Here, IPA undertook significant and costly efforts to revamp its existing policies and reporting mechanisms and retrained its entire workforce. The undisputed evidence summarized on pages 6-8 of IPA's motion for summary judgment demonstrates a long standing adherence to these revised polices. Female employees know where to go to report harassment and IPA for years now has promptly responded to and resolved complaints, notwithstanding the EEOC's nit-picking and petty quibbling over the forms that are used or other trivial matters. Furthermore, other than the one specious accusation made in Ms. Darsch's "declaration" against Ron Rakow, none of the previously accused employees have engaged in any harassment for at least the past 5 years. There are simply no grounds for the EEOC to conclude that this will change in any manner going forward. Under the circumstances, injunctive relief is not warranted.[8]

## CONCLUSION

The EEOC's assertion that "it is impossible to be precise with respect to the numbers in this case" is wrong. EEOC's Resp. Brief, p. 6. IPA's undisputed records provide a dead on accurate number of the female workforce since the applicable limitations period. The EEOC's case consists of 81 claimants and even if it were to include former claimants who are not barred from testifying at trial, the affected female population is still far below 1%. The only two courts

---

[7] The EEOC also argues that it can still obtain injunctive relief despite the fact that all of its claimants no longer work at IPA. While the EEOC cites cases on page 12 of its response brief in which injunctive relief was granted despite the fact that the plaintiffs were no longer employed by the defendant, none of the defendants in those cases raised the argument advanced here by IPA and, therefore, it was never an issue that was decided in those cases. Furthermore, the portion of the quote in *Shafer v. Army & Air Force Exchange Svs.*, 376 F.3d 386, 398 (5th Cir. 2004) the EEOC claims IPA "intentionally omitted" is not at all "helpful to [the] EEOC." EEOC's Resp. Brief, p. 12. The only "*specific class*" represented by the EEOC consists of former employees. *Id.* at 398 (emphasis added).

[8] The EEOC's last request – that it be entitled to a trial on its "pattern or practice" claim despite the "unavailability" of its remedy – is a non-starter. Such a trial would be duplicative and unnecessary. The EEOC will have ample opportunity to attempt to prove the negligence and other elements of its individual claims for damages without the need for a separate trial on that issue.

to have considered this issue found that such a negligible percentage is insufficient as a matter of law to establish a "pattern or practice" of discrimination. Furthermore, in the spirit of Title VII's mandate of voluntary compliance IPA has already accomplished what the EEOC seeks to impose on it again through an injunction. For these reasons, summary judgment should be granted in favor of IPA on the EEOC's "pattern or practice" claim.

Dated: November 13, 2009.

INTERNATIONAL PROFITS ASSOCIATES, INC.,

By:_____/s/ Myron M. Cherry_____
One of its Attorneys

Myron M. Cherry
Jacie C. Zolna
MYRON M. CHERRY & ASSOCIATES, LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
**Attorneys for Defendant**

18

### *CERTIFICATE OF SERVICE*

The undersigned hereby certifies that he served the foregoing **International Profit Associates, Inc.'s Reply Brief in Further Support of Its Motions for Summary Judgment on the EEOC's "Pattern or Practice" Claim** upon:

Ross J. Peters, Esq.                           Jeanne B. Szromba, Esq.
Ross J. Peters & Associates, Ltd.      U.S. Equal Employment
33 North County Street                     Opportunity Commission
Suite 402                                          500 West Madison Street
Waukegan, Illinois 60085                  Suite 2800
                                                         Chicago, Illinois  60661

Dennis P. W. Johnson
Uma Chandrasekaran
Pugh Jones Johnson & Quandt, P.C.
180 North LaSalle Street, Suite 3400
Chicago, Illinois 60601

via electronic filing on this 13th day of November, 2009.


_____ /s/ Myron M. Cherry_____