IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | No. 01 C 4427 |
| MARION TOWNSON, PHYLLIS LOPEZ, and RHONDA PORTER, | ) ) ) | The Honorable Joan B. Gottschall |
| Plaintiffs-Intervenors, | ) ) | Magistrate Judge Morton Denlow |
| v. | ) ) | |
| INTERNATIONAL PROFIT ASSOCIATES, INC., | ) ) ) | |
| Defendant. | ) | |

**REPORT TO THE PARTIES AND THE COURT PURSUANT
TO PARAGRAPH 40 OF THE CONSENT DECREE**

## I.    INTRODUCTION

We were appointed Co-Monitors pursuant to the Decree entered by the United States

District Court for the Northern District of Illinois on March 2, 2011.  Paragraphs 39 and 40 of the

Decree provided:

> 39.    Within one (1) year after their appointment, the Decree Monitors shall
> complete their own review and evaluation of all current employment policies and
> practices that are related to the Statement of Intolerance of Sexual Harassment,
> and shall submit a written report (which shall be a public report) to EEOC, IPA[1]
> and the Court setting forth the following information:

---

[1] International Profit Associates (IPA) changed its name to International Services, Inc. ("ISI") after the Decree was entered, and will be called "ISI" in this Report.

    A.    an assessment of whether IPA maintains or has successfully implemented each specific policy and practice ordered in paragraph 50 below;

    B.    for each policy, procedure or practice outlined in paragraph 50 below that has not been maintained or successfully implemented, a statement discussing the reason for IPA's failure to maintain or implement such policy, procedure or practice;

    C.    an evaluation of the impact of any specific changes made pursuant to this Decree;

    D.    an assessment of the effectiveness of IPA's policies and practices for achievement of IPA's Statement of Intolerance of Sexual Harassment;

    E.    recommendations for any changes to existing practices or programs that the Decree Monitors deem necessary or appropriate for achieving IPA's statement of Intolerance of Sexual Harassment and the terms of this Decree; and

    F.    timetables for implementation and completion of compliance with any of their recommendations, subject to the terms of this Decree.

40.    Thereafter, for the duration of the Decree, the Decree Monitors will be responsible for continuing the review and evaluation of all ongoing employment policies and practices of the Company relating to IPA's Statement of Intolerance of Sexual Harassment and the terms of this Decree, as well as monitoring the impact and effectiveness of their recommendations. The Decree Monitors will continue during this time to recommend revisions or modifications to ongoing employment policies and practices in order to achieve the Statement of Intolerance of Sexual Harassment and the terms of this Decree. At the end of each successive year, the Decree Monitors shall submit an annual public report to EEOC, IPA and the Court setting forth the information described in paragraph 39 herein.

We submitted our report (the "Year One Report") pursuant to paragraph 39 on February 23, 2012. The present report is the report required by paragraph 40 at the end of our second year of work.

We have continued our comprehensive activities on this assignment during the past year. We have had extensive telephone and email contact with ISI's Executive Director of Human

Resources, Jon Andes, who is the principal ISI official charged with responsibility for dealing with us and assuring compliance with the Decree, and we have met with other top Company officials. We have continued our extensive involvement in the training activities we will describe herein. We have been involved in review of ISI's processing of the eight internal complaints of sexual or sex-based harassment or retaliation that have been filed since the last Report, and have occasionally had dealings with complainants who have contacted us directly. With the assistance of a third interviewer, we conducted confidential interviews of 85 of the 320 employees at the Buffalo Grove headquarters during December 17, 18, and 19, 2012 and have tabulated and analyzed the results.

Most of our dealings with the Company continue to be conducted through the Executive Director, Human Resources. Our Year One Report discussed the excellent work that he had done to make the Decree work as intended, and that work has continued throughout the past year. He has been open in his communications with us, has dealt with all internal complaints of sexual or sex-based harassment with a sure hand, has been forceful in communicating with both managerial and non-supervisory employees on areas in which improvement is needed to promote the objectives of the Decree, and has maintained the backing of the Company's top management while taking corrective measures, which occasionally involved long-time and highly placed Company personnel.

## II.    COMPANY RESPONSES TO MONITORS' RECOMMENDATIONS IN ONE-YEAR REPORT

The Year One Report made a series of recommendations, which under the Decree required a formal response from the Company. All were responded to in writing as required by

the Decree and all have been acted upon, sometimes by issuing supplemental communications to employees or managers strengthening existing policies or imposing new requirements.

> **Recommendation:** *We recommend that the Company be attentive to upholding its EEO policy and Policy Against Sexual and Sex-Based Harassment relative to clients.*

This recommendation resulted from information we received in training and elsewhere that the Company occasionally experienced inappropriate demands or behavior from clients or prospective clients. We also learned that the Company gets occasional requests from clients to send only certain types of consultants based on gender, race and/or sexual orientation. While this latter subject is not regulated by the Decree, we reported this fact to the Executive Director, Human Resources. In the course of this year's training, both John and Tyler Burgess addressed participants and strongly emphasized the importance of applying the Company's anti-harassment and nondiscrimination policies to clients even if it results in loss of business opportunities. Additionally, based on our recommendation after the training sessions delivered during the Company's annual meeting held in January 2013, a memorandum from John Burgess to employees regarding how to respond to these inappropriate requests will be drafted and sent before the end of the current quarter.

> **Recommendation:** *[N]ext year the Policy Against Sexual and Sex-Based Harassment [should] be the key training policy, with the general non-harassment Policy being covered secondarily.*

This recommendation was aimed at keeping the Decree-mandated training as specifically focused as possible on the particular problems that had led to the Decree. The Company immediately agreed to "adjust our training program accordingly." This recommendation was implemented smoothly during the training sessions delivered onsite to Buffalo Grove employees. One of the monitors worked with the three trainers at the training done at the Company's annual meeting for field employees to assure that this recommendation was carried out consistently.

4

**Recommendation:** *We recommend that the Company invest the necessary resources and give substantial personnel powers to its Human Resources operation.*

This recommendation resulted from concerns that the Executive Director, Human Resources was overworked as he "faces the need to develop his department, respond to crises, and institutionalize procedures with minimal professional and support staff."

In response to the recommendation, the Company agreed to hire an additional Human Resources Generalist. After various personnel transactions during the year, the Department is now operating with four persons in addition to Jon Andes rather than three. Because of budget constraints, all vacant positions were filled from within.

With respect to the "substantial personnel powers" aspect of the recommendation, effective April 1, 2012, the Company gave the Executive Director of Human Resources final hiring authority on slates of candidates presented by the Director of Recruiting. This was a major step, particularly since it brings the Company into line with human resources practice at many major professional services firms and should be helpful in improving the average qualification of new hires, particularly given the very high level of turnover that is experienced by ISI in its "Business Consultant" positions.

**Recommendation:** *We recommend that by April 1, 2012, the Company consider reassigning [the Benefits Manager] to a position in a different area and that it adopt a policy that no employee in Human Resources be related to any other employee in the Company.*

This recommendation dealt with the fact that the Benefits Manager was the spouse of a high-level manager at ISI and worked in the Human Resources work area. While there were no complaints about this employee's performance, some employees raised concerns that complaints over sexual harassment or other problems might not be kept confidential. The Company reassigned this manager to report to a non-HR manager, although it did not relocate her office. A

memorandum was sent on April 9, 2012 to all employees announcing the reassignment of supervisory responsibility over the Benefits Manager and that she would no longer have any Human Resources responsibilities. After this change was implemented, we have heard no further concerns about confidentiality expressed on this score.

> **Recommendation:** *We recently recommended that the Company consider monitoring the BC Area [the area where the "Business Consultants," who do the initial telemarketing of ISI's services, work] and parking lots where breaks take place much the way employee telephone conversations are recorded. The use of audio and video surveillance would aid in uniformly enforcing and discouraging dress code violations, profanity, inappropriate comments and touching. The Company has agreed to explore these avenues with its security experts and report back to us by April 1, 2012.*

This recommendation arose out of our concern that to the extent behavioral problems of concern to the Decree remained at Buffalo Grove, they were clearly concentrated in the BC work area and to a lesser extent in the parking areas where some BC staff congregated on breaks. In response, ISI has not adopted audio or video monitoring, but proposed to have its long-time security contractor patrol the buildings and the parking lot during break and lunch times with a particular view to observing and reporting violations of the relevant policies. As will be discussed below, we are not entirely satisfied that this has been effective.

> **Recommendation:** *We believe ISI is sorely in need of [an anonymous 800 number for employees to call with complaints of violating the relevant policies].*

Effective April 15, 2012, the Company installed a telephone with an answering machine and an "800 number" in the office of the Executive Director, Human Resources. The Executive Director posted a memorandum to employees explaining this "hotline" and the option of the caller to remain anonymous, and sent the memorandum to all individual employees. Nonetheless, our interviews in December 2012 showed that only about two thirds of employees know of the hotline's existence, and the Executive Director reports that no message has ever been left on it. Of those who knew about the hotline, a substantial proportion, over 40%, did not

6

know that users have the option to remain anonymous. On February 15, 2013 a follow-up memo, which we reviewed, was sent to remind employees about the hotline and the option of anonymity. It has also been posted in four conspicuous areas. As will be discussed in Section V, however, the lack of use of the hotline can be viewed as evidence that the Company's efforts under the Decree are succeeding.

> **Recommendation:** *We recommend that by April 1, 2012, the Company institute a policy that employees who are fired for misconduct related to sexual or sex-based harassment or retaliation will not be rehired under any circumstances.*

This recommendation resulted from several instances of rehiring employees who in a past period of employment had been either terminated or had been the subject of credible allegations of sexual harassment. The Company implemented this recommendation with a memo of March 2012 from the Executive Director, Human Resources to all Directors, Managers, and Hiring Executives, telling them: "It has come to our attention that we have rehired several employees who either left under questionable circumstances or had discipline issues before their initial separation. It is imperative that we are very careful about who we hire, especially if a former employee left under less than positive circumstances." He then set forth, for the first time, clear guidelines on the Company's Rehire Policy. Among other provisions, the new policy provides: "Former employees who had a less than satisfactory work record or who were terminated for any type of involvement with sexual harassment or sex-based discrimination are excluded from rehire consideration. Under no circumstances will former employees be rehired without the review of their case by the Executive Director, Human Resources."

> **Recommendation:** *We recommend that a sign-off on the Dress Code Policy be included in the interviewing process by April 1, 2012.*

This was one of two recommendations that arose out of a discussion in the One Year Report of the Company's efforts to maintain a professional level of dress among employees. The

Company implemented this recommendation, preparing an acknowledgment form that all interviewees and new hires sign, stating: "Should you be hired, you will be expected to follow the policy and report to work in professional clothing. The policy attached has outlined what is and isn't acceptable. Managers will be ensuring that there is 100% compliance, and if you come to work one day wearing something inappropriate or in violation of the Dress Code Policy, you may be sent home, without pay, written up, or in the case of multiple violations, severe disciplinary action, up to and including termination, may take place."

> **Recommendation:** *"We also recommend that the Company's managers, including top managers, make clear the importance of appropriate dress among employees in their own areas and document having done so."*

In response to this recommendation, the Company responded that it would have each manager meet with his or her employees and hand out the Dress Code policy, explain it, and explain the consequences of violation. The Company also committed to meet with managers by April 15, 2012 to explain compliance with the Code. To ensure that managers would take this seriously, the Company established a bonus pool for managers to share, with the following repercussions of Dress Code violations: (1) if there is one infraction among employees under his or her supervision, the manager loses 25% of pool share; (2) if there are two infractions, the manager loses 50% of pool share; (3) if there are three infractions, the manager loses 100% of pool share. Managers were made to sign off on a compliance memorandum. Managers were required to police their area and contact Human Resources for assistance with compliance. Human Resources would have the final say regarding the appropriateness of particular instances of dress. Violations of the Dress Code and manager infractions would be tracked and sent to the Monitors on a quarterly basis.

The Company has followed through on these promises. A Corrected Dress Code Policy was issued April 9, 2012. The Company drafted and had its managers sign an Affidavit of

Compliance with Dress Code Policy Training and Supervision which contained, among other provisions, an acknowledgement that "I understand that it is my responsibility to enforce this policy and impose appropriate disciplinary action for any infractions of this policy," and "I understand that my participation in the bonus program is affected by my compliance with these guidelines for enforcing and ensuring all employees are compliant with the Policy. With the bonus, one reported infraction will cause a 25% reduction in your bonus, two reported infractions will cause a 50% reduction in your bonus, and three or more infractions will cause you to be ineligible for this bonus program."

Human Resources has been tracking Dress Code violations. Employees generally are warned on the first violation unless it is flagrant, whereupon they are sent home. Human Resources reported that in the third quarter, it sent home eleven employees, all in the Business Consultant (BC) area. In that quarter, all four zone managers and all four assistant zone managers lost their bonus, due to Dress Code infractions. In the fourth quarter all four zone managers and all four assistant zone managers lost their bonus. A more formal memorandum is presently in the process of preparation as to the details of how the loss-of-bonus program is applied to managers.

In short, it is clear that the Company has followed through on this issue. However, some managers have not carried out their enforcement responsibilities and have not been held sufficiently accountable. We will discuss the lingering problems that still need to be addressed with respect to the Dress Code in Section V.

> **Recommendation:** *We have encouraged Human Resources to be proactive in underscoring its commitment to a respectful workplace by utilizing [periodic memos to employees] on an ongoing and regular basis to highlight expectations about conduct and adherence to Company policies and to outline acceptable and unacceptable behavior.... We expect an upcoming memorandum to address the use of <u>profanity</u> and/or <u>slurs</u> by April 1, 2012.*

These recommendations were prompted by (1) the fact that turnover in some areas of the Company (especially the BC area) is very high, meaning that there is a need for frequent reminder memoranda and posting of important matters, and (2) information received in employee interviews about the use of foul language and profanity, especially by certain supervisors and managers in the BC area.

As has already been discussed, Human Resources has been active throughout the year in sending memoranda to employees on various subjects. As to profanity and slurs in the workplace, the Company issued a strongly worded reminder memorandum on March 2, 2012. We will comment in Section V about remaining issues in this category.

> **Recommendation:** *Based on our recommendations, Human Resources has also committed to issuing to all employees quarterly reports beginning June 1, 2012 that summarize in general terms the number of sexual harassment and sex-based harassment or related retaliation complaints, the nature of the violations, and disciplinary outcomes.*

Human Resources issued such quarterly reports on July 6, 2012, October 1, 2012 and January 10, 2013.

## III.  PROCESSING OF INTERNAL COMPLAINTS OF SEXUAL HARASSMENT

The Decree requires, and the ISI sexual harassment prevention policy specifies, an internal complaint procedure and also advises persons they may file charges of discrimination with government agencies, including the EEOC.

During the second year of the Decree, one charge was filed with a government agency alleging sexual or sex-based harassment.[2]  In the year since our Year One Report, there have

---

[2]  The employee in question filed the charge with the Illinois Department of Human Rights last month. The charge alleged that she had been discriminated against on the basis of her race, her sex, and her age. It focused on alleged remarks by a supervisor that the employee found racially offensive, but she did mention a single remark by the supervisor using a derogatory reference to women.  She also made an internal complaint to the Company along similar lines.

been eight complaints of sexual or sex-based harassment that were filed pursuant to the Company's internal procedure and generated investigations by Human Resources. This is a substantial decrease from the seventeen complaints that were filed during the first year of the Decree. The Executive Director, Human Resources handled all but one of these investigations; the remaining complaint was investigated by one of his staff. With one exception, pursuant to the Decree and arrangements we made with him, he provided us with his notes of interviews, and then provided us, in advance of carrying out any decision, with his report discussing his conclusions and proposed disposition. (The exception was the recent complaint noted above which appeared to focus on racial rather than sex discrimination and therefore, understandably, was not treated by the Executive Director as subject to the Decree's reporting requirements.) Through this process, we have had a detailed view of the investigative techniques and thought processes involved in all investigations.

In general, we have continued our previous approach of respecting the final judgment as to the course of action taken once we were consulted and had the opportunity to have input with regard to further investigation or discussion that we felt was necessary. This year we rarely found such discussion necessary, a fact that reflects the confidence and skill Mr. Andes has developed in handling these complaints and disposing of them in a sensible and fair manner.

As a result of the eight investigations since our Year One Report, one employee was terminated, and the relationship between the Company and an independent contractor who had provided services to the Company for many years was severed. The remaining six cases were less serious and resulted in warnings to employees and sometimes in the reassignment of employees to assure that future problems would not recur.

In our interviews in December 2012, fewer than 10% of employees interviewed had had any involvement with Human Resources in connection with an investigation of sexual

harassment or related retaliation. Whether or not they had had such involvement in a particular investigation, employees in interviews, with rare exceptions, expressed a notably high level of confidence in the HR Executive Director's performance on matters related to the Decree.

In our Year One Report we noted that "there were instances where we had the impression that had the employee in question been a less prominent producer, the discipline proposed initially might have been more drastic." We did not observe any such pattern this year as to those who were investigated. In Section V below we discuss remaining perceptions of favoritism toward certain "large producers."

Upon resolution of an investigation, complainants are given a written explanation of their right to appeal the disposition of the complaint to the Monitors. (We found that some employees think that the Monitors are the Equal Employment Opportunity Commission, so we had the Company revise the Monitor Appeal Form to make clear that we are not the EEOC.) To date, none of the complainants in the eight complaints has exercised her right under the Decree to appeal to the Monitors from the Company's disposition of her complaint, although one of them (as described above) subsequently filed a charge of discrimination with the Illinois Department of Human Rights, where the charge is pending.

## IV.    TRAINING ON THE COMPANY'S SEXUAL HARASSMENT POLICY

Our Year One Report discussed the extensive first round of training the Company carried out pursuant to Paragraph 50(C)(5) of the Decree. Paragraph 50(C)(6) of the Decree provides for mandatory annual refresher sexual harassment training to all employees, including all officers, managers, and supervisors (including senior managers), and mandatory sexual harassment training to all new employees during employee orientation.

12

The Company and the Monitors were pleased with the work done by Seyfarth Shaw At Work (SSAW) during the first year and have continued to use SSAW for the refresher training with good results. Most of the Monitors' work with respect to training was performed by Nancy Kreiter. She was involved in the planning for this training, and participated on July 26, 2012 in a "dry run" at Buffalo Grove. In September 2012, managers were given a 90-minute live training (four such sessions were held); Nancy Kreiter observed three of them. In September and October, non-managerial employees were given an hour-long live refresher training (twelve such sessions were held); Ms. Kreiter attended five of these. At the Company's annual meeting in Schaumburg on January 19, 2013, three trainers delivered three sessions apiece for the Company's field employees not based in Buffalo Grove; Ms. Kreiter attended three of these sessions and observed all three of the trainers. At the annual meeting there was also a training session for field managers and Buffalo Grove-based managers who missed the onsite training delivered in September 2012. Ms. Kreiter attended that session as well.

SSAW also prepared nine "Webinars" (web-based training seminars) to provide refresher training for field-based employees. Six sessions were held in February 2013 and three were given on March 2, 2013. Ms. Kreiter observed these as well and found they went very well. They were well designed in terms of content, timing, and interactive participation. She offered certain suggestions that the Company and SSAW agreed with and adopted in the course of delivering the sessions. Unfortunately, the Webinars were marred by technical glitches that did not occur during the Year One Training Webinars. Too many people had difficulties logging in online and had only audio access; participants were unable to see the polling results; and the Company was not able to solicit evaluative feedback about the training. It is our understanding that the Company utilized in-house IT resources this year rather than specialized software provided last year by an outside supplier. **We recommend that next year the Company make**

**certain to have the necessary technological support to prevent the flaws that were**
**encountered this year.**

In the Year One Training, there had been several troubling episodes with Director-level executives who attended the training and treated them flippantly and disrespectfully. Mr. Andes and John and Tyler Burgess made their displeasure over this conduct known to these individuals at the time. There was minimal repetition of such conduct this year. However, Mr. Andes still had to reprimand three Directors after the Buffalo Grove training sessions. To prevent any recurrence in subsequent training, Mr. Andes delivered warnings about the importance of the training to Directors before the recent annual meeting. Our impression is also that non-managerial employees this year took the training more seriously than they did last year, and were more respectful and engaged. Some of this can be attributed to their increased familiarity with the subject. SSAW used workbooks in these training sessions and these clearly helped keep trainees focused.

On the negative side, the hour devoted to non-managerial refresher training proved problematic. SSAW specializes in doing interactive training, and limiting the refresher course to 60 minutes forced it into a format more like a lecture. **We recommend that the refresher training required by the Decree during the coming 12 months be 90 minutes in length.**

The aspect of the training that provoked the most resistance concerned the situation in which clients object to having minority, female or gay consultants, or who specifically request flirtatious and/or "hot" females. In such a situation the Company realistically has only two options: give in to the demand or write off the business opportunity. The latter option does not sit well with Directors and field employees who are compensated only if sales take place. However, as described above, at the training sessions they attended, John Burgess and Tyler Burgess emphatically made their view clear that the Company cannot honor requests like this

from clients even if the result is to lose the business. We believe that the planned memorandum from John Burgess regarding how to respond to these inappropriate requests as described above will again underscore this point.

Our employee interviews from December 2012 found the great majority of employees continue to view the training as being useful and as having a positive impact on the workplace. Female employees were particularly likely to comment that the refresher training should continue.

## V. ASSESSMENT OF THE CURRENT SITUATION WITH RESPECT TO CONTROL OF SEXUAL HARASSMENT

All objective evidence suggests that conduct traditionally viewed as sexual harassment within the Company is low. The current challenge to the Company is to better control situations that do not involve overt sexual harassment but which violate the Company's view of acceptable workplace conduct and that contribute to views of employees, especially women employees, that problems still exist.

As discussed above, the number of complaints of sexual harassment or related retaliation declined sharply during the second year – from 17 in Year One to 8 in Year Two. Our interviewees during the December 2012 interviews, during which we spoke to a considerable percentage of the Company's current Buffalo Grove workforce, reported almost no recent sexual harassment to themselves. 91% (49 of 54) female interviewees said they had experienced no sexual harassment; of the five who said they had, only three reported that the harassment had happened since the Decree was entered; and of those three, two reported that the harassment consisted of inappropriate comments that stopped when they protested or complained. Nonetheless, a noticeable percentage of female interviewees (25%) thought that sexual

harassment was still a problem in the Company today at least to some degree. 9% of the female interviewees (5 out of 49) and 3% of males (1 out of 30) reported they had seen someone else being sexually harassed. Only two of these said they chose to report what they had seen.

Awareness of and appreciation of the Company's efforts to control harassment were high among our interviewees. 98% of the interviewees had been through the sexual harassment prevention training and virtually the same percentage found that it was useful, or at least "somewhat" useful. Most of the interviewees, including 87% of female interviewees, felt the training had had at least some positive impact on the workplace. Most interviewees, including 98% of the women, felt their supervisor was effective at least to some degree in keeping the workplace environment free from harassment. Most of them likewise rated their supervisors' professionalism to be acceptable or better, and 40% of them reported that the level of supervisor professionalism had improved since the entry of the Decree (another 50% said it had stayed the same).

Our interviews indicated four areas that are still potential sources of trouble for the company. The first involves dress code violations in the BC area. Human Resources has devoted substantial attention to the dress code over the past year, and progress is apparent, but inconsistent enforcement by BC supervisors who tolerate and perhaps encourage revealing dress by women under their supervision still causes commentary and resentment about inconsistent enforcement and favoritism. We have informally discussed in general terms what we have learned on this subject from our interviews (without revealing any particular source of the information) with the Executive Director of Human Resources, who agrees that enforcement of the policy needs to be tightened and that the dress code bonus problem is not working as it was intended to. John and Tyler Burgess also agree that enforcement needs to be strengthened and that a penalty system for non-enforcement, including loss of pay, will be devised. **We**

16

**recommend that the Company provide us, within thirty days, with a formal plan for increasing the monitoring of compliance with the Dress Code in the BC area, for increasing the level of discipline for first-time and multiple violations, and for holding all mangers accountable.**

The second problem that continued to be reported in our interviews is the use of foul language. A sizeable minority of our interviewees continues to view the Company as a profane workplace environment, although most say that this problem has been decreasing. This is not strictly a sexual harassment or related retaliation problem, but many employees perceive it as such. The most serious aspect of it is that there are still episodes of managers losing their tempers and cursing out employees on the BC floor in full hearing of their coworkers. It is true that as to this problem, the Company has come a long way from previous years, when such behavior on the BC floor by all accounts was routine and widespread. But the progress that has been made in this respect, and the increased expectations that progress has instilled in employees, only makes such outbursts as continue to occur more damaging, particularly when nothing is done to the managers involved.

As in the past, this problem is tied to the nature of the high-pressure work the BCs do. Telemarketing is stressful and high-pressured and a few of the managers whose behavior is most prone to outbursts and aggression are also managers whose areas post the best results. But the Company cannot have it both ways. It has spent large amounts of time and money training employees to behave professionally and emphasizing that those who do not can expect discipline. The persistence of managers in the BC area who behave poorly with impunity undermines these efforts and makes employees mock them. Unless this problem is eliminated, it is a serious concern for the future once the Decree expires.

The Executive Director for Human Resources is well aware of this problem and has been discussing it with the top management of the Company. We commend his efforts, but they do not change the basic reality: the Company to date has been reluctant to take severe measures against a few veteran managers who are deemed to be high producers and whose relationship with the Company's top management goes back many years. A Company that has made as much progress as this one should not find this lingering problem difficult to solve. These episodes are not secret and do not take elaborate monitoring measures to discover. We see no reason why any profane or obscene outburst of this nature on the BC floor by a manager against his supervisees should not be immediately reported and immediately dealt with severely. Nor do we see any reason for not holding the Director or Co-Director of the BC area immediately responsible for continued behavior like this by managers on the floor if it continues. **We recommend that within 30 days the Company provide us with a formal plan to address this issue, including proposed measures as to what actions will be taken if it persists.**

A third area where our interviews reported room for improvement is the performance of security guards with respect to the Company's policy. The Company contracts with an outside service for this function and we have had reports of behavior by security guards, particularly in the parking lot on breaks, engaging in inappropriate behavior which would not be tolerated from Company employees. We have discussed this issue with the HR Executive Director, and he and John Burgess have dealt forcefully with the owners of the security guard firm in question. In turn the owners have told each of their ISI-assigned employees that any incident of inappropriate language or behavior would call for immediate dismissal, no questions asked. Jon Andes also intends to personally train the security guards assigned to ISI.

Finally, our interviews elicited a few complaints that recently hired BCs (the area with the largest turnover) are not taking the training as seriously as veteran employees are. The Company

has committed to strengthening the orientation for BCs who are hired so that they understand the Policy Against Sexual and Sex-Based Harassment and the ramifications of non-compliance.  Mr. Andes will be present to observe, evaluate, and aid in the orientation training conducted by all four HR representatives.

## VI.    CONCLUSION

Despite the above concerns, the big picture should be kept in mind, which is that the Company has made significant progress since the Decree in improving its workplace environment.  Virtually everyone concurs that the environment continues to improve.  Complaints of violations continue to decrease, and investigations into such complaints are filed are well conducted and lead to serious results when the complaints are found meritorious.  The average level of responsibility and professionalism of managers and supervisors has vastly increased.  Employees continue to tell us that they would report violations if they saw them with little or no fear of retaliation and that management would take their complaints seriously.  They continue to express confidence in the Human Resources Department and its Director, and we share that confidence.  When problems persist, they are addressed rather than ignored.

In short, overall, the Decree is working as it was intended to work.  We will continue to monitor the Company's activities carefully during the coming final year of the Decree's existence.

/s/ Nancy B. Kreiter                  
Nancy B. Kreiter


/s/ George F. Galland, Jr.            
George F. Galland, Jr.

Date:  March 4, 2013

# APPENDIX A

## Formal recommendations in the Year Two Report

1. We recommend that next year the Company make certain to have the necessary technological support to prevent the flaws that were encountered this year [in the "Webinars" that were used to satisfy certain training obligations of the Decree]. (See pp. 13-14.)

2. We recommend that the refresher training required by the Decree during the coming 12 months be 90 minutes in length. (See p. 14.)

3. We recommend that the Company provide us, within thirty days, with a formal plan for increasing the monitoring of compliance with the Dress Code in the BC area, for increasing the level of discipline for first-time and multiple violations, and for holding all mangers accountable. (See pp. 16-17.)

4. We recommend that within 30 days the Company provide us with a formal plan to address [the issue of taking appropriate and consistent action in response to inappropriate language and public conduct by supervisors in the Business Consultant area], including proposed measures as to what actions will be taken if it persists. (See p. 18.)

<u>CERTIFICATE OF SERVICE</u>

Lisa Mecca Davis certifies that she caused a copy of the foregoing Report to be served upon all counsel of record, by this Court's electronic-filing system, this fourth day of March, 2013.


/s/ Lisa Mecca Davis
Lisa Mecca Davis